DOUGHERTY, RYAN, GIUFFRA, ZAMBITO & HESSION
Attorneys for Claimants/Defendants/Third Party Plaintiffs
131 East 38th Street
New York, New York 10016
Phone: (212) 889-2300
Facsimile: (212) 889-1288

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------------X
ROBERT SECKERS, HENRY MARINE SERVICES and
PAUL FLECKER,                                                Index No: 09 Civ. 3512

                              Plaintiffs,

              -vs-

THE CITY OF NEW YORK,

                              Defendants.
----------------------------------------------------------------------------X

# PLAINTIFFS' POST-TRIAL MEMORANDUM IN SUPPORT OF AN AWARD FOR SALVAGE

By: James E. Ryan
Craig M. Flanders
James E. Mercante
Justin T. Green

<u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION.................................................................................................... 1

I.  **SALVAGE AWARDS**............................................................................ 2
    A. **Purpose of Salvage Awards**.......................................................... 2
    B. **Determination of Award Amount**................................................. 4

       i.   *Blackwall Factors*.................................................................. 4
      ii.  *The 1989 Salvage Convention*............................................... 5
     iii.  *High/moderate/low order distinction only made after*
          *analysis of the facts under Blackwall/1989 Convention* 7
      iv.  *Scope and limitations of a factor based framework*.................. 8
       v.  *The factors as ingredients for a Cost-Benefit Analysis*................ 10
      vi.  *Life and Property*.................................................................. 11

II. **APPLICATION OF BLACKWALL AND THE 1989 SALVAGE CONVENTION**
**FACTORS TO THE RESCUE OF THE *BARBERI***.................................... 12

    A. **Salvor's "Measure of Success" in Rendering Salvage Services**............... 12

       i.   *Arrested  drift across the harbor and prevented*
          *running aground*................................................................ 13
       ii.  *Expediting the BARBERI's return to the St.*
          *George terminal*.................................................................. 16
      iii.  *Calming the Crew and Passengers down &*
          *Providing direct medical assistance*...................................... 20

    B. **The Value of the Property Saved**................................................... 22

       i.   *Value of the salved vessel was of the highest order in this case*.......... 22
      ii.  *Liability Salvage*.................................................................. 24

    C. **Degree of Danger from which lives and property are rescued**................. 28

       i.   *Defining and applying "nature and degree of danger"*............... 28
      ii.  *At the time that the DOROTHY J. began to render salvage*
          *services, the BARBERI and passengers were exposed to*
          *substantial harm, injury and other negative results*................... 32
          ▪ **Imminent Exposure to Running Aground**
            **On the Brooklyn Shore**............................................ 33
          ▪ **Exposure to Structural Snapping, Yielding or**
            **Fracturing of the Starboard Side Saloon Deck**............... 36
          ▪ **Exposure to Further Damage to the Interior,**
            **Engine and Propulsion Unit from Hazardous Loose Debris**... 42

i

■ Danger of Collision with other Vessels.............................. 43

C.  Availability of Other Aid................................................ 44

D.  Labor & Expenses Incurred by the Salvors............................ 48

    i.  *Scope of "labor and expenses" under* <u>Blackwall</u>....................... 48

E.  The Value of the Property Risked or Employed by Salvor,
    and Degree of Danger to which this Property was Exposed ...................... 51

    i.  *Value of the DOROTHY J. on October 15, 2003*......................... 51
    ii.  *Risks to the DOROTHY J. in rendering the salvage services*............. 53
        ■  **Risk of Broaching or Swamping**................................ 53
        ■  **Exposure to Engine or Mechanical Failure**.................... 54
        ■  **Risk of Propeller Fouling**.................................... 55
        ■  **Physical damage from loose debris and
        colliding against the *BARBERI***.............................. 55

F.  Danger to the Salvors...................................................... 56

    i.  *Risk to Salvors*.......................................................... 56
    ii.  *Risk of liability*......................................................... 59

G.  Promptitude, Skill & Energy of the Salvors............................. 60

    i.  *Salvage Services were Performed with a high
    degree of promptitude and energy*.................................... 60
    ii.  *Salvage Services Demonstrated an Extremely
    High Degree of Skill by DOROTHY J.'s crew*....................... 64

III.  **INTEREST**................................................................. 68

CONCLUSION........................................................................ 69

DOUGHERTY, RYAN, GIUFFRA, ZAMBITO & HESSION
Attorneys for Claimants/Defendants/Third Party Plaintiffs
131 East 38th Street
New York, New York 10016
Phone: (212) 889-2300
Facsimile: (212) 889-1288

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------X
ROBERT SECKERS, HENRY MARINE SERVICES and
PAUL FLECKER,                                                    Index No: 09 Civ. 3512

                                        Plaintiffs,

                        -vs-

THE CITY OF NEW YORK,

                                        Defendants.
--------------------------------------------------------------------------X

# PLAINTIFFS' POST-TRIAL MEMORANDUM IN SUPPORT OF AN AWARD FOR SALVAGE

### INTRODUCTION

Claimants Robert Seckers, Henry Marine Services and Paul Flecker respectfully submit this Post-Trial memorandum of Law to support their application for an award for the services they performed to aid the Staten island ferry *ANDREW J. BARBERI* following its October 15, 2003 crash into a concrete pier in Staten Island.  Claimants submit that the salvage services provided to the *ANDREW J. BARBERI* after its crash were of the highest order and the greatest value to the City of New York.  The evidence at trial shows conclusively that after alliding with a maintenance pier at full speed, the 3,300 ton, 300 foot ferry, began drifting, not under command with a swift current and wind across the Stapleton Anchorage and the New York shipping channel, thereby exposing the vessel and its passengers to a great danger.  The

1

catastrophic damage sustained by the *ANDREW J. BARBERI* in the crash also put its superstructure and its passengers at great risk of further damage and injury.

Despite never before  having encountered a situation like this, the mate on the *DOROTHY J.*, Robert Seckers, and her crew, including deckhand Paul Flecker, reacted immediately and with extraordinary skill, while placing their $900,000 vessel and themselves at substantial risks to render assistance to the *BARBERI*, a vessel exponentially larger than the *DOROTHY J.*, valued at $14,000,000 after the casualty.  As a result of the efforts of Seckers and the crew of the *DOROTHY J.*, the ferry's southerly drift was arrested, they expedited its return to the berth by more than 20 minutes, provided first aid to the passengers and helped the *BARBERI's* crew and passengers remain calm throughout the emergency.  These efforts saved lives, prevented further injury to passengers, further damage to the *BARBERI*, and helped the Defendant avert millions of dollars in additional costs and potential tort liability.

Applying the factors to determine the amount of an award for marine salvage established by the landmark <u>Blackwall</u> case and the 1989 Salvage Convention which are discussed below, the actions of Seckers, Henry Marine and Flecker merit a very substantial reward for what they did to help the *BARBERI* after the crash and the benefit their actions provided to the City of New York.

## I.    SALVAGE AWARDS

### A.  Purpose of Salvage Awards

An award for salvage service is inextricably linked to the history and public policy considerations upon which the law of Marine Salvage is founded.  Marine Salvage is one of the oldest principles of law in American jurisprudence.  Indeed, the practice of rewarding salvors spans from the Rhodian Law of the Sea (around 900 B.C.) and Roman law, to the Rules of

Oleron, one of the first codes of Maritime Law, in 1150 A.D.  See Benedict on Admiralty, THE

LAW ON SALVAGE, Volume 3A, 7th Edition, 1992 (herein "Benedict," which gives a detailed

history on the "origins of salvage").   Courts reviewing salvage cases abandon all of the

traditional notions of remedies under the common law, as salvage awards are outside common

law remedies.   Chief Justice John Marshall once distinguished common law and salvage

remedies as follows:

> If the property of an individual on land be exposed to the greatest peril, and be
> saved by the voluntary exertions of any person whatever; if valuable goods be
> rescued from a house in flames, at the imminent hazard of life by the salvor, no
> remuneration in the shape of salvage is allowed. The act is highly meritorious, and
> the service is as great as if rendered at sea. Yet the claim for salvage could not,
> perhaps, be supported. It is certainly not made. Let precisely the same service, at
> precisely the same hazard, be rendered at sea, and a very ample reward will be
> bestowed in the courts of justice.

Mason v. Blaireau, 1904 WL 1124 * 17 (1804).

The core purpose of salvage awards is "the encouragement of seamen to render prompt

service in future emergencies." Kimes v. U.S., 207 F.2d 60 (2nd Cir. 1953).  Such assistance is

considered vital to the success of the maritime industry as a whole.

> That has been so from the time of the Roman law downwards. The maritime law,
> for the purposes of public policy and for the advantage of trade, imposes in these
> cases a liability upon the thing saved, a liability which is a special consequence
> arising out of the character of mercantile enterprises, the nature of sea perils, and
> the fact that the thing saved was saved under great stress and exceptional
> circumstances. No similar doctrine applies to things lost upon land, nor to
> anything except ships or goods in peril at sea.

Falcke v. Scottish Imperial Insurance Co., 1885 F. 1145, 34 Ch. D. 234, 248-49, Ct. App. (1887).

In addition to American jurisprudence, International Salvage Law stresses the

"encouragement" policy.   See, e.g., International Convention on Salvage, Apr. 28, 1989

(hereinafter "1989 Convention," the preamble of which reads "convinced of the need to ensure

that adequate incentives are available to persons who undertake salvage operations in respect of

vessels and other property in danger"). Therefore, salvage awards must be substantial enough to rise to the level of inducing future mariners to render assistance to save life and property at sea. See Lago Oil & Transport Co., Ltd. v. U.S., 232 F.2d 238, 240 (2nd Cir. 1956) ("a stingy award to a salvor contravenes public policy").

**B.  Determination of Award Amount**

The size of a salvage award is soundly within the discretion of the court.  Sobonis v. Steam Tanker National Defender, 298 F.Supp, 631, 639 (S.D.N.Y. 1969). Courts exercise this discretion on an *ad hoc* basis, after reviewing the facts and circumstances of each case. See, e.g., Jones v. Sea Tow Services Freeport NY Inc., 30 F.2d 360 (2nd Cir. 1994); The Connemara, 108 U.S. 352, 359 (amount of salvage to be awarded "is largely a matter of fact and discretion which cannot be reduced to precise rules, but depends upon a consideration of all the circumstances of each case").

**i.  *Blackwall* Factors**

The Court's review of the facts and circumstances of a marine salvage is implemented within the flexible framework of a factor-based test.  The factors are sometimes collectively referred to as the "ingredients" making up a salvage award.  See, Gilmore and Black, THE LAW OF ADMIRALTY § 8-8, 2nd Edition, 1975.  The elements of a salvage award are often referred to as the Blackwall factors after the often cited 1869 United States Supreme Court salvage case. The Blackwall, 77 U.S. 1, 9 (1869) See, e.g., Jacobson v. Panama R. Co., 266 F. 344, 345 (2nd Cir. 1920) (applying "Blackwall factors" test). The Court's application of all the Blackwall factors is non-discretionary.  See Benedict at § 244 (stating that all Blackwall factors "must be considered" by the court).  The Blackwall case identified the following factors in assessing an award for salvage services:

> 1) The labor expended by the salvors in rendering the salvage service; 2) the promptitude, skill, and energy displayed in rendering the service and saving the property; 3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; 4) the risk incurred by the salvors in securing the property from the impending peril; 5) the value of the property saved; and 6) the degree of danger from which the property was rescued.

The Blackwall, 77 U.S. 1, 9 (1869).

### ii. The 1989 Salvage Convention Factors

The centuries old common law Blackwall test was updated under U.S. law in 1996 when the 1989 Salvage Convention became binding upon the United States. See International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 193. As a self-executing treaty, the 1989 Convention became the "supreme law of the land" in the United States on July 14, 1996, without the need for implementing legislation from Congress.  U.S. Const., Art. VI § 2; See, Warshauer v. Lloyd Sabaudo S.A., 71 F.2d 146, 148 (2nd Cir. 1934).  The factors for determining a salvage award under the 1989 Convention are:

> 1) The salved value of the vessel and other property; 2) the skill and efforts of the salvors in preventing or minimizing damage to the environment; 3) the measure of success obtained by the salvor; 4) the nature and degree of the danger; 5) the skill and efforts of the salvors in salving the vessel, other property and life; 6) the time used and expenses and losses incurred by the salvors; 7) the risk of liability and other risks run by the salvors or their equipment; 8) the promptness of the services rendered; 9) the availability and use of vessels or other equipment intended for salvage operations; and 10) the state of readiness and efficiency of the salvor's equipment and the value thereof.

The 1989 Salvage Convention adopted all six Blackwall factors, with the exception of Blackwall factor number two, which was modified to add the words "and life" (clearly showing an intent to include lives saved in an award for marine salvage). See The 1989 Salvage Convention at Art. 13(1)(e). The 1989 Convention also adds the following four factors to the original six Blackwall factors:

1) The skill and efforts of the salvors in preventing or minimizing damage to the environment;
2) The measure of success obtained by the salvor;
3) The availability and use of vessels or other equipment intended for salvage operations; and
4) The state of readiness and efficiency of the salvor's equipment and the value thereof [1]

See The 1989 Salvage Convention at Art. 13(1), b, c, i & j.

Where a treaty prescribes rules by which a private right is determined, the court is bound to apply the treaty, just as it would a statute. Edye v. Robertson, 112 U.S. 580, 598-599 (1884). Inexplicably, the U.S. courts have all too often neglected to consider the Salvage Convention of 1989 in their analysis of salvage cases, despite its binding force and effect. Indeed, only a handful of salvage cases since 1996 have even made any reference to the 1989 Convention. See Davies, Martin J., *Whatever Happened to the Salvage Convention of 1989?* JOURNAL OF MARITIME LAW AND COMMERCE, 39 J. Mar. L. & Com. 463, 464-65, FN. 6 (2008). The phenomenon of ignoring the binding law of the 1989 Salvage Convention may be explained by the simple fact that as a self-executing treaty, it did not need to be codified and therefore may have been "lost in the shuffle." Id. at 464. Nonetheless, the Second Circuit Court of Appeals has recognized the authority of self-executing salvage treaties in the past. See, Warshauer v. Lloyd Sabaudo S.A., 71 F.2d 146, 148 (2nd Cir. 1934) declaring that the Brussels Salvage treaty of 1910 "[a]s a declaration of the views of the great maritime nations, the treaty needs no 'implementation' by legislation. We are not at liberty to make new law in the face of that declaration"). As a result, some judges have openly admonished those American courts that have failed to apply self-executing salvage treaties. See, e.g., Westar Marine Services, v.

---

[1] This final factor covers the degree of readiness of professional salvors' equipment. The instant matter does not involve professional salvors, so this factor will not be discussed herein.

Heerema Marine Contractors, S.A., 621 F. Supp 1135 (D.C. Cal 1985) (applying Brussels Salvage Treaty of 1910).

Although the factors in the 1989 Convention overlap in some instances with the Blackwall factors, the Convention was "not a futile exercise of codification."  To the contrary, the 1989 Convention "wrought substantive changes to the law of salvage," which the court is therefore bound to apply in the case at bar.  See Davies, Martin J., *Whatever Happened to the Salvage Convention of 1989?* Journal of Maritime Law and Commerce, 39 J. Mar. L. & Com. 463, 464-65.

### iii.   *High/moderate/low order distinction only made after analysis of the facts under Blackwall/1989 Convention*

Many courts have generally grouped awards into the amorphous categories of "high order," "moderate order" and "low order," with no particular limitations or requirements for each category.  See, Texas Co. v. Texas & Gulf S.S. Co., 263 F. 868, 878 (5th Cir. 1920).  The terms "low order," "moderate order" and "high order" are a *post hoc* means for referring to certain groups of cases.  In the case at bar the Court has suggested that a preliminary determination of whether the salvage service is "low order," "moderate order" or "high order" may affect the relative weight the court gives to each of the factors in the factor-based analysis.  *See Tr. p. 806, lns. 9-16*.   The high/moderate/low order categories are loose connotations given to a salvage case *after* the court reaches a conclusion under the Blackwall/1989 Convention factor analysis is done.  These categories are not preliminary determinations that affect the relative weight of the factors under the Blackwall/1989 analysis.  Mississippi Valley Barge Line Co. v. Indian Towing Co., 232 F.2d 750, 753 (5th Cir. 1956) (holding "since life's variables defy repetition, today's 'low order' situation may present much different concerns than tomorrow's. The category itself is too elastic to think that once identified as such, the result or solution must be inflexible"). In fact,

the U.S. Supreme Court has held that where analyses of the factors concur, a liberal award must be given despite any preliminary perception of the perceived value of the services.  Cope v. Vallete Dry Dock Co. 119 U.S. 625, 628 (1887).  Courts approaching the factor-based analysis are guided by the policy that "compensation must be sufficiently liberal to induce valuable [vessels] to turn aside willingly, and without hesitation, to aid vessels in distress; but not so large as to lead disabled steamers to run unjustifiable risk of life and property, rather than incur the costs of salvage assistance." The Veendam, 46 F.489 S.D.N.Y. (1891); Jacobson v. Panama R. Co., 266 F. 344 (2nd Cir. 1920).

### iv.  Scope and limitations of a factor based framework

The factor-based test is designed so that the courts have flexibility in their *ad hoc* review of the facts and circumstances of each case.  The Phoenix, 62 F. 487, 496 (4th Cir. 1894) (noting the "elasticity of the law of salvage"). As a result, salvage jurisprudence approaches any attempts to apply rigid standards or rules with skepticism and often outright rejection.   Given the unique nature of each maritime emergency which gives rise to a salvage award, "no two salvage cases are exactly alike." The Dania, 70 F. 398, (2nd Cir. 1895). Therefore, with respect to the amount of the award at least, courts are bound not to treat other salvage cases as binding precedent. Waterman S.S. Corp. v. Dean, 171 F.2d 408 (4th Cir. 1948) ("precedents in salvage cases are not strictly controlling").   Nonetheless, salvage jurisprudence still serves as important "guide posts" for setting an award when reviewing the facts specific to a given marine salvage. See, e.g., The Neto, 15 F. 819, 820 (D.C. Fla. 1883) (looking at cases "if not parallel in all respects, yet are sufficiently similar to assist somewhat"); Strachan Shipping Co v. Cities Service Transport Co., 42 F.2d 524, 534 (Dist. Ct. S.C. 1930) (holding that other salvage cases remain "useful in indicating the opinion of learned and experienced judges in similar matters and assisting the court in refraining from going to too great an extreme either of generosity or parsimony").

8

Historically, courts awarded salvage as a percentage of the value of the property salvaged. The Egypt, 17 F. 359, 367 (D.E.V.A 1883) ("it was the habit of admiralty courts for centuries to estimate their awards of salvage by the proportions of the value of the property saved").  However, given the unique nature of each salvage case, the courts long ago abandoned the approach of borrowing percentages from other cases when assessing an award, mainly because of concerns that such percentages added rigidity to the flexible-by-design system.  *See* The Baker, 25 F. 771 (2nd Cir. 1886). Nonetheless, many courts, including courts within the Eastern District of New York, have expressed "lump sum" awards as a percentage within a given case that is derived after analyzing the facts within the Blackwall paradigm.  See, e.g., Kittelsaa v. U.S., 756 F. Supp. 845, 847, E.D.N.Y. (1948) (awarding 5% of the value of the salved vessel to the salvors after analyzing Blackwall factors); Margate v. M/V Ja Orgeron and U.S., 143 F.3d 976, 990 (5th Cir. 1998) (awarding a "customized percentage" derived from analysis of five of the six Blackwall factors, excluding "value of the salved vessel," and then applying that percentage to the value of the salved vessel to determine award).

A thorough, factor-based analysis, of the services rendered by Mate Robert Seckers, Henry Marine and the crew of the *DOROTHY J.* to the ferry *ANDREW J. BARBERI* on October 15, 2003 establish that they were of the highest order.  Even if this was not so, as "guideposts," the Court should note that even cases generally categorized as "low order" salvage,  fetch substantial salvage awards. See, e.g., B.V. Bureau Wijsmuller v. U.S., 702 F.2d 333 (2nd Cir. 1983) (upholding award of $635,000 for salvage of a vessel valued at $6,480,000, despite a finding that the skill displayed was merely average);  See, e.g. Lewis v. JPI Corp., No. 07-20103, 2009 WL 3761984 (S.D.Fla. November 9, 2009) (awarding 5% value for salvage that consisted of only 10-15 minutes of minimal labor); Triplecheck, Inc. v. Creole Yacht Charters Ltd., No.

05-21182, 2007 WL 917276 (S.D.Fla. 2007) (awarding 5% value where salvage consisted of pumping out water from boat, and no imminent danger was present); Miami Yacht Divers, Inc. v. M/V All Access, No. 06-61729, 2007 WL 2484309 (S.D.Fla. 2007) (awarding 5-10% of value for low level salvage that consisted of 30 minutes of salvage effort); Providenza DiGirolamo v. C. Malone Trucking, Inc., 211 F. Supp. 660, 661 (U.S.D.C. Mass. 1962) (awarding $1,875 in salvage for merely towing $7,500 power boat drifting in open sea and in no imminent danger); Kacpryzynski v. Lenhart, 1957 WL 87352, (Dist. Ct. Conn. 1957) (granting salvage award of $2,250 for fishing boat that towed drifting boat worth $18,000 to safety in calm waters in Long Island Sound).

The Fifth Circuit Court of Appeals has stated:

> Salvage at sea may and often does call for the performance of exciting acts of great bravery to rescue lives or property from the jaws of a near and certain doom. But it need not, for the aim of salvage is to save. To aid before it is a do-or-die wager with high risks, high stakes, and high rewards, assures the greatest likelihood of recovery at the least peril. Maritime salvage is not reserved for the hero alone. Its generous but judicious liberality is to encourage mariners instinctively to respond to need- be it great or small, drab or spectacular.

Mississippi Valley Barge Line Co. v. Indian Towing Co. 232 F.2d 750, 755 (5th Cir. 1956).

Indeed, courts have specifically rejected the notion that a nominal award is sufficient for "low order" salvage. Burke v. U.S., 96 F. Supp. 335, 338 (S.D.N.Y. 1951); Nicholas E. Vernicos Shipping Co. v. U.S., 223 F. Supp 116, 120 (S.D.N.Y. 1963); Texas Co. v. Texas & Gulf S.S. Co., 263 F. 868, 878 (5th Cir. 1920);

### v. The factors as ingredients for a Cost-Benefit Analysis

Liberal salvage awards under the Blackwall/1989 Convention analysis are rooted in a firm economic justification by prominent legal scholars. See William M. Landes & Richard A. Posner, *Salvors Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and*

*Altruism*, 7 J. LEG. STUD. 83 (1978) (the theory of economic justification for an award is referred to herein as "Judge Posner's cost-benefit analysis").

The economic paradigm for synthesizing the facts of a salvage case are broken down into a simple "cost-benefit" analysis as follows:

> 'The purpose of [court-granted] salvage awards is to encourage rescues in settings of high transaction costs by simulating the conditions and outcomes of a competitive market.' In an ideal world, every meeting of salvor and salvee would result in a freely negotiated contract for salvage services priced at a competitive level.  In the real world, however, most meetings of salvor and salvee cannot be resolved in this fashion.

> To accommodate this reality, the law of salvage aims to create a post-hoc solution that will induce the parties to save the ship without first agreeing on terms… In order to properly to induce the salvor (and salvee) to act, however, the law must provide for a proper and reasonable salvage award, one that gives neither the salvor too little incentive to do the salvage properly, nor the salvee too little reason to care if his property is saved

> By definition, this "efficient" fee is the one that would have been reached by the parties through voluntary negotiation in an open and competitive market, and its value will depend on a number of factual considerations…In a voluntary agreement between salvor and salvee, therefore, as in any agreement between arm's-length parties in any context, the twin considerations of cost and benefit will form the poles of negotiation between which any fair bargain must be struck

<u>Margate Shipping Co. v. M/V. Ja Orgeron</u>, 143 F.3d 976. 986-987 (5th Cir. 1998) (internal citations omitted), <u>citing</u>, William M. Landes & Richard A. Posner, *Salvors Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism*, 7 J. LEG. STUD. 83 (1978).

Therefore, Judge Posner's explanation of salvage, in economic terms as adopted by the Fifth Circuit in <u>Margate</u>, allows Courts to view the Blackwall/1989 Convention factors as a roadmap to determine an economically "efficient" award considering all of the "costs" to the salvors and the "benefits" to the salvee.

### *vi. Life and Property*

Defendants attempt to have the Court avoid considering the human elements of this tragedy, by concentrating attention solely on the property involved in the case, the ferry and the

tug boat.  Nonetheless, the policy of "encouragement," as discussed herein, clearly encompasses the saving of both "life" **and** "property."  The saving of human life from marine peril has always been squarely within the parameters of marine salvage awards.  See, e.g., *Mason v. Blaireau*, 1804 WL 1124 *18 (1804) (describing that salvage law is underlied by the policy that "the general interests of society require that the most powerful inducements should be held forth to men, to save *life* and property.").   In fact, Justice Clifford, the author of the Blackwall opinion itself, clearly states that a salvage award is meant "as an inducement to seaman and others to embark in such undertaking to save *life* and property." The Blackwall, 77 U.S. 1, 10 (1869) (emphasis added); see, also, Margate, 143 F.3d at 987 ("the Blackwall factors plainly intend to guide in a rational process of determining and weighing the costs and benefits of the particular transaction that the award chosen will give the proper inducement to the saving of *life* and property").  Similarly, the 1989 Convention explicitly incorporates the value of saving life into a salvage award.  See 1989 Salvage Convention § 13(1)(e)(listing "skill an efforts of the salvors in salving the vessel, other property and *life*" as one factor for an award).   Congress has also evidenced a clear intent to reward mariners who prevent injury or save lives in the course of a salvage operation.  See 46 U.S.C.§ 80107(a) (creating statutory right to share in a salvage award, for those that render assistance to prevent injury or death in a marine disaster). Therefore, a court reviewing a salvage claim involving great risk to life and limb to passengers aboard the salved vessel must account for the rescue of persons, in addition to property, in making its salvage award.

## II.   APPLICATION OF BLACKWALL AND 1989 CONVENTION FACTORS TO THE RESCUE OF THE *BARBERI*

### A.  Salvor's "Measure of Success" in Rendering Salvage Services

The 1989 Salvage Convention added the factor of the "measure of success obtained by the salvor" to the traditional Blackwall factors for a salvage award. See The 1989 Salvage Convention at Art 13(1)(c). Under the common law, the "degree of success" of salvage was best measured by the value of the salved property after the salvage, which as discussed below is quite substantial. See, e.g., Evanow v. M/V/ Neptune, 163 F.3d 1108 (9th Cir. 1998) (finding that degree of success in salvage cases is measured by the extent to which there is "preservation of the property for the benefit of the owner"). As discussed below, "liability salvage" is also one measure by which the Court should determine "success" under this factor.

In addition to the post-salvage value of the *BARBERI* and the liability averted by the Defendant, City of New York, "degree of success," according to its plain meaning, may be measured by the positive results proximately obtained by the services of the *DOROTHY J.* The *DOROTHY J.*'s service proximately resulted in: 1) arresting the *BARBERI*'s drift across New York Harbor to the Brooklyn shore; 2) hastening the *BARBERI*'s return to the St. George slip by at least 21 minutes, while 3) providing crowd control and direct medical attention to the passengers aboard the *BARBERI*.

### i. Arrested drift across the harbor

But for the actions of the *DOROTHY J.*, the *BARBERI* would have drifted in a southeasterly direction through the Stapleton Anchorage and the Verrazano Narrows shipping channel and run aground on the Brooklyn shore. Instead, she was stopped a few hundred yards from the maintenance pier she struck in the allision. Captain William Clifford, an expert in navigation and a licensed pilot with 30 years experience navigating and piloting ships in New York Harbor, estimated that if the *BARBERI* had been allowed to drift, the wind affecting *BARBERI's* massive sail area and rapid current running with the ebb tide would have caused the

vessel to travel at a speed of 5 knots[2] in a southeasterly direction. *See Cl. Ex. 17; Tr. p. 380, ln 24 – p. 381, ln 1. (Clifford)* ("5 knot speed, not the maximum but probably the speed it would reach").  Based on precise measurements, using a to-scale navigational chart, Captain Clifford, calculated that the *BARBERI,* drifting with the wind and the current conditions for twenty minutes, would have likely ended on or near the Brooklyn shoreline. *See Cl. Ex. 17; Tr. 372, lns 9-14 (Clifford).*  Captain Clifford calculated the estimated distance of drift (herein "estimated drift point") and accordingly marked this distance on the chart. *Cl. Ex. 17.*

The credible testimony at trial established that the vessel was indeed drifting for more than 20 minutes.  Captain Gansas testified that the *BARBERI* drifted "not under command" for 21-22 minutes after the allision. *Tr. p. 1022, ln. 1 – ln. 25 & p. 1054, lns. 10-13 & p. 1078, lns. 5-8. (Gansas)* (twenty minutes from time he entered Staten Island Pilothouse until he took control of vessel plus a minute and a half to get to Staten Island Pilothouse).  The testimony of Gansas regarding the 21-22 minute time of the drift is corroborated by the testimony of Mate Seckers, Deckhand Flecker, Engineer Druda and Captain Clifford.  *Tr. 61, ln. 12. (Seckers); Tr. p. 264  (Flecker) & Tr. p. 745, ln. 20 – p. 746, ln. 8 (Druda)* (Druda estimates 1.5 minutes before *DOROTHY J.* arrived at *BARBERI* combined with 20 minutes Flecker estimates from time *DOROTHY J.* arrives until power restored to New York pilothouse); *Tr. 373; ln. 23 - 374 ln. 24 (Clifford)* (20 minutes or so of drift based on time it would physically take to do the acts that *DOROTHY J.* performed).   Therefore, taking the likely speed of drift estimated by Captain Clifford and consistent testimony regarding the time the *BARBERI* drifted, the estimated drift point is more likely the outermost (i.e. to the right of the chart) red line which appears on the navigational chart marked by Captain Clifford. *Cl. Ex. 17.*

---

[2] A "knot" is a measure of speed in "nautical miles per hour."  1 knot (aka "nautical miles per hour"= 1.15 land miles or 2,025 yards/ hour.

The testimony at trial shows that the *BARBERI* actually reached only a few hundred yards from the maintenance pier. *Tr. p. 1062, lns. 13-20 (Gansas)* (*BARBERI* only made it as far as 300 feet off the pier); *Def. Ex. 21, p. 5 (NTSB report)* (*BARBERI* went "several hundred yards into the harbor"). Yet the estimated drift point of the *BARBERI* had the *DOROTHY J.* not rendered any services was fully across the harbor, over 1.5 miles away at or near the Brooklyn shore. *See Def. Ex. 17.*   The undisputed testimony at trial was that neither the *BARBERI*'s propulsion nor its steering  was in use during its period of drift, and therefore the *BARBERI* itself could not have been combating the southeasterly force of the wind and current during this time period. *Tr. p. 1019, ln. 24 – p. 1022, ln. 11 (Gansas)* (stating that he did not want to engage drive pitch or any other controls in Staten Island Pilothouse because of fear it would cause damage); *Tr. p. 558, ln. 22- 559, ln. 10 (Gherardi)* (stating that engines at idle immediately after the accident and not increased until after control taken in Staten Island end house); *Def. Ex.  p. 30, ln. 24 - p. 31, ln. 3 (Covella)* (stating that drive pitch was at zero immediately after accident). The trial testimony establishes that the *DOROTHY J.* completely arrested the southeasterly drift of the *BARBERI* by attaching and pulling on a soft line at the damaged end of the ferry, and subsequently by pushing the *BARBERI* from its New York end.   *Tr. 748, lns. 8-10 (Druda); Tr. p., 43, lns. 3-6 & p. 47, lns. 3-6 (Seckers); Tr. p. 299, lns. 13-24 (Flecker).* Therefore, the credible evidence confirms that the only motive force counteracting the wind and current's effects on the *BARBERI* during this twenty plus period of time were the efforts of the *DOROTHY J.* pulling and then pushing the boat to stop its southeasterly drift. This evidence confirms the testimony at trial about the assistance provided to the stricken ferry by the tug and her crew. *See generally, Tr. p. 26 et. seq. & p. 237 et. seq. (Seckers and Flecker)* (detailing the various actions taken to arrest the southeasterly drift of the *BARBERI*).   Consequently, distance saved between

the "actual drift point" (a boat length or two off the maintenance pier) and the "estimated drift point" (at or near the Brooklyn shore) was saved solely by the efforts of the *DOROTHY J.*

### ii.   Expediting the BARBERI's return to the St. George Terminal

Captain Gansas testified that once the *BARBERI* had regained power it took approximately 4-5 minutes for the *BARBERI* to return to the slip traveling at approximately 4-5 knots.  *Tr. p. 1047, lns 10-12 and p. 1074, ln. 2  (Gansas).*  As the court has stated in this case, the question then becomes how long would it have taken for the *BARBERI* to return to the slip but-for the actions of the *DOROTHY J. (Tr. P. 848, ln: 21   & p. 849, ln.3).*  The time that it would have taken the *BARBERI* to return to St. George terminal from its estimated furthest drift point at or near the Brooklyn shore can be calculated according to the following formula:

$$\text{Time} = \text{Distance} \div \text{Speed}$$

The court is asked to take judicial notice of this equation, which was used by Captain Clifford in making several of his calculations in this case.  *Tr. p. 382, lns. 7-13 (Clifford)* (stating "speed x time = distance travelled"; therefore time = distance ÷ speed).

The testimony establishes both the "distance" that the ferry would have drifted but-for the efforts of the *DOROTHY J.* (i.e. the "estimated drift point") and the "speed" at which it could have returned to its eventual berth at St. George terminal.  Therefore, a simple calculation under the formula listed above will provide the estimated time it would have taken for the *BARBERI* to return to its berth from the estimated drift point, that is the position it would have reached but for the tug's intervention.  As previously noted, the estimated drift point of the *BARBERI* in the wind and current conditions is reflected by a redline marked "5 knots" and "20 minutes" by Captain Clifford on the navigational chart of the area.  *Cl. Ex 17 (Chart).*  The return distance from this

estimated drift point to the place the *BARBERI* actually berthed is approximately 1.6696 nautical miles.[3]   The uncontroverted testimony at trial discloses that even when propulsion was returned, Captain Gansas did not increase the engines speed above idle because he feared that increasing the speed could cause further damage on the ferry or injury to the passengers. *Tr. P. 1047, ln. 16; p. 1048, ln. 13 (Gansas); Tr. p. 560, lns. 9-15 (Gherardi)*.   With the engines at idle and with the *DOROTHY J*. pushing in a northerly direction to offset the wind and current, the *BARBERI* traveled at approximately 4-5 knots while returning to the Ferry slip. *Tr. p. 1048, ln. 12 (Gansas)*.

Using the distance and speed both at 4 knots and 5 knots to calculate the time required to travel the distance from the estimated drift point 1.6696 miles away from the berth establishes that an accurate estimated time for the *BARBERI* to return to the slip from its estimated drift point would be 20-25 minutes.[4]   The testimony at trial discloses that the *BARBERI* returned to its slip from its actual drift point in 4 to 5 minutes.   *Tr.  p. 1073, ln. 24 –  p. 1074, ln. 2 (Gansas)*. Therefore, <u>but for the efforts of the *DOROTHY J*. the *BARBERI* would have returned to the berth at least 16 - 21 minutes *later* than it actually did</u>. [5]

The distance and speed figures used above are demonstrably fair and conservative estimates.   First, these numbers assume that *BARBERI* could have been maneuvered back to the slip under its own power alone.   However, the testimony at trial established that the engine

---

[3] Using the scale in the bottom right corner of Cl. Ex. 17,  1 nautical mile = 7.1875 inches using a standard 12 inch ruler.  Again using a standard 12 inch ruler, a measurement from the estimated drift point (i.e. the outermost redline) to the eventual berth to be 12 inches. The eventual berth was the one indicated by Robert Seckers (and uncontroverted at trial) as marking #7 of Cl. Ex. 20.   To convert this number to distance one calculates 12 inches (the return distance)/7.1875 (# of scale inches per nautical mile) = 1.6695 nautical miles.

[4]  At 4 Knots: 1.6695 nautical miles/4 nautical miles an hour=.4173 hours (or 25.038 minutes).  Alternatively at 5 Knots: 1.6695 nautical miles/5 nautical miles an hour=.339 hours (or 20.034 minutes).

[5] Notably, this figure is consistent with time frames reflected in other testimony.  If the *BARBERI* had returned to the maintenance pier at the same speed it drifted away (i.e. 4-5 knots) it would obviously take 20 minutes (or the exact same time to get back to where the drift began).  But the drift began at the maintenance pier that was some 600 yards south of the *BARBERI*'s eventual berth at St. George terminal.  This additional distance would easily add several minutes to the trip.  Therefore, the estimate of 20-25 additional minutes comports with the combined testimony of Gansas and Clifford.

revolutions were never increased above idle after the allision until several months later, after the vessel was repaired at GMD shipyard. *Tr. P. 1047, ln. 16; p. 1048, ln. 13 (Gansas); Tr. p. 560, lns. 9-15 (Gherardi).* Furthermore, as discussed in section "IIC" below, the credible evidence shows that the propulsion systems and integrated control systems of the Voith Schneider units were substantially damaged in the crash and in need of repair. As a result, it is unknown whether the *BARBERI* could have returned to its slip at all without the tug's assistance, or how long it would have taken if it was capable of doing so.

Captain Clifford marked the estimated drift at 5 knots taking into account the time it would have taken for the *BARBERI* to accelerate to that speed with the wind and current. *Tr. p. 380, ln. 17 0 p. 381, ln. 5 (Clifford).* To reflect the buildup of speed, Captain Clifford marked an estimated drift point after ten minutes at 3 knots, which he considered to be the minimum speed of drift directly after the allision. *Tr. p. 380, ln. 17 0 p. 381, ln. 5 (Clifford)* (stating *BARBERI* "would be increasing speed if it was not stopped right there"). Captain Clifford also testified that in his opinion 5 knots was the likely, although not the maximum, speed the *BARBERI* would have drifted in the southeasterly direction. *Tr. p. 380, ln 24 – p. 381, ln 1. (Clifford)* ("5 knot speed, not the maximum by probably the speed it would reach").

In addition, the calculations made above assume that the *BARBERI* would have returned from its estimated drift point in a direct reverse course without needing to turn the vessel in the arc it actually used in order to line up with the slip. In reality, the *BARBERI* returned from its actual drift point in a long sweeping northerly movement into the harbor before lining up to be directed into the slip. *Tr. p. 1087, lns 5-14 (Gansas).* The combination of these factors, would indisputably have increased the return time from the 20 to 25 minutes estimated above.

Finally, it is a matter of simple physics that the *BARBERI* would not have been able to reach a speed of 4-5 knots with its engines at idle traveling on its own from the estimated drift point.  In reality, the actual speed of the boat would have been substantially reduced by the wind and current.  The force of the current would carry the boat along with it.  The entire body of water and anything in it would move with the current.  This phenomenon is similar to a person walking the opposite direction on a moving walkway in the airport.  One would not make any headway if he or she merely walked at the same speed as the walkway was moving.  Similarly, a vessel pushing against a 4-5 knot speed into a wind with the current pushing it 4 -5 knots in the other direction, would not make any headway even though its engines were set to run at 4 to 5 knots.  A speed of 4-5 knots from the position near the maintenance pier could only have been achieved with the *DOROTHY J*. pushing and holding the *BARBERI* into the wind and current as the ferry it headed back to the slip.  *See* *Tr.  p. 51, ln. 4 – p. 52, ln. 5 (Seckers)*.  Without this added assistance, the *BARBERI* would have necessarily 1) returned at a lower rate of speed than 4-5 knots made, thus increasing the return time to travel the distance from the estimates made above, or alternatively  2) Captain Gansas would have had to increase the RPMs of the engines, despite his concerns about the safety hazard this maneuver would present, thus exposing the vessel to further damage to increased engine vibrations in the choppy waters and increased danger to the passengers.

Therefore, in addition to expediting the ferry's return time by 16-21 minutes by holding the *BARBERI* at the actual drift point instead of the estimated drift point across the harbor, the *DOROTHY J*. enabled the *BARBERI* to return more quickly by holding the *BARBERI* into the wind and current so as to minimize their affects on the ferry as it returned to the slip at St. George terminal.  *See* *Tr.  p. 51, ln. 4 – p. 52, ln. 5 (Seckers)*.  Captain Gansas testified that he

never attempted to increase the speed of the *BARBERI* while he was returning, because of fear that increasing the engine speed could cause further damage to the *BARBERI*.  *Tr. p. 1047, ln. 16 - p. 1048, ln. 13 (Gansas)*.  By pushing the *BARBERI* north, the *DOROTHY J*. enabled the ferry to reach a 4-5 knot actual speed into the wind and current without having to increase its engines above idle.  Clearly,  the *BARBERI*  would not have been able to return to the slip but for the *DOROTHY J*.'s additional assistance.

### iii.   *Calming the Crew and Passengers & Providing direct medical assistance*

The salvage services commenced immediately as the *DOROTHY J* got underway to render assistance.  See Reynolds Leasing Corp. v. Tug Patrice McAllister, 572 F. Supp. 1131, 1134 (S.D.N.Y. 1983) (stating that "[t]he act of salvage need not be so dramatic and need not consist of rendering physical services").   Indeed, the Courts have held that the mere act of standing by a vessel in distress, and providing assurance to the vessel's crew constitutes a compensable salvage service.  The Pendragon Castle, 5 F.2d 56, 57 (2nd Cir. 1924).   As one Commentator has stated "[b]eing assured of aid at hand is of help to the salved ship as her crew is enabled to put forth redoubled efforts with their minds relieved by the thoughts of being left to their fate." Benedict at § 26.

Here, several witnesses testified that the mere presence of the *DOROTHY J*. made them feel more safe and secure.  Specifically, the tug's presence reassured the crew of the *BARBERI* and provided a sense of security.  *Tr. p. 1052 lns 10-19 p. 1087, ln. 25 - p. 1088, ln. 5 (Gansas)* (where *BARBERI*'s Captain states he "felt a sense of relief….because I knew someone was helping me"); *Def. Ex. 96, p. 84, lns 4-16 & p. 34, lns 6-10 (Covella)* (Chief Engineer describes how he saw the tug as he came above deck immediately after the accident & then was able to turn attention to helping passengers).

In addition, the testimony at trial disclosed that the terrified and panicked passengers were greatly relieved when they saw the tug alongside the *BARBERI*. *Tr. p. 326, lns. 1-4 (Downey)* (Where passenger on board the ferry stated that after seeing the *DOROTHY J.* arrive alongside the ferry he was "relieved that there's going to be some help, you know, to get us to safety"). Moreover, the crew of the *DOROTHY J.* succeeded in calming the passengers and reassuring them that help had arrived and that things were under control. *Tr. p. 47, lns. 16-25 (Seckers)*. In addition, the *DOROTHY J.*'s crew boarded the *BARBERI* and provided direct medical aid to injured passengers with the use of a first aid kit, blankets and sweatshirts. *Tr. p. 47, lns. 16-25 (Seckers); Tr. p. 257, ln. 7 (Flecker)*.

The value of returning to the *BARBERI* to the slip up to 21 minutes earlier cannot be overstated. The Court has agreed with the proposition that the time of exposure to a given risk has a directly proportional relationship to the likelihood that the risk will occur. *Tr. p. 813, lns 21-25*. In other words, the greater the time of exposure to risk of harm, injury or negative result, the higher the likelihood that the harm injury or negative result will occur. Id. The "measure of success" of the salvage services is directly correlated to the extent to which the services removed the dangers which the *BARBERI* faced. These dangers are discussed at length in Section II C.

Nonetheless, by reducing the time that it took for the *BARBERI* to return to its berth, the salvage services substantially reduced the risk of: further injuries and/or fatalities to passengers, damage and injury from loose and hazardous debris, damage and injury from buckling or fracture of the saloon deck, and the decks above it, exposure to drifting in a busy shipping channel, running aground on the Brooklyn shore and exposure to other risks which resulted from the crash, including the catastrophic conditions. Moreover, by preventing the *BARBERI* from

drifting across the harbor, the *DOROTHY J.* substantially reduced the *BARBERI*'s exposure to extensive risks to harm, injury and/or negative results which that might have caused.   In addition, the mere presence of the tug, and the actual verbal and physical assistance rendered by the crew of the *DOROTHY J.* significantly reduced the substantial dangers to the safety and the well being of the *BARBERI'S* passengers.

**The Value of the Property Saved**

   *i)      Value of the salved vessel was of the highest order in this case*

   The case at bar involves a unique vessel with one of the highest values in the history of salvage cases ever recorded within the Second Circuit and indeed, in the entire United States. See Margate Shipping Co. v. M/V JA Orgeron, 143 F.3d 976, 995 (5th Cir. 1998) (comparing nine highest salvage awards in U.S. history up to that date). The post-salvage value of the *BARBERI* is stipulated to be **$14,000,000**. Comparatively, the two highest salvage awards ever given within the Second Circuit involved salved vessels valued at $6.5 million and $1.15 million respectfully.  See Usatorre v. Comania Argentina Navegacion Mihanovich, Ltd., 64 F. Supp. 370, S.D.N.Y 1945, reversed on other grounds, 172 F.2d 434 (2nd Cir. 1949); B.V. Bureau Wijsmuller v. U.S., 702 F.2d 333 (2nd Cir. 1983).   The "value of property saved" component is comprised of the value of the saved vessel, plus the value of the vessel's cargo.  Nicholas E. Vernicos Shipping Co. v. U.S., S.D.N.Y. (1963).  Courts measure the value of cargo in addition to the value of the vessel, because saved cargo represents the best measure of potential liability of the saved vessel's owner, who is potentially liable to shippers in the event of lost or damaged cargo.  Moreover, the value of the saved vessel, after salvage, constitutes one of the primary benefits accruing to the owner under Posner's cost-benefit analysis.  Consequently, since the

value of the saved vessel here was so high, the value of the salvage services to the City of New York was great.

The Court suggested at trial that the "value of the property saved" is not particularly relevant if the *BARBERI* was eventually found to be in danger of sinking.  *Tr.  p. 964  lns. 15-23*. Salvage jurisprudence and statutory and international salvage law is entirely devoid of any requirement that a salvaged vessel be in danger of sinking or total loss in order for the value of the vessel to have relevance to the amount of the award.  Courts routinely give substantial salvage awards where vessels are exposed to dangers other than sinking. See, e.g., The Mercer, 297 F. 981 (2nd Cir. 1924) (vessel merely adrift & not taking on water); See McNabb v. O.S. Bowfin, 565 F. Supp. 22, 24 (W.D. Wash. 1983) (awarding maximum amount under parties stipulated high-low agreement for "low grade salvage service of a high value property); The Gallego, 30 F. 271 (E.D.N.Y. 1887) (holding that "the first thing which one considers is the value of the property which has been saved" and awarding over 5% where ship merely lost use of its rudder and power and hull were completely sound); see, also, Triplecheck, Inc. v. Creole Yacht Charters Ltd., No. 05-21182, 2007 WL 917276 (S.D. Fla. 2007); Providenza DiGirolamo v. C. Malone Trucking, Inc., 211 F. Supp. 660, 661 (U.S.D.C. Mass. 1962).

Moreover, the "value of the saved vessel" is an independent element from the "degree of danger" and one is not a necessary predicate to the other. See, generally, 1989 Convention and Blackwall.  Indeed, the value of the saved vessel is routinely considered by legal experts to be the most important factor in the factor-based analysis.  See Gilmore and Black, The Law of Admiralty at § 8-8  (referring to value of property salved as "unquestionably the most important" factor).   Indeed, many courts accord the "value of saved property" factor the greatest weight in

determining a salvage award.  See, e.g., Margate, 143 F.3d at 976.  In that case, the Fifth Circuit

has opined:

> The general economic reality is simply that, the greater the value of the threatened
> property, the greater the potential loss, and, consequently, the more the salvee
> would be willing to pay to save that property from destruction. To approximate
> properly the incentive that the salvee himself would offer, it follows that the law
> of salvage must generally grant its highest awards where the property has highest
> value.

Id.

In light of the particular facts and circumstances of this case, the $14,000,000 post-salvage value

of the *BARBERI* is very strong evidence of a "high-order" salvage services performed here.

### ii)   *Liability Salvage*

The *res* of the property saved extends beyond physical property to include the "averted

liabilities" of the owner of the salved vessel.  Jurists refer to the practice of measuring property

value in terms of potential liability as "liability salvage."  See Michael Kerr, The International

Convention on Salvage 1989- How it Came to Be, 39 INT'L & COMP. L.Q. 530 *et. seq.* (1990).

The concept of "liability salvage" includes averted liability in tort to third parties that were saved

from personal injury or death.  See Reis v. One Schat Harding Lifeboat No. 120776 No. 1, 444 F.

Supp. 2d 553, 558 (D.S.C. 2006) (holding "by taking the lifeboat under tow, the Plaintiffs

removed the SKS TORENS from potential liability from claims for damage or injury").

Specifically, courts have explicitly held that "liability salvage" should be included as one of the

"ingredients" in a salvage award under the General Maritime Law where the salved-vessel

owner's "petition for limitation"[6] has been defeated.  See Allseas Maritime, S.A. v. M/V

Mimosa, 820 F.2d 243, 247 (5th Cir. 1987) (adopting averted liability standard and stating that

---

[6] Certainly familiar to this Court, "Limitation" under Limitation of Liability Act , where it applies, sets an overall
ceiling on the amount of total recovery a claimant can collect for personal injuries in tort occurring on a vessel. 46
U.S.C. § 30505(b).  If limitation applies, claimants are limited in their recovery to the value of the vessel after the
accident.

the only reason that averted third party liability did not enter into calculating the award was because "limitation" rules would be applied to all potential future claims).

No American court has reviewed the applicability of "liability salvage" since the 1989 Convention took effect in 1996, so in this respect, the applicability of "liability salvage" here is a matter of first impression for this Court.   Foreign courts, however, have specifically held that "liability salvage" should be considered under the 1989 Salvage Convention, despite not being specifically enumerated in the Salvage Convention factors.   See United Salvage Pty. Ltd. V. Louis Dreyfus Armateurs, S.N.C. (2006) 163 F.C.R. 151 (Austl.), aff'd. (2007) 164 F.C.R. *183 (Austl.)* (examining history of 1989 Convention drafting in detail and concluding that "[t]he Court should consider that the factor of potential exposure to third party liability operates generally to inform the fixation of the global figure, which results from the evaluation of criteria listed in Art. 13 [of the 1989 convention]").

U.S. law governing treaty interpretation supports the application of "liability salvage" under the 1989 Convention.  The United States Supreme Court has held that "[w]hen a treaty provision fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be inferred." See Nielsen v. Johnson, 279 U.S. 47, 52 (1929).   It is axiomatic that all treaties are to be interpreted in accordance with the purpose of the treaty.   See Bacari Corp. of America v. Domenaech, 211, U.S. 150, 163 (1940) (stating that courts "should construe the treaty liberally to give effect to the purpose which animates it"); Factor v. Laubenheimer, 290 U.S. 276, 315 (1933) ("Treaties must receive a fair interpretation, according to the intention of the contracting parties and so to carry out their manifest purpose.")  The stated purpose of the 1989 Convention appears in its preamble which reads:

> CONSCIOUS of the major contribution which efficient and timely salvage operations can make to the safety of vessels and other property in danger and to the protection of the environment, CONVINCED of the need to ensure that adequate incentives are available to persons who undertake salvage operations in respect of vessels and other property in danger.

1989 Convention on Salvage, Preamble.

Therefore, each of the factors enumerated under Article 13 of the 1989 Convention must be interpreted in light of the purpose of incentivizing salvors to render salvage services in accordance with the "major contribution" those services provide to the salvage. Although the salvage convention itself does not enumerate "averted liability" as a separate factor, in light of the stated purpose of the 1989 Convention, the factors (for example, "property saved," "degree of danger" and "measure of success") outlined in Article 13, should be interpreted to include the consideration of distressed vessel owners' exposure to liability to third parties, and the extent to which a salvors' services reduced or removed that exposure. Moreover, the drafting history of the 1989 Convention supports this interpretation. The factors listed under Article § 13(1) are not an exhaustive list of considerations made when determining a salvage award. See Brent Nielson, *Report to the Executive Counsel of the International Maritime Organization* (1984) (a report regularly used to interpret the 1989 Convention states "the draft convention is not intended to set out the law of salvage in any exhaustive matter"). Therefore, the absence of a specific factor for "averted liability" under the 1989 Convention, does not preclude its consideration under the factors for affixing a salvage award. Including a consideration of "liability salvage" under the 1989 Convention is consistent with other language under Article 13. See, 1989 Convention Art. 13 (7) (expressly providing for consideration of liability to 3rd parties in salvors tort).

Moreover, legal scholars concur that "liability salvage" should be considered among the factors of a salvage award. See *Calculating and Allocating Salvage Liability*, 99 HARV. L. REV. 1896, 1905-1906 (1986); Martin Davies, *WHATEVER HAPPENED TO THE SALVAGE*

*CONVENTION OF 1989?*, 39 J. Mar. L. & Com. 464, 497 (2008) (concluding that after the 1989 Salvage Convention, "the fact that the salvors averted the risk of liability for physical damage and perhaps loss of life or personal injury" should be considered in awarding salvage); see, also, John Reeder, Brice on Maritime Law of Salvage §§ [6-21] [6-24- (4th Ed. 2003) (stating that courts should take into account  "removal by the salvor of the threat of claims albeit very generally as one  of the elements showing the merit of the salvor's services and to that extent an enhancing feature"); See Michael Kerr, *The International Convention on Salvage 1989- How it Came to Be*, 39 Int'l & Comp. L.Q. 530 et. seq. (1990).

A ferry is not a vessel that carries "cargo" in a traditional sense, as its cargoes are not chattels at all, but rather, its cargo is its passengers.  Nonetheless, the "business" of a ferry within the maritime industry, is the transport of passengers.  As detailed above (in Section "I"), in light of the underlying policy in salvage of supporting the maritime business by encouraging seaman to "render assistance to save life," the Court should consider the value of the lives saved and injuries avoided with at least as much vigor as it would for salvaged cargo. See, e.g., 1989 Convention 13(b)(1)(explicitly including "life" as part of factors for salvage awards: *Mason v. Blaireau*, 1804 WL 1124 *18 (1804).  "Liability salvage" provides a framework for measuring the value of human life and safety in terms of the benefit of the averted liability which further injury and loss of life would have caused the owner of the salvaged vessel.

Substantially reduced tort liability also represents an essential "benefit" to the owner of the salvaged vessel under Posner's "cost-benefit" analysis.   In a related proceeding, this Court has denied the Defendant City of New York's petition for limitation of liability. See In Re City of New York, 475 F. Supp.2d 235, 250 (E.D.N.Y. 2007); affirmed, 522 F.3d 279 (2nd Cir. 2008).  Consequently, the Court may take judicial notice that over $90 million in personal injury and

wrongful death claims arising out of the *BARBERI* tragedy have been paid by the City of New York, as owner of the ferry.  Therefore, under the reasoning of <u>Allseas Maritime</u> the massive "averted liability" in the way of averted additional claims from passengers against the Defendant in tort, had the *BARBERI* not been rescued so quickly and safely, should be a major consideration in assessing the value of the salvage services rendered by the crew and owners of the *DOROTHY J*.  The extent of the danger posed to the *BARBERI'S* passengers are outlined in detail in the following section.

**B.  Degree of Danger from which lives and property are rescued**

    *iv.  Defining and applying "nature and degree of danger"*

At the time *DOROTHY J*. rendered the salvage services, the *BARBERI* and its passengers were in substantial danger of: further injuries and/or fatalities, damage and injury from loose and hazardous debris, damage and injury from buckling or fracture of the saloon deck, and the decks above it, collision with other vessels, running aground on the Brooklyn shore and other dangers created by the conditions which existed on the wounded ferry after the accident.  The Defendant in this case has argued that "reasonable apprehension of danger" is only pertinent for determining "marine peril" as a *prima facie* element of a salvage case and not for determining the amount of the award to be made. *Tr. p. 20., ln. 14-17 (Meehan)*.  Thus, they argue, if what was perceived to be a danger proves otherwise at the end of the day, there should be little award. This construction of the "degree of danger" factor of <u>Blackwall</u> ignores the well-established salvage policy considerations of "inducing future mariners to render assistance to vessels in distress."  Indeed, a salvor's very decision to render assistance in every case is based solely on salvor's "reasonable apprehension of danger." If Courts were to initially label assistance as "marine salvage" only to later assign salvage awards nominal sums based on the "actual danger,"

found to have existed once the salvage is complete, this approach would inevitably deter future mariners from rendering assistance out of concern that the salvor's initial "apprehensions" will turn out not to be real, and the salvor's efforts would go unrewarded.

Black's law dictionary defines "Danger" as "Peril; exposure to harm, loss, pain, or other negative result." Black's Law Dictionary (8th ed. 2004). Therefore, for purposes of salvage law the terms "danger" and "peril" are synonymous.  Id.; See also Benedict at § 190.   Furthermore, under maritime law "dangerous exposure" is specifically defined as "the amount of liability or other risk" "that is reasonably foreseeable in the ordinary chances, mistakes or hazards of navigation." Black's Law Dictionary (8th ed. 2004).  Therefore, "danger" constitutes foreseeable risk of harm or other negative result, and not the actual harm or negative result itself.

The widely accepted algebraic formula for calculating risk or danger in the engineering field is as follows:

**Danger = Probability X Consequences or (D=PC)**

See, e.g., Desmond N.D. Hartford and Gregory B. Baecher, *CEA Technologies, Dam Safety Interest Group*, 252, Thomas Telford (2004); see, also, *Tr. p. 636, lns 13-14 (Cushing)* (applying this formula in assessing danger of structural fracture to the Saloon Deck).

The  Defendant has repeatedly stated the illogical position that where a specific "harm, loss, pain or other negative result" does not actually occur, this proves there was no real "danger" of the event occurring under the Blackwall/1989 Convention analysis.  This reasoning, engages in the logical fallacy of *argumentum ad consequentum* ("argument from consequences").   In essence, the Defendant urges the court to conclude that the "exposure to harm" never existed, because of the ultimate fact that the "harm" or "negative consequence" never occurred.  Such reasoning must be rejected on its face as illogical *per se*.  Here, the fact that the *BARBERI* and its

passengers did not incur even further injuries and fatalities or buckling or fracture of the starboard saloon deck, or running aground on the Brooklyn shore, or collision with vessels in the shipping channel or anchorage, or engine failure, fire and a host of other harms created by the disastrous conditions on board the ferry, does not therefore mean that there was not a substantial "exposure to harm, injury or other negative result" (and thus "danger") at the time the *DOROTHY J.* rendered her salvage services. Quite the contrary, the danger to these harms was real, indeed.

Defendant's attempts to minimize the significant dangers facing the *BARBERI* and her passengers after this accident are far from novel. Indeed, it is quite common that "after the peril is over and the stressed ship brought to safety by the effort of the salvors, the fact of the peril is lightly dismissed by the master or owner of the salved vessel as being inconsequential." <u>See</u> Benedict (supra) at 244. To counter the salvage defendants' proclivities to understate the dangers which result from a maritime accident, courts analyzing the circumstances of the salvage operation, look at all the evidence to determine to what degree life and property were exposed to harm. <u>See</u> <u>The Benison</u>, 36 F. 793, (S.D.N.Y. 1888) (awarding $7,500 to salvor for salving vessel worth $40,500 even though master of the vessel salvaged claimed they were not in any "imminent danger").

Defendant here goes so far as to suggest that the *BARBERI* rapidly drifting through Stapleton anchorage and New York Harbor, "not under command" for over 20 minutes, with 1500 passengers on board (many dead or dying) with 200 feet of its super structure substantially demolished, and several hundred tons of hazard created by loose debris on board had absolutely no "exposure to harm, injury or other negative result following the crash with the maintenance pier." *See Tr., p. 26, l. 11-15*. Defendant's argument here is preposterous in light of the graphic

testimonial and photographic evidence in the record.   It also completely ignores the fact that Captain Gansas himself perceived a danger so great that he called for all vessels in the area to come to help the *BARBERI*.

In that regard, courts have found that a "distress call" or "may day" is extremely strong evidence of the existence of "danger" in salvage cases. See The Spokane, 67 F. 254, 256 (Dist. Ct. Wisc. 1895) ("where a vessel in distress calls upon a passing vessel for help, salvage compensation is implied").  Such a request for assistance has been construed by the courts as a call to aid to all prospective salvors.  The Richmond, 219 F. 714, 715 (2nd Cir. 1914).  Moreover, it is well established that a drifting vessel not under command is *per se* in danger.  See Markakis v. S/S. Volendam, 486 F. Supp. 1103, 1106 (S.D.N.Y. 1980) (holding that if distressed vessel is "not under command" at the time the vessel is taken in tow, then in it is in peril).   Specifically, vessels that are drifting near shore while not in a state of "command," as the *BARBERI* was, after the crash, have been found to be in grave danger.  See, e.g., The Mercer, 297 F. 981 (2nd Cir. 1921) (tug in New York harbor tied up a boat that did not have use of engines and had broken loose near the shore); The Plymouth Rock, 9 F. 413 (S.D.N.Y. 1881);  See also, Goldade v. F/V. Seattle Star, 1992 A.M.C. 808 (Arb. Wash 1992) (arbitration award of $275,000 for salving $2,500,000 vessel that had lost power and was drifting toward St. George Island).   Indeed, danger of collision, allision, or running aground under any circumstances has been held to be a particularly high level of danger. See, e.g., South American S.S. Co. v. Atlantic Towing Co., 22 F.3d 16, 17 (5th Cir. 1927) (awarding $3,000 for merely warning a vessel worth $65,824 to change course in order to avert running aground in shallow water); The Hudson, 68 F. 936 (S.D.N.Y. 1895) (danger of collision with ice warranted award of $250 for salving $3,000 vessel).  Moreover, averting potential damage to the environment is now also a recognized

"danger" under salvage law. <u>See</u> <u>Evanow v. M/V Neptune</u>, 163 F.3d 1108, 1115 (9th Cir. 1998);

<u>B.V. Bureau Wijsmuller v. U.S.</u>, 702 F.2d 333 (2nd Cir. 1983).

> **i.     At the time that the DOROTHY J. began to render salvage services, the BARBERI and passengers were exposed to substantial harm, injury and other negative results.**

It is undisputed that at the time that the *DOROTHY J.* began the salvage services, the *BARBERI* was drifting, not "under a state of command," and had issued a "distress call" or "S.O.S." call for help.  Furthermore, there is evidence that either the Port Captain, John Mauldin, or the *BARBERI*'s Captain, Michael Gansas, specifically asked for the *DOROTHY J.*'s assistance in getting back to the slip.  *Cl. Ex. 32, p. 4 (Mauldin)*("He told him that they needed to get the tug to help him (19a frequency) to get it back into a slip to help the injured).   Moreover, as previously discussed, the credible evidence shows that the *BARBERI* was "not under command" for over 20 minutes.  As a result, under the principles outlined in <u>The Mercer</u> and <u>Goldade</u> cases (supra) above, the *BARBERI*, and its passengers, were indisputably in actual danger at the time the salvage services were rendered.

**EXPOSURE TO FURTHER INJURY OR DEATH**

The danger to the *BARBERI* passengers clearly included: 1) deterioration of injuries already sustained in the initial allision; 2) risk of further injury from exposure to a variety of hazardous conditions created by the destruction that the ferry had suffered; 3) a chaotic and panicked mob of passengers which might have done anything to get off the ferry.

Approximately 1,500 passengers were on board the *BARBERI* at the time of the allision. *See Def. Ex. 21, p. 7 (NTSB Report)*.  Ten passengers were killed instantly and at least 76 others

suffered significant injury from the initial allision. Id.  Chief Engineer Covella testified that he witnessed the physical condition deteriorating rapidly for many of the passengers on board the *BARBERI* who had been fortunate enough to have survived the initial impact, but had sustained life threatening injuries such as severed limbs, gouged eyes, torsos ripped open and other severe trauma. *Def. Ex. 96, p. 71, ln 18 – p. 72, ln. 19 (Covella)*.  Clearly, there can be no greater imminent danger to an individual than the immediate risk of death or permanent physical injury.

As, as time passes without medical care, the exposure to additional injury or harm increases exponentially as passengers became increasingly disabled and anxious about their situations and as they crowded to one end of the vessel through an area littered with hazardous debris and dangers. *Tr. 332, lns 6-8 (Downey)*.  The testimony at trial was that at least 100 passengers had already attempted to jump ship or force their way onto the *DOROTHY J.* in an attempt to get to safety. *Tr. p. 46, lns 4-8 (Seckers)*.  Other passengers had already plunged off the *BARBERI* into the water. *See Tr. p. 34, lns. 1-4 (Seckers); p. 324, lns .11-12 (Downey)*.  The pictures entered into evidence clearly depict torn wood, sharp metal, detached rows of passenger chairs and jagged objects loosely scattered in heaps throughout the main deck with support stanchions torn away and buckling ceilings.  *See Ex. 3-6 & 34-45 & Def. Ex. 21 A6* (NTSB Report) (describing how fireman had to dislodge victims from beneath the debris).  These conditions clearly created an imminent risk to the lives and well-being of those passengers who had survived the crash.

**IMMINENT EXPOSURE TO RUNNING AGROUND ON THE BROOKLYN SHORE**

As described in detail above, Captain Clifford's "estimated drift point" of the *BARBERI*, but-for the efforts of the *DOROTHY J.*, when taking into account the time of drift established by the credible testimony of Captain Gansas and Mate Seckers would have placed the *BARBERI* across the harbor from the initial allision point to a position near the Brooklyn shore. See infra,

Section "IIA";   *See Cl. Ex. 17; Tr. 372, lns 9-14 (Clifford);Tr. p. 1034, lns. 10-24 (Gansas)*. Therefore, at the time the salvage services commenced, the *BARBERI* was on the path of imminent danger of running aground on the Brooklyn shore.

The credible evidence shows also that Captain Gansas would not have utilized any of the engine or steering controls of the *BARBERI* any earlier had the *DOROTHY J.* not been assisting the ferry, than he actually did with the assistance of the *DOROTHY J.*   No less than five witnesses offered uncontroverted testimony at trial that Captain Gansas reported a problem with the *BARBERI's* propulsion, during the time the ferry was adrift following the accident.   *Cl. Ex. 32, p. 3 (Mauldin)* (Port Captain testified that Gansas told him over the radio "I'm having trouble, trouble getting power"); *Tr. p. 43, lns. 9-14 (Seckers)* (stating that Gansas told him over the radio that he did not have power, but did have steering); *Tr. p. 253, lns. 12-19 (Flecker)* (heard radio call from Gansas saying the *BARBERI* had no power); *Tr. 741, p. 6-9 & p. 768, lns 6-8 (Druda)* (stating "that would have been my understanding at the time…that the ferry didn't have power"); *Cl. Ex. 31 (Piazza)*(where Deckhand in the Staten Island pilothouse during the period of drift testified that Gansas was complaining about a problem with "engines" and "power" and concluding  "there was something wrong at this point in regards to the propulsion"). Captain Gansas himself does not deny that he made radio communications regarding problems with the propulsion and according to his testimony, he said he did not know if the propulsion was properly working or not. *Tr. p. 1033, lns. 15-21 (Gansas)* (when asked by the Court if he told the *DOROTHY J.* he didn't have power, Gansas answered "I don't remember if I did").

Indeed, the only documentary evidence in the record establishes that there were substantial mechanical problems with the Voith Schneider unit and the ferry's control systems after the crash.   The "Specification for Repair," dated November 24, 2003, prepared by the New

York City Department of Transportation, the agency tasked with managing the repairs to the *BARBERI*, provided detailed instructions to GMD Shipyard regarding repairs which called for the contractor to reassemble the entire Voith Schneider propeller unit including "new and used parts." *Cl. Ex. 8, p. 54* (NYDOT Specs for Repair).   The specifications for repair also made this comment:

> INTEGRATED CONTROL SYSTEM: The accident may have damaged/destroyed some of the controls to the Voith-Schneider propellers.  This is presently being inspected and examined by the propeller manufacturer. If there is any shipyard work required, NYCDOT will advise.

*Cl. Ex. 8, p. 69* (NYDOT Specs for Repair).

Furthermore, the Repair Specifications require the Repair Contractor to provide a series of periodic updates regarding the repair schedule, orders of materials and charts of costs.  *Ex. 8, pgs. 69-70* (NYDOT Specs for Repair).  One such periodic report, finalized on December 2, 2003, includes Contractor costs of $86,000 in labor for repairs to the "propulsion unit (all parts)" and "integrated control system, propeller and machinery controls."  *Def. Ex. 42* (Cost Analysis for Repairs).  Still later, the Department of Transportation's "cost analysis" of the *BARBERI*'s repairs includes already-negotiated prices for "Voith Parts- First Shipment for Dry Dock (agreed 3/21/04)," "Voith Parts- Second Shipment (New Agreed 06/01/04)" totaling $203,948 in ordered Voith Schneider parts by June of 2004. *Def. Ex. 42*.   In light of the detailed labor and part cost provision for repairs to the Voith Schneider Unit and its integrated control systems totaling almost $300,000 in repairs; in conjunction with the repair specifications referencing suspected problems with these systems, it is reasonable to conclude that there was substantial damage to the Voith Schneider unit caused by the crash which resulted in the loss of function which Captain Gansas reported experiencing.

Consequently, Gansas' concern with *BARBERI*'s perceived and/or actual mechanical problems combined with his perceived dangers of utilizing the *BARBERI*'s controls, it is highly

improbable that Gansas would have (or could have) taken control and maneuvered the vessel any sooner than he did on the date of the accident, even if  the *DOROTHY J.*  had not taken action to stop the drift and the *BARBERI* continued its drift across the harbor.  Consequently, one must conclude that considering the evidence of the furthest position of drift, the *BARBERI* was in actual danger of running aground at the time the *DOROTHY J.*  first began its salvage services.

It takes no great stretch of the imagination to recognize the myriad of additional dangers which would arise had the *BARBERI* run aground in her already wounded state, or struck the Brooklyn shoreline while moving at 5 knots with over 1,500 panic-stricken passengers onboard. Dr. Charles Cushing, Claimants' expert naval architect, estimated that running aground could cause further structural buckling and fracture of the saloon deck, and a breach to the hull potentially resulting in the *BARBERI* foundering, or substantial listing causing the *BARBERI* to take on water through the already open main decks areas or causing environmental damage from a leak of the 30,000 gallons of diesel fuel which were on board. *Tr. p. 646, ln 13 – p. 647, ln. 4 & p.684, lns. 23-25 (Cushing).*

## EXPOSURE TO STRUCTURAL SNAPPING, YIELDING OR FRACTURE OF THE STABOARD SIDE SALOON DECK

During the trial the Court has posed this question: if the upper decks of the *BARBERI* did not collapse after the initial allision with the pier, were they in danger of collapsing at all?  The answer to that question is that exposure to substantial and imminent danger of collapse does <u>not</u> require an actual collapse to occur.  The presumption that since a structure did not actually collapse, it was therefore not in danger of collapsing, is again an illogical *argumentum ad consequentum*.  At trial, there was discussion about the precise definition of the term "collapse" in the context of the dangers existing on the *BARBERI* following the crash.  *P. 938, lns. 10-23* (sidebar).    Webster's Dictionary defines "collapse" as "to cave or fall in or give way." Miriam

Webster's Dictionary (2010 ed.).   The NTSB uses the term "collapsed" when describing the damage to the *BARBERI*. *Def. ex. 21, p. 22* (NTSB Report).  Dr. Cushing uses the term collapse synonymously with "snapping" or "yielding" or "fracturing." *Tr. p. 641, ln. 1 - 642, ln. 1 (Cushing)*.   John Paulson, the BMT surveyor who inspected the damage to the *BARBERI* following the accident, preferred to use the terms "buckling" or "cracking" rather than "collapsing" although he failed to specifically distinguish the two.   *Tr. p. 926, lns. 10-19 (Paulson)*.   It is submitted that under the plain dictionary definition quoted above that these phrases are just different ways of describing the same phenomena (mainly the "giving way" of the starboard-side saloon deck).

It is axiomatic that a deck comprising thousands of pounds of steel and other material, which itself supports two decks above it, is in substantially heightened danger of buckling or cracking when two-thirds of its support stanchions have been destroyed.  Dr. Cushing, who personally surveyed the vessel in the immediate aftermath of the accident, testified that it was his expert opinion that the starboard-side saloon deck of the *BARBERI* was in imminent danger of collapse. *Tr. p. 639, lns 5-8 (Cushing)*.

Dr. Cushing based his conclusions on the following facts:

- Two-thirds (8 out of 12) of the vertical support stanchions from the center line of the main deck to the starboard bulkhead were completely knocked out, leaving the saloon deck and the two decks above it without any vertical support in this entire section

- 210 feet of the starboard-side steel plating of the superstructure was ripped open leaving the deck above unsupported on its starboard edge

- The vertical staircase from the main cabin to the saloon deck was completely destroyed, leaving the saloon deck hanging where it was previously supported by the staircase

- The saloon deck was observed to be substantially "sagging" throughout the vessel

- The horizontal "deck-stiffeners" underneath the saloon deck were substantially bending under the stress of the unsupported decks above

- The saloon deck was "bowing" outward in a distorted "cantilevered fashion" under the weight from the decks above

*Tr. 640, ln. 16 – p. 642, ln. 2 (Cushing); Cl. Exs. 15A-15D* (demonstrative slides of damage); *Def. Ex. 21, p. 7 et. seq.* (NTSB Accident Report).

As a result of the clear signs that the deck was already starting to give way, Dr. Cushing concluded, based on his 50 years of experience as a marine architect, that the probability that the Saloon Deck would have "snapped" "yielded" "fractured" or collapsed was "very very high." *Tr. p. 640 (Cushing)*. This conclusion was corroborated by the very actions which were taken to prevent a collapse after the ferry returned.

The actions of the Fire Department damage control personnel, New York City Officials, NTSB Investigators, GMD shipyard and its Underwriters and Surveyors demonstrate a shared assessment that there was a substantial risk of further structural damage to the *BARBERI* after the crash. The gravity of the risk to the superstructure is shown by the fact that among the very first acts that the FDNY and emergency rescue workers performed after the *BARBERI* was secured in its berth, was to erect 6' x 6' wooden timber columns throughout the vessel in order to shore up the decks. *Def. Ex. 41* (FDNY Report)("conducted an extensive shoring operation to replace the columns supporting the upper decks") *Tr. p. 894, lns. 15-16 (Paulson)*. *See Cl. Ex. 4, 5 & 34-49;* Even after the decks were shored up by the FDNY damage control teams, New York City Department of Transportation officials instructed the *DOROTHY J.* to remove face wires that were attached to the Staten Island end after the *BARBERI* had returned to the slip, out of fear that the mere pressure from those wires could cause further fracturing, buckling or collapse of the superstructure. *Tr. p. 720, ln. 10 – p. 721, ln. 5 (Druda); Tr. p. 104, lns. 7-20 (Seckers)*. In

addition, the NTSB investigators clearly concluded that there was a high risk of further damage to the upper decks even after extensive shoring was done.   In performing tests immediately after the accident, the investigators concluded:

> The propulsion system was tested without applying rotational drive from the main engine to the unit's gearbox. That was because of the concern about the effect of vibrations from the main engine and propulsion system on the structural integrity of the upper deck, which had been weakened by the accident.

*Def. Ex. 21, pgs. 36-37* (NTSB Report).

This concern was expressed even <u>after</u> the upper decks had been reinforced by wood and steel shoring which was installed at the slip. <u>Id</u>. *Def. Ex. 21, pgs. 36-37* (NTSB Report). Obviously, the concern of the NTSB that mere engine vibrations may cause the upper decks to fracture, buckle or collapse, even after extensive temporary measures were taken to support the superstructure, prove that the danger of further damage to the *BARBERI's* superstructure was indeed real.

Even after the extensive shoring by the FDNY, substantial additional shoring was ordered by John Paulson, a surveyor and manager for BMT Salvage, who was hired by the GMD Shipyard and its underwriters to survey the *BARBERI* prior to its transfer from St. George terminal to the Brooklyn Naval Yard for repairs and to make recommendations how to make the ferry safe to move.  Paulson's recommendations to insure the safety of the *BARBERI* for the move to GMD prior to towage are detailed in Paulson's report (attached as Claimant's exhibit 33) and included: tripling the support of the saloon deck in the areas of the 8 destroyed vertical supports and reinforcing the bulkhead with 7" x 4" x ½" verticals, installing a steel girder to reinforce the upper decks at the forward end of the saloon deck (which were already buckling), removing the extensive loose debris, and cropping, securing and removing all hanging steel or aluminum. <u>*See*</u> *Cl. Ex. 31*; <u>*see, generally,*</u> *Tr. pgs. 900-926 (Paulson).*  These extensive and

substantial repairs are clear evidence of Paulson's actual assessment that the upper decks were at risk of collapsing, buckling, fracturing or snapping, despite his contention during the trial that they were unnecessary.

It is simply not credible that only after being hired as Defendant's expert witness seven (7) years after the incident, Mr. Paulson denies the only rational explanation for the recommendations he made when he was retained to assess the safety of moving the ferry to GMD. There should be no doubt that without the repairs Paulson recommended, the ferry would have suffered additional damage to its superstructure if it was moved. Paulson's denying this risk is simply not supported by what he did and what he recommended after the accident, or by his official report reflecting the same, or even by his own testimony at trial. Although Paulson stated at trial that the *BARBERI* could have been moved on the night of the accident without any further repairs, *Tr. p. 917, ln. 22-23 (Paulson)*. He never communicated this view to anyone at the time of the accident. To the contrary, Paulson testified at trial that he specifically recommended to GMD shipyard that they wait to move the *BARBERI* until the next day. *Tr. p. 917, ln. 25 & pgs. 901, 909, 916, 918 & 925 (Paulson)* (detailing extensive repairs recommended before *BARBERI* could be moved safely). In fact, Paulson testified that he believed the hazardous debris throughout the main deck "was a mess" and a "safety issue." *Tr. p. 902, ln. 8 (Paulson)*. Therefore, the notion that Mr. Paulson really believed that it was safe to move a vessel that he had already concluded had several dangerous conditions and actually took extensive steps to remedy those conditions before those conditions were corrected and those repairs were made, is preposterous and not credible.

In addition, Paulson's attempts to dismiss his recommendations as purely motivated by the desire to satisfy an overly-cautious insurer's concerns ignore the fact that the U.S. Coast

Guard was not going to allow the ferry to move without these repairs.  Paulson and BMT were hired to make an assessment about what steps were necessary to safely tow the *BARBERI* from St. George to GMD *(Tr. 889, 890)*.   Paulson admitted at trial that his recommendations were made to bring "the risks of damage or injury down to an acceptable level for the underwriters." *Tr. p. 918, lns. 3-14. (Paulson)*.  The only reasonable interpretation of this testimony is that prior to the extensive shoring, cropping and debris removal ordered by Paulson, the danger of further structural damage to the *BARBERI*  was at such a high level that the insurers, who make a living assessing these risks, were unwilling to underwrite even a two (2) mile towage of the *BARBERI* to the Brooklyn Naval Yard for repairs.  Similarly, the temporary repairs were necessary to get the Coast Guard's approval prior to moving the vessel.  *Tr. P. 918, lns 13-14 (Gansas)*.  Indeed, Paulson repeatedly admitted at trial that extensive remedial measures were needed for legitimate "safety" reasons and to "prevent further damage" to the *BARBERI*, rather than out of an abundant caution to satisfy underwriters.  *Tr. 908, lns 22-23 p. 925, lns. 2-6 (Paulson)* ("Q: repairs were done and the shoring was done, that's what reduced the risk and minimized the risk of any further damage to the Ferry A: Further damage").

Notably, by the time that Paulson arrived at the *BARBERI*, the emergency shoring teams had already put in place heavy wooden timbers and columns to shore up the saloon deck, thus reducing the risk of that deck and those above it buckling. *Tr. p. 894, lns. 15-16 (Paulson)*. When specifically asked by the Court if the risk of collapse existed prior to the shoring by the FDNY, Paulson dodged the question but admitted that the bulkhead had already been partially pulled down by the impact. *Tr. p. 927, lns. 3-15 (Paulson)*.  Yet Paulson offers no explanation why a deck without two-thirds of its support stanchions, in addition to losing the support of the bulkhead steel plating, and having to bear the weight of two decks above it, would be under

absolutely no risk of further buckling or collapse. Paulson also admitted that he did no calculations regarding the stresses placed on the saloon deck or upper decks at any time. *Tr. p. 929, lns. 3-17 (Paulson)*.  Consequently, Paulson's attempts to summarily dismiss the risk of additional collapse/fracturing/buckling/cracking of the superstructure should be rejected in light of Paulson's actions and recommendations in the immediate aftermath of the allision.

A collapse or buckling of the upper decks would certainly have caused additional substantial damage to the ferry itself, including the lower decks and foreseeable through areas where the main deck was already ripped open.  Even Paulson admits that the mere buckling or cracking of the upper decks would "cost more to fix." *Tr. 926, lns. 8-9 (Paulson)*.  In addition, further collapse or fracture in the superstructure could have caused additional sections of steel or aluminum debris to fall onto the passengers on the decks below or endangered those passengers who may have still been on the saloon deck itself,  and thereby increasing the exposure to further injuries and or fatalities. *Tr. p. 639, lns. 17-24 (Cushing)*.

The **probability** of the upper decks buckling, cracking or collapsing was manifestly high (in light of the damage to the superstructure) and the **consequences** of such an event would have been catastrophic (in terms of cost of repairs and further in the way of injuries/fatalities to passengers),, and therefore the **"danger" or "risk"** of buckling, fracturing or collapsing was substantial.

### EXPOSURE TO FURTHER DAMAGE TO THE INTERIOR, ENGINE AND PROPULSION UNIT FROM HAZARDOUS LOOSE DEBRIS

Loose or falling debris also presents an imminent danger to a vessel in distress. see, e.g., Treworgy v. Richards, 10 F.2d 152 (1ˢᵗ Cir. 1926) (citing presence of logs, wood and debris). The danger created by the vast amount of loose and hazardous debris throughout the *BARBERI* cannot be overstated.  One crew member described the scene as if a "bomb went off." *Def. Ex.*

*96, p. 31 ln. 21 – p. 32, ln. 4 (Covella)*.  As depicted in various pictures and introduced at trial, the piles of debris including, splintered wooden beams, jagged steel and aluminum, detached passengers chairs and countless foreign objects haphazardly strewn throughout the main deck. <u>*See*</u> *Cl. Exs. 34-45* (pictures); *Tr. p. 566, ln. 14-17 (Gherardi); Tr. p. 928 ln. 3 (Paulson)* ("there was debris everywhere").  In addition, metal and wood hung precariously throughout the main passenger deck. <u>*See*</u> *Cl. Exs. 34-45*; *Tr.   & Ex. 31* (Paulson's Report) (calling for "insecure and hanging steel" to be cropped).  Some witnesses described debris that had already showered into the harbor. *Def. Ex. 21, p. 33* (NTSB Report) (describing 400 yard debris field in the water). <u>*See*</u> *Tr. p. 32, lns. 17-20 (Seckers)*.

In view of the heavy wind and current conditions at the time the salvage services began, any number of these objects could have been converted into a "missile hazards" at any time.  It would take only one chair or a falling piece of metal blowing downwind to severely injure or even kill more passengers on board the ferry.

The loose debris described here also created a substantial danger of further damage to the interior of the *BARBERI*.  Most notably, the main deck above the engine spaces had already collapsed, exposing the engine compartment to all of the heavy debris on the main deck. *Tr. p. 578, ln. 24-p.57, ln. 9 (Gherardi); Def. Ex. 96, Tr. p. 53, lns. 16-25 & p. 68, on. 21- p. 69, ln. 16 (Covella)* (noting massive amount of debris and chairs that were above a hole in the deck above the engine unit & some debris that had already fallen into the engine room and was blocking the entrance to the Voith Schneider room).   As large objects shifted around loosely the *BARBERI's* interior spaces were also exposed to continued damage.

**<u>DANGER OF COLLISION WITH OTHER VESSELS</u>**

It is undisputed that the Stapleton Anchorage and the shipping channel in New York Harbor is one of the most heavily trafficked harbors in the world and is regularly used by large

and small vessels at anchorage, under tow or under way.  *See Tr. 338, ln. 11; p. 397, ln 5 – 399,*

*ln 4 (Clifford).*   Indeed, immediately after the allision with the maintenance pier, several

witnesses testified that they saw barges & cargo ships in the area. Sergeant Downey testified that

he saw several boats in the harbor and one "import/export" boat headed in the direction of the

*BARBERI. Tr. 324-25, l. 3 (Downey).*   Paul Flecker testified that he saw several boats in

anchorage that day.   *Tr. 299-300, ln. 3 (Flecker).*   Mate Seckers testified that a vessel was

heading north near the Verrazano Bridge destined for the Stapleton Anchorage at the time of the

allision, and that there was another barge anchored in Stapleton Anchorage at the time of the

allision. *Tr. 131, lns. 4-6 & 133, lns. 11-17 (Seckers).*  Even so, the actual number or location of

the vessels in the area is not dispositive of the "exposure" to collision to which the *BARBERI*

was placed.  By analogy, a car without a driver behind the wheel rolling down a hill on a heavily

trafficked highway would be "exposed" to the risk of a collision whether or not the highway was

fortuitously empty at the time.   Similarly, the mere drifting of the *BARBERI*, "not under

command," through a normally heavy traffic area of New York harbor when there was vessel

traffic in the vicinity, exposed the *BARBERI* to collision which was "reasonably foreseeable in

the ordinary chances, mistakes or hazards of navigation," within the meaning of the Black's Law

Dictionary definition of "danger," regardless of the precise number or location of other vessels in

the area.

### C. Availability of Other Aid

The *DOROTHY J.* was the only vessel available to render assistance to the *BARBERI*

during the time salvage assistance was required.   The 1989 Salvage Convention added the factor

"availability and use of vessels or other equipment intended for salvage operations" to the

traditional Blackwall factors. See The 1989 Salvage Convention at Art. 13(1)(i).   Under the

common law, availability of other aid has always been considered under the "degree of danger" factor of <u>Blackwall</u>. The courts have traditionally reasoned that the greater availability of vessels to render assistance to a vessel in distress, the less the distressed vessel is exposed to danger. <u>See</u>, <u>e.g.</u>, <u>The North Erin</u>, 71 F. 430, (E.D.N.Y 1895) (considering the fact that salvor was in route to the salved vessel and would have reached it before any other damage was done).

One specific subset of cases considering "availability of other aid" arises in salvage services that occur geographically within harbors. Some courts have generalized that salvage services which occur in harbors, as a class, are "low order," based on the *assumption* that there is an abundance of tug boats or other vessels nearby and available to aid the vessel in distress. <u>The Cassandra Adams</u>, 30 F. 379, (E.D.N.Y. 1887) (where boat grounded just outside of New York harbor, the availability of other tugs in busy harbor taken into account); <u>O.C. Hanchett</u>, 76 F. 1003 (2nd Cir. 1896); <u>The Kaiser Whilhelm Der. Grosse</u>, 106 F. 963, (S.D.N.Y 1901). However, the "harbor salvage" classification directly contradicts the settled precedent against applying rigidity in marine salvage law, and therefore, courts regularly ignore the "harbor salvage" assumption in favor of an in-depth review of the facts. <u>See</u>, <u>e.g.</u>, <u>U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff and M/V Sea Alaska</u>, 768 F.2d 1099, 1101 (9th Cir. 1985). Moreover, where "other aid" is not available altogether, the harbor salvage presumption naturally does not apply. <u>De Aldamez v. Th. Skogland & Sons,</u> 17 F.2d 873 (5th Cir. 1927) (increasing District Court's award for salvage in a harbor fivefold because of the dearth of other boats willing to render aid and the high degree of danger from running aground). In fact, many courts have held that vessels drifting in close proximity to land are actually subject to a *heightened*, rather than a diminished, degree of danger. <u>See</u>, <u>e.g.</u>, <u>Sir Robert Fernie</u>, 96 F. 348 (D. Wash. 1899). In particularly busy harbors (such as New York Harbor), where strong currents carry the heightened

45

risk of collision with other boats, piers, anchors or dangerous shores, a vessel is naturally more at risk than it would be on the vast open areas of the sea, where a vessel can drift for days without the risk of collision, grounding, foundering or other risks found within the harbor. Benedict at § 255.

The *BARBERI's* salvage is analogous to the U.S. Dominator  case.   In the U.S. Dominator, two fish-processing vessels (one powered and the other unpowered), were moored together in Dutch Harbor off the coast of Alaska. U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff and M/V Sea Alaska, 768 F.2d 1099, 1101 (9th Cir. 1985).   During the night, the two moored vessels were caught in a storm that caused them to collide and to severely strain their mooring lines. Id.  at 1101-02.  Two salvors answered calls for assistance by pushing the distressed vessels away from one another and standing by until the morning, when the weather had cleared and the salvaged vessels could be returned to their individual moorings. Id.  The owner of both salvaged vessels urged the court to apply the "harbor salvage" standard because the salvage occurred geographically within Dutch Harbor. Id. at 1106. The court declined to apply the "harbor salvage" standard in light of the danger to both vessels and the apparent lack of available tugs or other vessels  in the area able to assist the salved vessels. Id. The United States Court of Appeals, Ninth Circuit, upheld an award to the salvors of $350,000 for salvage services to both vessels who had a combined valued of $3,500,000.  Id. at 206. The U.S. Dominator case demonstrates that the courts' *ad hoc* analysis preempts the application of a rigid "harbor salvage" presumption about the value of salvage services performed within a harbor.

Furthermore, the High Cliff, a harbor salvage case cited by this Court in its decision granting the Claimants' motion for Summary Judgment on the issue of whether marine salvage was performed here, is clearly distinguishable from the case at bar.  In High Cliff, a covered

wooden barge lost its lines to a steamship while tied up within a slip. <u>See</u>, The <u>High Cliff</u>, 271 F. 202, 205 (2nd Cir. 1921). The barge drifted for a short distance within the slip when a tug at the scene tied lines to the barge and pushed it into a berth within the slip in the direction the wind would have taken the barge in any event. <u>Id</u>. The <u>High Cliff</u> court applied the "harbor salvage" standard and allowed only a minimal award. <u>Id</u>. at 203.

The <u>High Cliff</u> case and its progeny of "harbor salvage" cases are inapposite. "Harbor salvage" only applies to cases "where tugs are abundant and on the ground." Captain Gansas issued a "distress call" to all available vessels within the harbor immediately after the allision. *Tr. p. 1006, lns. 1-18 (Gansas)*. Sergeant Downey also issued phone calls to several emergency services. *Tr. p. 324, lns 8-10 (Downey)*. The evidence in this case is unrefuted that no willing and able vessel other than the *DOROTHY J.* was in the vicinity of the *BARBERI*, and capable of responding, let alone actually offering assistance, at any time after the allision and prior to the *BARBERI* was returned to the slip at St. George. Several witnesses have confirmed that no vessels came to the assistance of the *BARBERI* from the time of the accident to the time it got back to the slip. *<u>See, e.g.</u>, Tr. 326, lns. 12-25 (Downey)*; *1045, lns. 9-15 (Gansas)*. Indeed, Dorothy Julian, the President of Henry Marine Services also called for the *FLOSSY GELLATLY*, to proceed to the scene and it did not arrive until roughly 1 hour and 40 minutes after the allision (well after the *BARBERI* was safely returned to its slip). *Def. Ex. 18; Tr. p. 186*. In addition, emergency services were unable to get even get a helicopter airborne to survey the scene during this time due to the extremely high wind conditions in the harbor at the time. Def. Ex. 32 (FDNY Emergency Records) (noting "due to high winds aviation down" at 15:41:22).

Several other factors in this case at bar distinguish it from the comparatively low value services rendered in the <u>High Cliff</u> case. The *BARBERI* salvage did not involve the mere drifting

of a "scow or barge" that detached from a mooring or line and never left the safety of a slip. Rather, it involved a 3,350 ton ferry boat, with over a hundred injured and ten dead among its 1,500 passengers on board with substantial structural damage, which was drifting not under command   through a heavily trafficked shipping channel toward the Brooklyn shore. Particularly in light of the obvious unavailability of other aid to the *BARBERI*, and the extreme conditions which existed on the *BARBERI* and under which the services were provided, the case before this Court is clearly more analogous to the U.S. Dominator case than the High Cliff case. The result in High Cliff should not be considered here.

### D.  Labor & Expenses Incurred by the Salvors

### i)      *Scope of "labor and expenses" under Blackwall*

Under the common law Blackwall analysis, the factor of "labor expended" is consistently treated as the *least* important of all the "ingredients" of a salvage award.  See Benedict on Admiralty at § 237; 68 Am. Jur. 2d Salvage § 71 (2009).  One reason for the courts de-emphasis of this factor is that compensation for labor and expenses sounds more in common law or liquidated damages, than as a flexible policy-driven remedy.  Courts consider "actual expenses" under this factor including "loss of time and out of pocket expenses" such as fuel in determining a salvage award.  See, e.g., The Elkridge, 24 F.3d 147, 150 S.D.N.Y. (1927); The Kanawha, 254 F.762 (2nd Cir. 1918).

"Labor" under the Blackwall analysis includes both the time and the conditions under which the services were rendered.  The length of time that labor occurs is inversely proportional to the "promptitude" of the salvage services (i.e. the greater the labor the lower the promptitude). As discussed in Section "II H," "promptitude" is specifically rewarded as an independent factor under both Blackwall and the 1989 Convention.  It is well settled law that a short period of

salvage services does not formulaically equate to "low order" salvage.  The B.C. Terry, 9 F. 920,

927 (D.C. GA 1881) ("rate of salvage is not governed by the mere extent of labor").  Moreover,

while an extremely lengthy period of service may work to increase a salvage award, a short

period of salvage services does not diminish the value of a salvage award.  Indeed, many courts

have found that in circumstances like the *BARBERI* salvage, the less time spent achieving

success, the greater the award should be.  See, e.g., The Connemara, 108 U.S. 352 (1883)(where

U.S. Supreme Court held "[t]he shortness of the time occupied in rescuing the ship from danger

does not lessen the merit of the service"); Martin J. Norris, The Law of Seaman 343 (4th Ed.

1985) (herein "Norris") (quoting English case where the court concludes "I am at a loss to

conceive why a patient should complain of the shortness of an operation").   Salvage services

occurring over short periods often reap substantial awards. See McNabb v. O.S. Bowfin, 565 F.

Supp. 22, 24 (W.D. Wash. 1983) (awarding maximum amount in stipulated high-low for 5-10

minutes of work);  The Boyne, 98 F. 444, 446 (E.D. Va. 1899) (awarding 5% for 15 minute

salvage where "time in the position in which the ships were, was of vital importance" and "the

least delay would have been fatal"); The Connemara, 108 U.S. 352 (1883) (where the United

States Supreme Court proclaimed that "[t]he shortness of the time occupied in rescuing the ship

from danger does not lessen the merit of the service").

Courts judge the "nature of the labor" in addition to the time of the labor.  Where labor is

performed under stressful conditions or rough weather, the value of the salvage services will be

increased. See O'Hagan v. M&T Marine Group, LLC, 2010 WL 1372431 *2 (noting labor made

more difficult by high winds and flying debris);  The George Hawley, 242 F. 473, 475 (5th Cir.

1917).

Particularly where there is a high degree of imminent peril to life and property, salvors that act with the highest level of skill and seamanship will inevitably rescue a distressed vessel with greater speed.  As a result, salvage jurisprudence is replete with cases holding that where degree of danger and other risks are high, a short salvage period is a basis for *increasing* rather than decreasing the salvage award. See The Toledo, 136 F. 959, (S.D.N.Y. 1905); The Boyne, 98 F. 444 (E.D. Va. 1899) (15-20 minutes); The Straits of Gibraltar, 32 F. 297 (Dist. Ct. N.J. 1887) (short salvage is particularly valuable where each moment of delay would have added to injury). Notably, the salvage period in the seminal Blackwall case itself lasted less than one hour. The Blackwall, 77 U.S. 1 (1869) (upholding award of $10,000 when salved vessel was valued at $100,000 and salvor's tug valued at $50,000).

As discussed in detail under the "promptitude" in Section "II H" *infra*, the salvage services in the case at bar were rendered extremely promptly.  As many passengers had potentially fatal injuries and the *BARBERI* was in danger of running aground in merely 20 minutes, speed was an essential ingredient of success under the circumstances of this case. Therefore, under the reasoning applied by the courts in The Straits of Gibraltar and The Toledo cases, this Court should reward Mate Seckers and the crew of the *DOROTHY J.* for the great promptitude of the services they performed.   Defendant's arguments that the value of the salvage services are diminished by the relatively brief time period in which they were rendered, were specifically rejected by the Supreme Court nearly 130 years ago in The Connemara.   In addition, this Court should recognize that the labor was performed under the extremely extenuating circumstances of this case.  As detailed in the following section, Seckers, Flecker and the crew of the *DOROTHY J.* performed the salvage services in high winds, strong current, amongst hazardous debris, amend a hoard of frantic passengers, on a ferry with an unstable

superstructure and virtually no assistance from the ferry's crew.   The combination of these factors made the salvor's "labor" extremely difficult and challenging under the circumstances.

### E.   The value of the property risked or employed by salvor, and degree of danger to which this property was exposed

#### i)   *Value of the DOROTHY J. on October 15, 2003*

Courts also consider the value of the salvor's property under the *Blackwall* analysis. <u>See</u>, <u>e.g.</u>, <u>Lambros Seaplane Base v. The Batory</u>, 215 F.2d 228, 234 (2nd Cir. 1954). Value and risk to the salvor's property are central considerations in the calculation of "cost" under Posner's cost-benefit considerations.   <u>See</u>  <u>Savannah Sugar Refining Corp. v. Atlantic Towing Co.</u>, 15 F.2d 648 (5th Cir. 1926).  "Value" of the salvor's property is measured by "fair market value" at the time of the salvage operation.  <u>Id.</u>; <u>DiGirolamao v. C. Malone Trucking</u>, 211 F.Supp. 660 (D. Mass. 1963).  Where a certain vessel does not have an established market, the proper measure of value is "replacement value less the cost of depreciation."  <u>See</u> <u>Petition of U.S.</u>, 229 F. Supp. 241, 243 (D.C. Oregon 1963); <u>B.V. Bureau Wijsmuller v. U.S.</u>, 487 F. Supp. 156, 159 (S.D.N.Y. 1979) (holding that where no market value, "replacement value" is proper measure of value salvage cases).  Although the Defendant has attempted to argue that "insured value" represents an owner's assessment of the true value of his or her vessel *(see Tr. 193, lns. 10-14)*, Courts have specifically rejected this argument in the past. <u>See</u> <u>San Francisco Bar Pilots v. Vessell Peacock</u>, 733 F.2d 680, 682 (9th Cir. 1984) (noting that "difficulties arise" in using insured value because they are often "deliberately underinsured" and therefore insured values are not "regarded as conclusive evidence of value, nor do they have much weight").  Indeed, the metric of "insured value" is only employed in the rare circumstance, not present in the instant matter, when there is absolutely no other means to value the vessel.  <u>See</u>, <u>Lewis v. JPI Corp.</u>, 2009 WL 37619847

(S.D. Fla 2009) (finding that use of "insured value" of the boat would be improper because market value could be ascertained).

The *DOROTHY J*. had a fair market value of approximately **$900,000** and a replacement value over **$1,900,000** on October 15, 2003.   *See Def. Ex. 12* (survey report).    At trial, independent survey reports performed closest in time (immediately before and after) to October 15, 2003, reflect a fair market value of $730,000 on February 3, 2003 and $1,000,000 on September 4, 2004. *Def. Ex. 12 (Survey Report 2.3.10)* & *Cl. Ex. 21 (Survey Report 9.4.10)*. Dorothy Julian, the *DOROTHY J*.'s owner testified that the increase in value in 2004 was due to extensive upgrades to the *DOROTHY J*. after February 3, 2003, that were already in progress prior to October 15, 2003.  *Tr. 159, lns. 1-14 (Julian)* (noting extensive upgrades that were made on the *DOROTHY J*. after the February 3, 2003 survey was performed increasing its value to approximately $900,000).   Nevertheless, if the Court determines that the market value for the *DOROTHY J*. was not established by the evidence at trial, under the clear case law, the Court should then use "replacement value" as the proper measure of the tug's value.  The independent survey closest in time to October 15, 2003 estimates the *DOROTHY J*.'s replacement value at $1,900,000.[7]  *Def. Ex. 12 (Survey Report 2.3.10)*.   For the reasons explained above, the  Court should ignore any evidence as to the insured value of the *DOROTHY J*. because of the availability of other more accurate measures of the tug's value favored by salvage jurisprudence. Additionally, the owner of the *DOROTHY J*. testified at trial that she deliberately underinsured the *DOROTHY J*. in order to reduce the cost of her insurance premiums. *Tr. p. 194, lns. 1-14 (Julian)*.  Therefore, in the case at bar, "insured value" is particularly unreliable for determining the value of the *DOROTHY J*. at the relevant time.

---

[7] The upgrades that occurred post 2.3.10 would have increased the "replacement value" just as these upgrades enhanced the "fair market value" so the "replacement value" would actually be greater than $1,900,000.

### ii)       *Risks to the DOROTHY J. in rendering the salvage services*

In order to determine the "costs" to the salvor associated with salvage services courts not only look at the value of the salvor's vessel, but the degree to which that vessel was at risk. See De Aldamez v. Th. Skogland & Sons, 17 F.2d 873 (5th Cir. 1927) (noting substantial risk of salvor running aground).  Where the value of the salvor's property is substantial and the degree of risk high, courts will give a more liberal award.  Id. (where award was doubled after risk of running aground taken into account).  Moreover, Courts have held that exposure of the salving vessel's propeller to getting entangled in a line or debris (i.e. "fouling) constitutes a substantial risk under this factor.   The Melody 157, F.2d 448, 449 (9th Cir. 1946) (citing inherent risk that any towing vehicle "will foul his own towing line in his own propeller").   The Second Circuit Court of Appeals has also held that weather conditions may affect the degree of danger to the salvor's property.  See Hausteca Petroleum Co. v. U.S., 27 F.2d 734, 735 (2nd Cir. 1928) (increasing of award because of danger of rendering services in high current).

The broad range of dangers to the *BARBERI* and its passengers are well chronicled in the "degree of danger" Section "IIC" above.  Many of these dangers, such as loose & hazardous debris on the *BARBERI*, also presented risks to the *DOROTHY J.*   In addition, the tug itself was exposed to a unique set of risks including the risk of broaching or swamping, engine or mechanical failure due to engaging the engines without being adequately warmed up, damage from hazardous debris, striking against the *BARBERI* with the wind and current and exposure to the propeller fouling.

**Risk of Broaching or Swamping**

Mate Seckers testified at trial that the *DOROTHY J.* secured "face wires" to the *BARBERI* at "position 2" [8] During this process Mate Seckers continued to push the *BARBERI* to prevent its southeasterly drift. *Tr. p. 45, lns. 14-22 & p. 47, lns. 3-7 (Seckers).*  The *DOROTHY J.*'s deckhand testified that the face wires were put up one at a time. *Tr. p. 716, ln 11– 717, ln. 20 (Druda).*  Under the conditions of the strain from the current and wind and the pressure from the *DOROTHY J.* pushing the *BARBERI*, with the face wire up only one side, the *DOROTHY J.* was at risk of heeling or "rolling over" from the uneven pressure of the face wire. *Tr. 46, lns. 9-16 (Seckers).*

In addition, Seckers testified that at least 100 panicked passengers attempted to push their way on to the *DOROTHY J.* as it arrived at "position 2" on the New York end of the *BARBERI*. *Tr. 46, lns. 3-8 (Seckers); Tr. p. 256, lns. 11-18 (Druda).*  Had this occurred, the pandemonium that would have created and the additional weight it would have placed on the *DOROTHY J.* which was not designed to carry any passengers could have caused the tug to swamp.  At the very least, it would have interfered with the tug crew performing their jobs and placed the tug in danger from that alone.

## Exposure to Engine or Mechanical Failure

Routine operating procedure on the *DOROTHY J.* required the engines to warm up for approximately 15-20 minutes prior to getting underway. *Tr. p. 33, lns. 15 -18 (Seckers).*  At the time of the allision, Mate Seckers, reacting to the emergency, ordered the engines to be started immediately and to get underway without warming them up. Id.  Seckers immediate response to the emergency exposed the *DOROTHY J.*'s engines to mechanical failure.

---

[8] Several numbered "position" were demarcated by Mate Seckers at trial to describe the various places the tug came along the ferry to render assistance. Tr. pgs. 31- 72 (Seckers).  The 3 "positions" referred to herein are generally as follows: **position 1**: the Staten Island end bow where *DOROTHY J.* tied up a soft line to arrest the ferry drift; **position 2:** New York end where *DOROTHY J.* pushed and made up "push wires" and **position 3:** where Dorothy J. pushed *BARBERI* into the wind from the damaged side of the ferry midship.

**Risk of Propeller Fouling**

The *DOROTHY J.*' propeller was at risk of fouling from the extensive debris in the water. When the *DOROTHY J.* was in the process of leaving the slip to come to the aid of the *BARBERI*, it was surrounded by a field of debris including hundreds of loose life jackets as well as the debris field from the ferry's superstructure spanning 400 yards. *Def. Ex. 21, p. 33* (NTSB Report) (Coast Guard broadcast warning, within ten minutes of salvage period, describes 400 yard debris filed moving through anchorage). *Tr. p. 32, ln. 15 – p. 33, ln. 1 (Seckers).* In addition, because of the set-back location of the cleats on the *BARBERI* , the *DOROTHY J.*, was forced to use long tow lines and push wires to reach them. *Tr. p. 44, lns. 16-18 & p. 44, lns. 21-23 (Seckers).* Under the reasoning of <u>The Melody</u>, the long lines exposed the *DOROTHY J.* to the risk of fouling its propeller. There was a substantial risk that the loose debris or that the tow ropes or wires could have been entangled in the moving propeller of the *DOROTHY J.* thus "fouling" the propeller and rendering it inoperable. This could also have caused damage to the *DOROTHY J.'s* propeller shaft and to her engine.

**Physical damage from loose debris and colliding against the *BARBERI***

Under the wind and tide conditions which existed at the time, simply coming alongside the *BARBERI* exposed the *DOROTHY J.* to damage from colliding against the *BARBERI* in the gusting wind and running sea conditions. *Tr. p. 417, p. 4-17 (Clifford).* Moreover the Dorothy J.'s close proximity to the *BARBERI* exposed it to the danger of being struck by loose debris described under the Section IIC "degree of danger" above. At times during the salvage operation the *DOROTHY J.* was positioned downwind (i.e. to the southeast) of the *BARBERI* thus exposing the tug to a greater risk that any debris taking flight in the strong winds would land on the tug or strike it. *Tr. p. 46, lns. 4-6 (Seckers)* (describing pushing the *BARBERI* toward the slip (i.e. northwest) from New York end of the ferry, which necessarily means the tug was southeast and

downwind of the ferry).  The *DOROTHY J.*'s exposure to physical damage particularly increased as the *DOROTHY J.* pushed the *BARBERI* at its damaged side at "position 3" where there was unsupported superstructure, in order to hold the *BARBERI* into the wind and current as it maneuvered into the slip.  *Tr. p. 51, ln. 4 – p. 53, ln. 6 (Seckers)* ("with the damage there, the superstructure could've—a lot of it was just hanging, could've fell on the tug").  Moreover, any buckling or fracture of the upper decks could have fallen directly onto the tug.  *Tr. p. 649, lns. 5-22 (Cushing)*.  This risk actually increased after the *BARBERI*'s power returned because the vibrations from the engines increased the likelihood of the upper decks fracturing or buckling and that loose debris would fall off the ferry.  Id; Section "IIC" infra ("degree of danger").

## F.  Danger to the Salvors

### i.  Risks to Salvors

In addition to the danger posed to the salvor's property, Courts consider the exposure of the salvors themselves to harm or injury.  Platoro Limited, Inc. v. Unidentified Remains of Vessel, 518 F. Supp. 816 (W.D. Tex. 1981).  While the dangers to the salvors are inextricably linked to the danger to the salvors' property, there are risks that are unique to each.  Moreover, the danger to life and limb is arguably the most important "cost" to salvors to consider in Posner's cost-benefit analysis, as people generally place a high premium on their own physical well-being.  As one court has aptly noted:

> What enhances the pretension of salvors most is the actual danger which they have incurred.  The value of human life is, and ought to be, principally considered in the preservation of other men's property; and, if it be shown to have been hazarded, it is most highly estimated.

The B.C. Terry, 9 F. 920 (D. Ga. 1881).

The risks to salvors that factor into a salvage award are those that are not "normally encountered by men who go to sea." B.V. Bureau Wijsmuller, v. U.S., 702 F.2d 333 (2nd Cir.

1983).   The Second Circuit Court of Appeals has held that a strong current poses substantial risks to salvors.  See Huasteca Petroleum Co. v. U.S., 27 F.2d 734, 735-36 (2nd Cir. 1928) (doubling lower court's salvage award on appeal for failure to take current into account); Tyner v. F/V. Bristol Enterprise, 1997 A.M.C. 1714 (D. Alaska 1997) (salvors at substantial risk of collisions and injury while hooking up tow lines in strong current).   Moreover, salvage that involves towing under strained conditions includes the substantial risk of the lines parting which can cause severe injury to salvors in the lines' path.   The Western Pride, 274 F. 920 (2nd Cir. 1921) (where lines parted multiple times in towage of vessel in high winds); The Buckhannon, 284 F. 917 (S.D.N.Y. 1922) (where cable parted in high winds during towage).

The dangers to the tug *DOROTHY J.* are discussed in detail in the "danger to the salvor's property" Section "IIF." Not surprisingly, the salvors' fate was also tied to that of the tug.  The hazardous loose debris, the risk of collision, inundation from passengers and risk of swamping or broaching, the risk of falling between the boats or falling overboard also presented clear and present dangers to salvors themselves.  Indeed, many of these dangers posed an even greater risk to the salvors than they did to the tug.  For instance, a piece of aluminum blown through the air or dropping from the ferry's deck may have only caused minimal damage to the steel hull of the tugboat but nonetheless could have posed a potentially fatal risk to the unprotected crewmember on deck.  Moreover, all of the *DOROTHY J.'s*  crew members who boarded the ferry were also exposed to the additional risks posed to the *BARBERI* and its passengers discussed under the "degree of danger" in section "IIB" above.  The salvors were also exposed to additional injuries from falling overboard, being struck by parting lines, risks created from the *BARBERI* moving without knowing the *DOROTHY J.*'s whereabouts, and even potential liability in negligence to third parties had they not performed as well as they did.

The *DOROTHY J.*'s crewmembers passed from the *DOROTHY J.* to and from *BARBERI* several times throughout the salvage services. *Tr. p. 746, ln. 22 – 747, ln. 5 (Druda)*.  Under the wind and sea conditions existing at the time, this created a risk that the crewmembers could fall overboard and drown or be crushed between the two vessels each time a crewmember moved between the vessels.  Applying the formula for risk (risk = probability x consequences), the consequences of such a fall would have been severe while the probability was great that such an injury would occur despite Seckers' skill in holding the tug flush to the *BARBERI* and therefore the danger was extremely high.  The crew's position close to the strained lines and wires also placed them in harm's way in the event that the line parted or broke, *Tr. p. 749, lns. 1-21 (Druda)* (if line parted it could have injured him severely); *Tr. p. 46, ln 17 – p. 47, ln. 1 (Seckers)* (parting could severely injure or kill someone).

These dangers were intensified at "position 1" of the salvage operation, before the tug had any communications with the *BARBERI* and the ferry Captain was unaware of the *DOROTHY J.*'s location.  Seckers assumed a substantial risk of the *BARBERI* unexpectedly powering off without warning, by placing his soft line at "position 1" before he had established communication with the *BARBERI's* Captain.  The trial evidence establishes that despite diligent efforts the *DOROTHY J.* could not establish radio communications with the *BARBERI* until several minutes after they made fast the soft line on the Staten Island end of the Ferry.  *Tr. p. 39, lns. 7-16 (Seckers) (10-15 minutes before radio contact with Captain Gansas); Tr. p. 1024, ln 19 -1025, ln. 19* (Seckers told Gansas he was already hooked up when radio communications first established).  Captain Gansas testified that he did not see the location of the *DOROTHY J.* or its crew from the Staten End pilothouse. *Tr. p. 1024, lns. 16-18 (Gansas)*.  Although it is now known that the controls were not utilized for over twenty minutes after the crash, had the

*BARBERI* attempted to maneuver or change position while the tug was on its bow, that could have resulted in injury to the *DOROTHY J.*'s crew.  Similarly, had the *BARBERI* suddenly moved while the crewmembers were getting on or off, they could have fallen into the water or between the two vessels.  The sheer size and power of the *BARBERI* could have parted the lines that were made fast between the two vessels, also putting crewmembers at risk.

### ii.  Risk of liability

Under the 1989 Convention "risk to salvors" explicitly includes "risk to liability" in tort. 1989 Convention at 13(7).  Salvors liability for breaching a duty of care can be substantial. Salvors have a "duty of reasonable care" with respect to the property and lives that are in need of the salvage.  See, e.g., The George W. Elzey, 250 F. 602, 604 (2nd Cir. 1918) (reducing salvage award for salvor's negligence in putting out fire).   It is well established that a party who renders voluntary medical assistance to a wounded person in need, whether or not in a salvage context, owes that person a duty of reasonable care.  See Restatement (Second) of Torts § 323 (2010). Indeed, courts hold salvors affirmatively liable in damages for negligent rendering of salvage services. See generally, Joseph Edwards, *When Damages will be Assessed Against a Negligent Salvor*,  28 A.L.R. Fed. 223 (1976); see, also, The S.C. Schenk, 158 F. 54, 60 (6th Cir. 1907) (holding "when a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel"); Serviss v. Ferguson, 84 F. 202 (2nd Cir. 1897) (assessing damages against salvor, for failure to prevent damage to vessel after it was rescued). Specifically, the Second Circuit Court of Appeals has assessed damages against a salvor who negligently collided with an adrift vessel it was saving.  The Cape Race, 18 F. 2d 79, 81 (2nd Cir. 1927) (holding that salvor's negligence forfeited salvage award and awarding affirmative

damages against the would-be salvor for the negligent collision).  Moreover, courts have held salvors liable for negligent towing of a vessel.  See, e.g., The Noah's Ark v. Bentley & Felton Corp., 292 F.2d 437, 440-441 (5th Cir. 1961).

Thanks to the diligent efforts of the salvors here, the salvage services by Seckers and the crew of the *DOROTHY J.* were carried out with the highest degree of care.  Nonetheless, by voluntarily rendering services to assist the *BARBERI*, the *DOROTHY J.*'s crew also exposed themselves to potential liability to both the owners of the *BARBERI* and the 1,500 passengers on board, in the event that services were performed negligently.  In the event that Seckers or the *DOROTHY J.* had caused additional damage to the *BARBERI* or had the crew caused injuries to its passengers they may have forfeited their rights to any salvage award or have been affirmatively liable for damages themselves.  Had Mate Seckers chosen the wrong spot to push the *BARBERI* at "position three," the *DOROTHY J.* could have breached the damaged superstructure of the ferry and caused additional damage.  Just as the Second Circuit has held that salvors are liable for colliding with a drifting vessel they were attempting to save, in The Cape Race case, had the *DOROTHY J.* collided with the *BARBERI* during its multiple approaches, Seckers and Henry Marine could have been exposed to a claim for damages. Similarly, the crew members that boarded the *BARBERI* with first aid kits assumed the duty of reasonable care to those passengers receiving care.  Finally, the evidence shows that several passengers had jumped or fallen into the water surrounding the ferry. *Tr. p. 33, lns. 15 -18 (Seckers)* and Mate Seckers was at risk of negligently hitting or running over these passengers as he guided the *DOROTHY J.* to and around the *BARBERI* during the salvage operations.

### G.  Promptitude, Skill & Energy of the Salvors

### i.    *Salvage Services were Performed with a high degree of promptitude and energy*

Under common law, Courts have always given substantial weight to the degree of promptitude of the salvage service under the <u>Blackwall</u> factors. <u>See, e.g.</u>, <u>Nolan v. A.H. Basse Rederi Aksteiselskab</u>, 164 F. Supp. 774, 777-78 (D.C. PA 1958) (awarding over 9% of value of property saved where promptitude was high order, even where, unlike the instant case, risks to salvor and its property were low). Indeed, the drafters of the 1989 Convention, felt that this consideration was so important that they made "the promptness of the services rendered" an independent factor for a salvage award. <u>See</u> 1989 Convention at 13(1)(h). Particular weight is given to "promptitude" in those situations where the nature of the marine peril requires immediate action for the salvage to be successful. <u>See</u> <u>The Lydia</u>, 49 F. 666, (E.D.N.Y. 1892) (awarding higher share to tugs that arrived on scene first where fire would have engulfed salved vessel had they arrived later). In this same vein, courts have held that alacrity is never of greater importance than when lives are at risk on a vessel. <u>See</u> <u>The Boyne</u>, 98 F. 444 (E.D. Va. 1899) (upholding award of 5% for 15 minute salvage reasoning "[t]ime, in the position in which the ships were, was of vital importance. The least delay would have been fatal, and this time was just what saved the vessel"). The concept of "promptitude" covers both the speed with which the salvor *arrives* at the scene of the distressed vessel, and the rapidity with which the salvage service is successfully *completed*. <u>See</u> <u>The Elkridge</u>, 34 F.2d 147, (S.D.N.Y. 1927) (awarding $25,000 for salvaging a vessel valued at $198,000 and noting the prompt fashion in which salvage services performed); <u>W.E. Rippon & Son v. U.S.</u>, 348 F.2d 627, 629 (2nd Cir.) (noting timely arrival of salvor). In addition, Courts give larger awards to salvors who act with a high level of energy or zeal during the salvage. <u>See</u>, <u>e.g.</u>, <u>Devine v. F/V. Hornet</u>, 1969 A.M.C. 640, 642 (D.C. Alaska 1967).

Even where there is little danger and only routine skill is used, unlike the *BARBERI* salvage, courts grant substantial awards for prompt rescue.  For example, in The No. 92,  four scows were adrift without power in New York Harbor, The No. 92 Waterfront Contracting and Lighterage Co. v. Goodwin-Gallagher Sand & Gravel Co., 252, F. 117 (2nd Cir. 1929).  A tugboat promptly responded to save the drifting scows and pulled them to safety in roughly thirty minutes, Id. at 119.  The Second Circuit Court of Appeals held that "[t]he service did not involve any danger and took very little time; but it was prompt and effective, and averted the probability of total loss or substantial injury." Consequently, the Court of Appeals doubled the salvage award made by the district Court.  Id.

The prompt response in the case at bar is uncontroverted.  Even Defendant's Counsel admitted in his opening statement that "The *DOROTHY J.* did, in fact, promptly proceed out to the *ANDREW J. BARBERI.*" *Tr. 23, lns. 18-19 (Meehan).*  The *DOROTHY J.* and its crew engaged in the salvage services, arrived alongside the *BARBERI,* and ultimately returned the ferry to its slip with the highest possible degree of promptitude, energy and zeal.  The record at trial established that upon perceiving the impending allision, Mate Seckers sounded the tug whistle, got the engines started and cast off the lines before the *BARBERI* even made contact with the pier. *Tr. p. 31, lns 9-7 & p. 32, ln. 5 (Seckers)*; The tug then immediately proceeded to the ferry's side to render assistance. *Tr. p. 33, ln. 13 – p. 34, ln. 4 (Seckers).* The *DOROTHY J.* arrived alongside the damaged end of the *BARBERI* within minutes.  *Tr. p. 745, ln. 20 – p. 746, ln. 11 (Druda)* (1.5 minutes from time tugboat cast off until they were on their way to ferry and he first observed damage); (Seckers) (5 minutes after allision until tug made fast with soft line to ferry).  Subsequently, the efforts of the *DOROTHY J.* allowed the ferry to return to the berth roughly 23 minutes after the allision, which was in less than half the time that it would have

returned without the *DOROTHY J.*'s assistance.  <u>*See*</u> *Def. Ex. 21* (NTSB Report)(describing ferry entering slip at roughly 15:43 and emergency records indicating the allision happened at approximately 15:20); <u>see</u> <u>supra</u>, "expediting the ferry's return" Section II(A) ("Measure of Success").

The Court has suggested that the *DOROTHY J.*'s quick response was due to the "fortuitous fact that it happened to be right there when the accident occurred." *Tr. p. 409, ln. 20 – p. 410, ln. 3*.  To be sure, to some degree, all successful salvage operations hinge on the fortuitous circumstance that the salvors are close enough to the distressed vessel to get to the scene and render successful services before it is too late.  Nevertheless, the <u>Blackwall</u>/1989 Convention factors dictate a liberal interpretation of the promptitude factor.  "Promptitude" includes the exigency with which the salvors *engage* in the salvage by setting out to render assistance, not merely the quickness with which the salvors *arrive* at the vessel in distress.  <u>See</u>, <u>e.g.</u>, <u>Conolly v. S.S. Karina II</u>, 302 F. Supp. 675, 678 & 681 (E.D.N.Y. 1969) (finding undisputed high degree of promptness  where "they began readying their vessel as soon as they became aware of [the distressed vessel's] plight," even though salvors did not arrive at distressed vessel for three and one half hours); <u>The Shreveport</u>,  42 F. 2d. 524, 535 (D.C.S.C. 1930) (enhancing award were salvors initiated services "with no hesitation").  Although, the *DOROTHY J.* had to travel a relatively short distance to reach the *BARBERI* because of its close proximity, this fact does not diminish the immediacy of the crew's response.  Regardless of the *DOROTHY J.'s* geographic location,  Mate Seckers could have waited for permission from the tug's owner, Dorothy Julian, before placing his employer's property at risk or he could have waited to establish radio contact with the *BARBERI* before doing anything or he could have waited for emergency personnel to arrive on the scene before taking any action. Alternatively,

the crew could have succumbed to the conventional culture of "not getting involved," and not responded to the disaster at all. Despite these reasonable alternatives, Seckers and the crew of the *DOROTHY J.* did none of these things.  Seckers and the crew took immediate action, without hesitation, to go to help the *BARBERI* without regard for their personal safety or convenience.

In view of the speed of the *BARBERI*'s uncontrolled drift, her state of no command, and the degree of danger she and her passengers were in, "promptitude" was indeed of vital importance  for the salvage services to be successful at all.   Therefore, under the reasoning of The Lydia and The Boyne, cases discussed above, the promptitude shown here should also be accorded substantial weight in considering the amount to be awarded in this case.

### ii.  *Salvage Services Demonstrated an Extremely High Degree of Skill by DOROTHY J.'s crew.*

A high degree of skill displayed by the salvors also works to enhance the size of a salvage award.  See Wood v. the Wellington, 54 F. 901 (D.C. Cal 1893) (commending high skill in attaching a hawser).   "Skill" is comprised of decision making, judgment and physical acts. See The Dolcoath, 16 F. 264, 266 (D.C. Fla. 1883) (holding that "[s]kill is shown in the adoption of means suited to accomplish the end. It is in the choice and use of the best means at command that good judgment is displayed," citing, Marvin, The Law of Wreck and Salvage, 107 (a treatise still widely used by jurists today); see, also, The City of Portland, 298 F. 27, 29 (5th Cir. 1924) (commending good judgment); De Aldamiz v. The Skogland & Sons, 17 F.2d 873, 874 (5th Cir. 1927) (noting skillful maneuvering of tug by salvor to avoid running aground). The Second Circuit Court of Appeals has held that attaching towing lines under dangerous conditions requires "skill and courage of the highest order." The West Harshaw, 69 F.2d 521, 523 (2nd Cir. 1934).  Moreover, this court has previously held that a high degree of skill is demonstrated by a

tug boat with limited power assisting a much larger vessel.  See, Conolly v. S.S. Karina II, 302 F. Supp. 675, 678 & 681 (E.D.N.Y. 1969).

Courts treat anything beyond "ordinary skill" displayed by a non-professional salvor, as an extraordinary service working to enhance the salvage award.  The Cape Race, 18 F.2d 79 (2nd Cir. 1927).  Defendant's Counsel has argued, through a series of incomplete analogies, that the salvage services here were merely the type of activities typically performed by a tugboat and its crew. *Tr. 26, lns 4-7 (Meehan)* (salvage services were "not beyond the work routinely performed by vessels involved in harbor towing operations).  Defendant argues that since tugs ordinarily attach lines to barges at anchor or approach vessels as they are underway, the *DOROTHY J.*'s activities with respect to the *BARBERI* were ordinary services. *Tr. p. 127 – 129, ln. 24 (Seckers)*. If accepted, this argument would entirely divorce all of the actions and services of the crew of the *DOROTHY J.* from the context in which they were rendered, and it completely ignores the size and capabilities of both vessels as well.

Courts do not consider the work done in salvage service in a vacuum.  The degree of skill shown in the performance of the salvage services is inextricably linked to the conditions under which they were rendered.  See Hausteca Petroleum Co. v. U.S., 27 F.2d 734, 735 (2nd Cir. 1928) (increasing award for failure to take into account how strong current increased skill level necessary to perform salvage); The Western Pride, 274 F. 920 (2nd Cir. 1921) (high winds and rough seas make the act of tying up lines and towing particularly skilful).  Here, the dangers to the salvors and their property and the degree of danger facing the *BARBERI* and its passengers, which are discussed in detail in Sections "IIF" and "IIG" *infra*, demanded the highest degree of skill by the salvors to perform a successful salvage service and necessarily made the services extraordinary.  Moreover, the extent of the human suffering which was unfolding on the ferry at

the time the services were rendered inevitably presented unique stresses on the salvors who persevered and maintained focused on the task at hand.

The facts and circumstances of the particular activities involved in this salvage vastly differed from the ordinary activities of the tug.  Even with routine towing, the testimony at trial discloses that the towing of the ferry was ordinarily done with: 1) two or three individual tugboats;   2) the assistance of ferry's deckhands to make lines fast to the tug while the ferry was at anchor or in a berth; 3) a towage plan agreed upon between all parties in advance; 4) a pilot standing  watch on the ferry's bridge conducting the operation while in radio communication with all of the tugs; 5) multiple lines and wires between the two vessels; and 6) prior approval of the Coast Guard.  *See Tr. p. 413, lns. 9-14  (Clifford)* (lines normally attached to the ferry only when it is tied up in a slip); *Cl. Ex. 21, p. 4-5 (BMT Report)* (outlining detailed towage plan, recommending 3 tugs, a pilot to conduct the operation and line handlers); *Tr. p. 54, lns. 13-23 (Seckers)* (based on personal experience, ferry normally moved with multiple tugs and a pilot on the ferry making all of the decisions); *Tr. 162, ln. 8 – 164, ln. 14 (Julian)* (prior notification to Coast Guard, multiple tugs, ferry line handlers and pilot all ordinarily required).  In contrast, the *DOROTHY J.* and its crew successfully stopped the drift of the *BARBERI* with a single tugboat of merely 1400 horsepower, it made fast or came alongside a severely damaged vessel on three (3) separate occasions, without the assistance of any of the ferry's deckhands, and without the benefit of a pilot or anyone else from the  ferry directing the operation, without any prior towage plan and with limited communication with the ferry pilothouse.  *Tr. p. 49, lns. 11-12 (Seckers)*.

Also, lines were made fast by the tug's crew after boarding the moving ferry several times while avoiding the debris which surrounded the ferry's cleats and deck.  *Tr. p. 746, ln. 22 – 747, ln. 747, ln. 5 (Druda)* (boarded at least 4 times while making lines fast).  Photographs of the

deck and interior of the ferry, the NTSB report, and several eyewitness accounts clearly show the devastation in the areas where the lines and wires were made fast to the ferry.  *See Cl. Ex. 41* (Photo) (displaying the sharp hanging metal and extensive debris covering whole Staten Island end where *DOROTHY J.* tied up at position 1); Def. Ex. 21, p. 20 (NTSB Report) (noting excessive damage in the areas of the cleats); *Tr. p. 38, lns. 4-6 (Seckers)* (noting debris all around cleats); *Tr. p. 248, lns. 1-5 (Flecker)* (cleats had to be cleared of debris); Moreover, one of the crewmembers tasked with making  lines fast was the *DOROTHY J.*'s Engineer, who, unlike a deckhand, was not ordinarily responsible for tying up lines. *Tr. p. 249, lns. 14-24 (Flecker)* (Druda had to help tie up lines because *DOROTHY J.* was short one deckhand from its normal crew complement that day).

With merely 1400 horsepower, the *DOROTHY J.* was also underpowered to move the *BARBERI* on its own.  The record of this case shows that a towage plan to move the *BARBERI* just days after the accident, after it had the benefit of the extensive shoring, called for the use of three tugboats with minimum 3,300 HP, 2,200 HP and 1,600 HP respectively.  *Cl. Ex. 33, p. 5* (BMT Report).  The *DOROTHY J.* had only 1,400 HP and was only 65 ft. in length, yet Seckers and the crew of the *DOROTHY J.* selflessly and successfully stopped the *BARBERI* from drifting across New York Harbor and helped the *BARBERI* get in to St. George over twenty (20) minutes sooner than she would have gotten there alone.  *See Def. Ex 12 & 13* (Survey Reports).  Mate Seckers described the tug's size and strength relative to the *BARBERI* as being like an "ant on an elephant" *Tr. p. 54, ln. 6 (Seckers)*.  The *DOROTHY J.* was ordinarily utilized as a "harbor tug" and was never used for docking or berthing ships in New York Harbor on any occasion prior to October 15, 2003.  *Tr. p. 163, lns. 16-24 (Julian)* (*DOROTHY J.* never used to come along ships for assistance or docking); *Tr. p. 416, ln. 10 (Clifford)* she was ("not a salvage tug").

Consequently, under the court's reasoning in the <u>Conolly</u> case *supra*, the fact of Seckers and the crew's success, despite their having had absolutely no prior experience with the situation they encountered, and despite the vessels' disparity in size and power, is testament to the salvors expert management and great skill, which they exhibited here.

Throughout, Seckers and the *DOROTHY J.*'s crew demonstrated a superb ability to react quickly and effectively  under pressure and to accomplish the job before them.    Under salvage jurisprudence as explained in <u>The Dolcoath</u>, case *supra*,  such high degree of skill in combination with the salvors promptitude and zeal, dictates that a very liberal award be made in this case.

## III.    INTEREST

The Court should direct the Clerk to award prejudgment interest on any salvage award it makes in this case.  While the award of prejudgment interest is within the discretion of the Court, there is a specific presumption in favor of prejudgment interest in salvage cases. <u>See Southernmost Marine Services, Inc. v. 1 2000 54' Sea Ray</u>,  250 F. Supp. 2d 1367, 1381 (S.D. Fla 2003) (holding "the law is clear that prejudgment interest should generally be awarded in admiralty cases absent peculiar circumstances"), <u>citing</u> <u>Steelmet, Inc. v. Caribe Towing Corp.</u>, 842 F.2d 1237, 1243-44 (11th Cir. 1988).  Specifically, the Second Circuit has held that prejudgment interest in salvage cases is necessary to fully compensate salvors for their services. Moreover, Courts have awarded prejudgment interest where litigation was delayed due to parallel proceedings such as a petition for maritime limitation.  <u>Hausteca Petroleum Co. v. 27,907 Bags of Coffee</u>, 60 F.2d 907, 908 (2nd Cir. 1932).  <u>The West Harshaw</u>, 69 F.2d 521, 524 (2nd Cir. 1934) (holding that not awarding prejudgment interest "would deprive the salvors of their award for nearly eight years without any compensation to them for what is in substance the use of their money by the claimant").  In the instant case, nearly 7 years has passed since the

salvage occurred on October 15, 2003.  Claimants filed their claim for marine salvage within 5 months after the incident, on March 10, 2004.  Moreover, any excessive delays in the litigation were beyond the control of Claimants.  The related civil litigation was stayed in 2004 pending an investigation by the Justice Department and criminal prosecutions related to this incident, and parallel proceedings involving the City's Petition for Limitation of Liability took place after that stay was lifted.  Consequently, the Court should award prejudgment interest from the date the salvage services were rendered, to compensate the salvors for being deprived the beneficial use of their award since that date.

## <u>CONCLUSION</u>

A thorough analysis of the appropriate considerations under <u>Blackwall</u> and the 1989 Convention reveal that the services provided by the *DOROTHY J.*'s crew to the *BARBERI*  and its passengers on October 15, 2003 were of the highest order.  After alliding with a maintenance pier at full speed, the 300 foot ferry, began drifting, not under command, with a swift current and wind across a commercial anchorage while exposing the vessel and its passengers to a high degree of danger.  The crew of the *DOROTHY J.*, the only available aid, reacted promptly and skillfully, placing their $900,000 vessel and themselves at substantial risks to render assistance to the *BARBERI*, a vessel exponentially larger than the *DOROTHY J,* valued at $14,000,000 after the casualty.   As a result of the efforts of Seckers and the crew of the *DOROTHY J.*, the ferry's southerly drift was arrested, they expedited its return to the berth by more than 20 minutes, and helped the *BARBERI's* crew and passengers remain calm throughout the emergency.   These efforts saved lives, prevented further injury to passengers, further damage to the *BARBERI,* and helped the Defendant avert millions of dollars in additional costs and potential tort liability.

As described by Richard Posner in *Salvors Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism*, the <u>Blackwall</u>/1989 Convention factors

provide a paradigm for synthesizing the costs and benefits at play between the salvor and the owner of the salved vessel. Applying these factors here reveals that Defendant received an extremely valuable benefit from the salvage services rendered at substantial potential costs to the salvors.

The services performed by Robert Seckers, Paul Flecker and Henry Marine deserve an award of the highest order.

Dated: New York, New York
      August 19, 2010

                DOUGHERTY RYAN GIUFFRA
                ZAMBITO & HESSION
                Attorneys for Claimant ROBERT SECKERS

                By: _____
                    James E. Ryan, Esq. (JR 4671)
                    131 East 38th Street
                    New York, New York 10016
                    (212) 889-2300

                DOUGHERTY RYAN GIUFFRA
                ZAMBITO & HESSION
                Attorneys for Claimant ROBERT SECKERS

                By: _____
                    Craig M. Flanders, Esq. (CF 2009)
                    131 East 38th Street
                    New York, New York 10016
                    (212) 889-2300

                RUBIN, FIORELLA & FRIEDMAN LLP
                Attorneys for Claimant
                 HENRY MARINE SERVICES, INC.

                By: _____
                James E. Mercante (JM 4231)
                292 Madison Avenue
                New York, New York 10017
                (212) 953-2381
                File: 171-4473

KREINDLER & KREINDLER LLP
Attorneys for Claimant PAUL FLECKER

By: _____
     Justin T. Green, Esq. (JG 0318)
     100 Park Avenue
     New York, New York 10017
     (212) 687-8181