UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

IN RE: DOROTHY J, et al.,                     :
                                              :
                    Plaintiffs,               :     **MEMORANDUM & ORDER**
                                              :
                 - against -                  :     No. 09-cv-3512 (ERK)
                                              :
THE CITY OF NEW YORK,                         :
                                              :
                    Defendants.               :
                                              :
------------------------------------------------------------------------X

**KORMAN, J.:**

On the afternoon of October 15, 2003, the Staten Island Ferry, *Andrew J. Barberi*, allided with a maintenance pier near the Staten Island Ferry Terminal, killing eleven passengers and injuring more than seventy. When the allision took place, the *Dorothy J*, a tugboat owned and operated by Henry Marine Service, Inc. ("Henry Marine"), was docked at the same maintenance pier the *Barberi* hit. Unable to reach the *Barberi* or the City, the *Dorothy J* undertook an attempt to assist the *Barberi* back to the passenger slip where emergency personnel were waiting to help. After this initial period of assistance, the *Dorothy J* spent the next several days continuously pushing on the *Barberi* to hold it in position.

Subsequently, Henry Marine, as well as Robert Seckers and Paul Flecker, who respectively served as the mate and a deckhand aboard the *Dorothy J* on October 15, 2003, filed claims against the City of New York seeking an award for the marine salvage services performed on the *Dorothy J* to assist the *Barberi*. I granted the plaintiffs' motion for summary judgment on the issue of their entitlement to a salvage award for the services they provided in the immediate aftermath of the allision based on the assumption that "the *Dorothy J* [had] successfully helped

push the *Barberi* back to the passenger slip," *In re Complaint of the City of New York, as Owner & Operator of M/V Andrew J. Barberi*, 534 F. Supp. 2d 370, 376 (E.D.N.Y. 2008).[1]

A bench trial was subsequently held to determine the appropriate award for the salvage services the plaintiffs provided in the immediate aftermath of the allision. The evidence presented at trial clarified the role that the *Dorothy J* and its crew played in assisting the *Barberi* to safety, and provided a far more complete record than was available on the motion for summary judgment. Indeed, the trial record compels me to reconsider the threshold issue of whether the services rendered by the plaintiffs entitled them to an award—namely, whether the salvage operation had a sufficiently "useful result" to "give rise to a reward." International Convention on Salvage, Apr. 28, 1989, S. Treaty Doc. No. 102–12, 1953 U.N.T.S. 193, Art. 12(1) [hereinafter 1989 Salvage Convention].[2]

As the leading treatise on federal procedure observes: "A ruling made early in the proceeding may rest on poorly developed facts that have been better developed by continuing proceedings. In these circumstances, the forward progress of the case encourages reconsideration." 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal

---

[1]      I concluded, however, that the services the *Dorothy J* provided in keeping the *Barberi* stable in the ferry slip once the City had ordered it to do so—as the City was entitled to do under the terms of its contract with Henry Marine—did not justify a salvage award to Henry Marine or its crew members. *See In re Complaint of the City of New York, as Owner & Operator of M/V Andrew J. Barberi*, 534 F. Supp. 2d 370, 373, 382 (E.D.N.Y. 2008).

[2]      "The Senate gave advice and consent to ratification of the Salvage Convention 1989 on October 29th, 1991. . . . The Convention came into force internationally on July 14th, 1996." Martin Davies, *Whatever Happened to the Salvage Convention 1989?*, 39 J. Mar. L. & Com. 463, 463 n.2 (2008). Although Article 30 permits participating countries to "reserve the right not to apply the provisions of th[e] Convention . . . when the salvage operation takes place in inland waters and all vessels involved are of inland navigation," 1989 Salvage Convention Art. 30, Congress has not reserved that right. Indeed, during negotiations leading to the drafting of the Convention, the United States argued in favor of its application to inland waters. *See* Michael Kerr, *The International Convention on Salvage—How it Came to Be*, 39 Int'l & Comp. L.Q. 530, 549 (1990).

Practice and Procedure § 4478.1, at 695 (2d ed. 2002). Such post-trial reconsideration is not precluded. On the contrary, a district judge remains free to correct an order that resolves fewer than all of the claims between all of the parties at any time prior to final judgment. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 & n.17 (1983); Fed. R. Civ. P. 54(b).[3] This includes an order granting summary judgment. 18B Wright, Miller, & Cooper, Federal Practice and Procedure § 4478.1, at 702. While it may be unfair to revisit a pre-trial ruling when doing so would prejudice a party who declined to present evidence on the issue at trial in reliance on the previous order resolving the issue, *see Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999), revisiting the issue of the plaintiffs' entitlement to a salvage award does not undermine the plaintiffs' reliance interests. Because the issue at trial was the amount of any salvage award, and because "the measure of success obtained by the salvor" is one of the factors to consider in fixing an award, 1989 Salvage Convention Art. 13(c), the plaintiffs had every incentive to present, and indeed did present, evidence regarding the contributions made by the salvage operation.

## BACKGROUND

Henry Marine is a small tugboat company that is owned and operated by its president, Dorothy Julian. (*See* Julian Tr. 146–48.) In October 2003, the company consisted of the *Dorothy J* and one other tugboat. (Julian Tr. 147.) The *Dorothy J* is a 65-foot, twin screw harbor tug with 16 B-92 engines and a shallow draft, which had approximately 1,400 horsepower in 2003. (Julian Tr. 148–49.) It is considered a small tug within the New York Harbor. (Julian Tr.

---

[3]       Indeed, "[i]t is essential . . . to remember that reconsideration is better deserved, and more important, while an action wends its way toward the first final judgment in the trial court than in other steps in the proceeding." 18B Wright, Miller, & Cooper, Federal Practice and Procedure § 4478.1, at 694.

149.) Based on surveys performed in 2002 and 2003, the approximate value of the *Dorothy J* in October 2003 was $730,000. (*See* Pls. Ex. 21, Condition & Valuation Survey (2002); Def. Ex. 11, Condition & Valuation Survey (2002); Def. Ex. 12, Condition & Valuation Survey (2003).)

In October 2003, Henry Marine was under contract with the New York City Department of Transportation ("DOT") to provide tugboat services upon the City's authorization and request for a rate of $239 per hour. (Def. Ex. 2, Contract Between Henry Marine & City, § 8, at C-3.) Under the terms of the contract, Henry Marine agreed to make its tugboat services available to the DOT 24 hours a day, 7 days a week, to provide the DOT with tugboat services for towing, which included maneuvering, shifting, pumping, and siphoning, as well as for additional services, such as firefighting, aiding stranded ferry vessels as an emergency response vessel, and other authorized work as required by the DOT. (Def. Ex. 2, Contract Between Henry Marine & City, § 8, at C-3.) While the contract included services that would fall easily within the definition of "salvage," Henry Marine's obligation to provide those services was contingent upon an express direction from the City. *In re Andrew J. Barberi*, 534 F. Supp. 2d at 381–82. As such, the contract did not preclude an award for salvage services Henry Marine provided to the City on its own initiative. *Id.*

On the afternoon of October 15, 2003, the Staten Island Ferry *Andrew J. Barberi* had been making its regularly scheduled 3:00 PM trip from Whitehall Terminal, Manhattan, to St. George, Staten Island, when, at shortly after 3:20 PM, the vessel suddenly veered off course, proceeded full speed toward the Staten Island Ferry Terminal, and ultimately crashed into a concrete maintenance pier (pier B-1). (*See* Def. Ex. 32, FDNY EMS Report, at 3.) The weather, though very windy, was clear and not extreme. (Def. Ex. 22, NTSB Operations Group Factual Report, at 15; *see also* Druda Tr. 722–23; Gansas Tr. 1082; Def. Ex. 58, NYPD Aviation Dep't

Photos/Report.) The cause of the allision has been attributed to the sudden incapacitation of Assistant Captain Richard Smith, who was piloting the *Barberi* at the time. *See United States v. Ryan*, 365 F. Supp. 2d 338, 338–39 (E.D.N.Y. 2005).

At the time of the allision, the *Dorothy J* was docked at a pier near the St. George Ferry Terminal on a job for the City, awaiting orders to tow an oil barge. (Seckers Tr. 29–30.) On board the tug that day were Captain Mark Creamer, Mate Robert Seckers, Engineer Mike Druda, and Deckhand Paul Flecker. The DOT had advised the crew that there would be a delay in the job, and Seckers was in the wheelhouse biding his time when he observed the *Barberi* about 300 feet from the maintenance pier. (Seckers Tr. 29, 31.) By that time, the *Barberi* was far off course and rapidly approaching the slip at which the *Dorothy J* was berthed. (Seckers Tr. 31–32.) Seckers immediately sounded the deck whistle to alert the crew that the *Barberi* was heading toward the *Dorothy J*. (*See* Seckers Tr. 109–10.) Druda was in the galley at the time and the remaining crew members were sleeping in their rooms. (Druda Tr. 699.) Druda heard Seckers screaming about an emergency and came out on deck to see that the Ferry had allided with the pier. (Druda Tr. 700.)

After the allision, Druda first ran down and started the *Dorothy J*'s engines (*see* Seckers Tr. 32), then woke Flecker and other sleeping crew members (*see* Flecker Tr. 241). Once dressed, Flecker helped Druda release the lines that secured the *Dorothy J* to the pier, and the *Dorothy J* cast off from the dock within a few minutes of the allision. (Flecker Tr. 241 (describing how he assisted Druda in preparing the tug to cast off and testifying that "[a] couple minutes" elapsed from the time that Druda woke him up until the tug was underway); Druda Tr. 702 (detailing the steps he took to prepare the tug to cast off); Def. Ex. 96, Covella Dep., at 30, 33 (testifying that he saw the *Dorothy J* in the slip a few minutes after the allision).) To proceed

out toward the *Barberi*, the *Dorothy J* first had to "back out and swing." (Druda Tr. 702.) Once the tug turned around, it proceeded toward the *Barberi* very slowly and cautiously because the slip was filled with lifejackets and Seckers could not tell whether the lifejackets had people in them. (Seckers Tr. 32–33.) It took the tug about 8 minutes from the time it left to reach the *Barberi*, (*see* Seckers Tr. 34 (estimating that the process of maneuvering toward the *Barberi* took 5 to 10 minutes); Flecker Tr. 244–45, 264–65 (estimating it took the tug 10 minutes from the time it got underway to arrive alongside the *Barberi*)), which placed the *Dorothy J* alongside the *Barberi* about 10 minutes after the allision.

The damage and debris from the impact was almost entirely confined to the portion of the *Barberi* that had actually allided with the pier—the starboard side of the Staten Island end. (*See* Pls. Ex. 15, *Barberi* Damage Graphics.) Seckers initially brought the *Dorothy J* along the port side of the Staten Island end of the *Barberi*, which was on the same end of the vessel as the damage but the opposite side. (Seckers Tr. 38; *see* Pls. Ex. 15-A, *Barberi* Damage Graphic, Seckers Markings.) At that location, the crew first attempted to secure a "wire," a nautical term for a cable, but could not complete the attachment. (Flecker Tr. 247–48.) Instead, they ultimately secured a "line," a nautical term for a rope. (Seckers Tr. 38; Flecker Tr. 248.) The *Barberi* crew was not available to assist, and the *Dorothy J* was short a deckhand, so Druda stepped onto the *Barberi* to secure the line and then returned to the *Dorothy J* to secure the other end, while Flecker assisted Druda from the tug. (Seckers Tr. 38; *see also* Flecker Tr. 248–49.) The bow of the tug was level with the deck of the Ferry each time Druda crossed, and there was no rocking, which allowed him to step between the tug and the Ferry without jumping or climbing. (Druda Tr. 710–12, 724–25.)

Seckers testified that, once the line was secure, he used the tug to pull north inbound to stop the *Barberi*'s drift. (Seckers Tr. 38.) Due to its limited size and power relative to the *Barberi*, the *Dorothy J* was unable to actually move the *Barberi* north. At most, all the tug could do was slow the drift of the *Barberi* (Gansas Tr. 1072–73; Def. Ex. 96, Covella Dep., at 73–74), which was already drifting slowly (Gansas Tr. 1008, 1010; Flecker Tr. 267). This assistance lasted for a very brief period of time, because soon after the *Dorothy J* crew secured the line, Seckers was able to reach the *Barberi* Captain, Michael Gansas, over Channel 13 on the radio. (Seckers Tr. 38; Gansas Tr. 1024–25.) Seckers claimed that he was told by Gansas that the *Barberi* had steering but no propulsion. Consequently, Seckers had the crew release the line because he knew that the *Dorothy J* could not serve as propulsion with only one line out from its current location (Seckers Tr. 43–44, 139), and presumably because it was having little effect on the drift.

Seckers testified that he suggested the *Dorothy J* move to the New York end of the *Barberi* to put up face wires, which "Gansas agreed . . . was the only alternative available at the time to safely get the Ferry back into the slip." (Seckers Tr. 43–44.) Gansas, however, does not recall any portion of that conversation other than Seckers telling him he had a line up. (Gansas Tr. 1033–34.) Moreover, although Gansas's memory of the communication is admittedly limited, he did not believe—nor does the evidence support a belief—that the *Barberi* lacked propulsion. On the contrary, the *Barberi* never lost power.

I pause now to describe briefly the mechanism by which the *Barberi* was piloted and powered. The *Barberi* is a double-ended Ferry, which means it has two control pilothouses, one on each end of the Ferry, which allows it to approach and leave the dock without turning around. (Def. Ex. 22, NTSB Operations Group Factual Report, at 6.) The end of the *Barberi* that points

toward Manhattan is referred to as the New York end, housing the New York pilothouse, and the end of *Barberi* that points toward Staten Island is referred to as the Staten Island end, housing the Staten Island pilothouse.

The *Barberi* has two Voith-Schneider propeller units that are located on the underside of the Ferry, one on each end of the vessel. (Gherardi Tr. 505–08; *see also* Def. Ex. 50, *Barberi* Diagram.) The Voith-Schneider propeller is a form of propulsion that permits vessels to thrust 360 degrees in any direction at once. (Gherardi Tr. 506.) Because the *Barberi* is equipped with a Voith-Schneider propulsion system, it is exceptionally maneuverable. Trevor Gherardi, the Chief Engineer for the DOT, explained that unlike ships with a typical rudder and propeller system,[4] such as the *Dorothy J*, vessels with Voith-Schneider propulsion systems like the *Barberi* can move sideways, front and back, spin on center, and in any other conceivable direction at once. Indeed, the *Barberi* "could pirouette across the Harbor if it wanted to." (Gherardi Tr. 513.) Likewise, Charles Covella, who worked for the Staten Island Ferry operation in the engineering department for roughly eighteen years prior to his retirement in 2006 and served as the Chief Engineer aboard the *Barberi* on October 15, 2003, testified that a double-ended Ferry with a Voith-Schneider propulsion system is "probably the best maneuverable vessel made," adding that "[y]ou can spin the boat so fast that it would make you dizzy." (Def. Ex. 96, Covella Dep., at 12–13.) Moreover, while vessels with a typical rudder system are susceptible to tide, currents, and wind conditions, the Voith-Schneider propulsion system counteracts such conditions. (Gherardi Tr. 513–14; Def. Ex. 96, Covella Dep., at 13–14; *see also* Gansas Tr. 1082.)

---

[4]     With a typical rudder system, the vessel has a fixed propeller with an independent rudder. The propeller is typically located at the aft end of a vessel and spins either to the right or left to provide forward and aft propulsion, while the vessel is steered through the rudder, which is a separate piece of machinery. (Gherardi Tr. 508–09.)

Each Voith-Schneider unit includes a turntable with five blades, and both turntables rotate continuously when the Ferry is in motion. (Gherardi Tr. 506.) A captain can drive the vessel by adjusting the fore/aft and left/right controls from 0 to 100 percent. (*See* Def. Ex. 64-A, *Barberi* Pilothouse Controls, Gherardi Markings.) The degree of pivot on the blades is called "pitch," which is measured in terms of a percentage (e.g., 50 percent forward, 10 percent left). (Def. Ex. 96, Covella Dep., at 9, 11–12, 17; *see also* Gherardi Tr. 581–82.) Power is supplied to the Voith-Schneider units from four main diesel engines, with two engines supplying power to each unit. (Gherardi Tr. 506–07.) The speed at which the turntables rotate depends on the speed of the engines. The turntables will rotate even if the engines are placed in idle (around 400 RPMs); the vessel moves and turns a little slower in idle, of course, but the captain can move the blades more precisely and thus steer with greater accuracy. (Gherardi Tr. 559–60, 583–84.)

The two Voith-Schneider units and the four main engines can be controlled from either the New York or the Staten Island pilothouse (or the engine room). The pilothouse controls are the same in both pilothouses. Each pilothouse has a forward console that contains fore/aft and left/right pitch controls for both the New York and the Staten Island Voith-Schneider units, as well as engine room controls. (*See* Def. Ex. 64-A, *Barberi* Pilothouse Controls, Gherardi Markings.) Two levers control the fore/aft pitch of the blades on the Voith-Schneider units, with one lever controlling the fore/aft pitch on the New York unit and one lever controlling the fore/aft pitch on the Staten Island unit. Two hand-wheels control the left/right pitch of the blades, with one hand-wheel controlling the left/right pitch on the New York unit and one hand-wheel controlling the left/right pitch on the Staten Island unit. The engine room controls, which consist of two larger levers, called "throttles," are used to control the RPM setting of the four main engines. (*See* Def. Ex. 64-A, *Barberi* Pilothouse Controls, Gherardi Markings.)

While the engines and both Voith-Schneider units operate at the same time and can be controlled from either pilothouse, only one pilothouse can have control of the engines and propulsion system at a time. Transferring control of the engines and propulsion system from one pilothouse to the other requires two people, one in each pilothouse. A person in the pilothouse that has control is required to release control, at which time a person in the other pilothouse is required to accept control. (Gherardi Tr. 516.)

When the allision initially occurred, control of the engines and propulsion system was vested in the Staten Island pilothouse and Gansas was in the New York pilothouse. (Gansas Tr. 985.) Gansas became aware that a problem existed when he felt a "jolt." (Gansas Tr. 985.) He immediately ran across the approximately 270 foot "hurricane deck" which connects the New York pilothouse to the Staten Island pilothouse (Gansas Tr. 985–86), and arrived at the Staten Island pilothouse within 1 to 1.5 minutes of the allision (Gansas Tr. 1054). There, he found a distraught Assistant Captain Smith standing near the controls, waving his hands in the air, and acting erratically. (Gansas Tr. 987–88, 1019.)

Gansas then observed that the New York end of the vessel was drifting east and swinging toward a more easterly pier. (Gansas Tr. 989–90, 995.) He immediately grabbed the left/right pitch controls (that is, the wheel) for the New York Voith-Schneider unit and turned it counterclockwise in an effort to stop the pitch of the swing. (Gansas Tr. 1001; *see also* Def. Ex. 21, NTSB Marine Accident Report, at 4–5.) Gansas was too late to counteract the movement toward the more easterly pier, however, and the Ferry laid up against it. (Gansas Tr. 995, 1002–03.) The pier stopped the drift of the Ferry temporarily (Gansas Tr. 1003), but the Ferry slowly moved out from the pier and resumed a southeastern drift in the direction of the Verrazano Bridge (Gansas Tr. 1008–10, 1028, 1024; *see also* Seckers Tr. 134). By this time, the *Barberi*

had cleared the point where it was at risk of hitting other piers and it was not drifting at a substantial rate. (Gansas Tr. 1008, 1010; Flecker Tr. 267 (noting that the *Barberi* was "not [drifting] fast" when the *Dorothy J* arrived alongside it).)

Aside from turning the New York wheel as the Ferry approached the second pier, Gansas declined to manipulate the engines or the propulsion system from the Staten Island pilothouse. Because he did not know the extent of the damage to the Staten Island end of the Ferry, which bore the brunt of the impact, "[Gansas] was trying to be as cautious as [he] could in the Staten Island pilothouse." (Gansas Tr. 1033.) Instead, he was intent on transferring control of the engines and propulsion system from the Staten Island pilothouse to the New York pilothouse so that he could maneuver the Ferry into the slip from the undamaged end. Because Assistant Captain Smith was unable to assist in the transfer, Gansas focused his efforts on locating Chief Engineer Covella to assist him. Gansas had trouble contacting Covella initially and ultimately sent a deckhand down to the engine room to retrieve him. (*See* Gansas Tr. 1014.)

In the meantime, Gansas contacted the Coast Guard on Channel 14, explained the situation and that "we needed assistance from anybody in the area," and emphasized that there were casualties and injuries. (Gansas Tr. 1005–06.) Likewise, he spoke with port captain John Mauldin at the Ferry office and Ferry terminal supervisor Richie Russo to coordinate his movement into the berth. (Gansas Tr. 1014.) During the time Gansas was waiting for Covella to assist him in transferring control of the engines and propulsion system from the Staten Island pilothouse to the New York pilothouse, Gansas also had radio contact with Seckers and learned that the tug had a line attached. Gansas "felt a sense of relief" when he learned the *Dorothy J* was alongside the *Barberi* and available to provide assistance if necessary. (Gansas Tr. 1052; *see also* Gansas Tr. 1083.)

Following this communication, as has been observed, the *Dorothy J* released the line and maneuvered to the New York end of the *Barberi*, where the crew attempted to attach push wires. The crew put the tug's port face wire out but experienced difficulty attaching it to the Ferry due to the location of the Ferry's bit. (Seckers Tr. 49.) Druda again stepped onto the Ferry and, together with Flecker on the tug, made an effort to attach the wires. (Flecker Tr. 254.) According to Seckers, Druda secured the first wire (Seckers Tr. 48–49), although Druda's testimony suggests otherwise (Druda Tr. 716–17). A second wire, which would have been necessary to assist in propelling the Ferry, was not secured because Seckers heard over the radio that control of the engines and propulsion system had been transferred to the New York pilothouse. (Seckers Tr. 45–49.) Seckers then had the crew remove the single wire from the New York end of the *Barberi*. (Seckers Tr. 48–49.) The crew "put the tow wires back onto the tug and followed the ferry into the slip." (Druda Tr. 717.)

By the time control was transferred to the New York pilothouse, the *Barberi* was less than half a mile from the initial allision site.[5] To turn back toward the pier, Gansas initially gave a counterclockwise direction on the New York propeller, which spun the New York end of the vessel toward the St. George Ferry Terminal. He then proceeded north until he cleared any obstructions in the back. Finally, he turned left into the slip (Slip 5). (Gansas Tr. 1039, 1080–81.) Gansas used the pitch controls for both the Staten Island and New York Voith-Schneider

_____

[5]    Based on Gansas's estimate that he proceeded back to the slip at 4 to 5 knots (Gansas Tr. 1047), and that it took him 4 to 5 minutes to maneuver back to the slip (Gansas Tr. 1074), it is possible to estimate that the *Barberi* would have been anywhere from .307 miles (about 1620 feet or 540 yards) to .480 miles (about 2532 feet or 844 yards) from the slip when it turned around, had Gansas maneuvered the *Barberi* in a straight line back to the slip. Of course, Gansas did not maneuver the *Barberi* in a straight line back to the slip (*see* Gansas Tr. 1039, 1080–81), which means that the numbers cited above slightly overestimate the total distance the *Barberi* was from the slip.

propulsion units to maneuver into the slip, although he mostly relied on the New York unit. (Gansas Tr. 1081.) The Ferry was entirely responsive and Gansas did not require or request any assistance maneuvering back toward or into the slip. (Gansas Tr. 1032, 1042–43, 1079, 1082.)

Gansas proceeded at a slow pace into the slip, which he estimated to be "a couple hundred RPMs," or "[f]our to five knots," although no slower than the speed at which the Ferry ordinarily approaches the slip. (Gansas Tr. 1047–49). Indeed, judicial notice may be taken of the fact that maneuvering a vessel the size of the *Barberi* into a narrow slip is a delicate process which cannot be safely accomplished at a high speed. *See* Richard T. Farrell, Prince, Richardson on Evidence, § 2-208, at 43–44 (11th ed. 1995). The vessel was "[a]bsolutely" fully capable of maneuvering into the slip under its own power at the RPM at which the Ferry was operating. (Gansas Tr. 1082.) Emergency records reveal that the *Barberi* arrived in the slip a few seconds shy of 3:43 PM, between 20 and 21 minutes after the allision. (Def. Ex. 32, FDNY EMS Report, at 3, 6; Def. Ex 33, FDNY Fire/Rescue Report, at 3, 5; Def. Ex. 34, FDNY Synopsis of Emergency Response, at 1; *see also* Def. Ex. 21, NTSB Marine Accident Report, at 6.)

While all this was transpiring, Dorothy Julian, whom Captain Creamer had notified in vague terms that the Staten Island Ferry had crashed and was in need of assistance, called and ordered another tugboat on site, the *Flossie Gellatly*, and ordered her docking pilot to go down to the berth. (Julian Tr. 168–70.) The *Flossie Gellatly* arrived on the scene after the *Barberi* was in the slip and was therefore unable to assist in the salvage operation. (Julian Tr. 183–88; Def. Ex. 18, *Flossie Gellatly* Vessel Log.) Indeed, although Julian testified that she called the *Flossie Gellatly* almost immediately after hearing about the allision (Julian Tr. 183), the *Flossie Gellatly* did not depart the mooring until 4:40 PM, nearly an hour after the *Barberi* arrived safely in the slip, and the *Flossie Gellatly* did not actually arrive at the slip until 5:00 PM (Def. Ex. 18,

*Flossie Gellatly* Vessel Log). Nor did the docking pilot Julian ordered to the scene assist the *Barberi* directly. Nevertheless, both the *Flossie Gellatly* and the docking pilot remained on the scene until 11:00 PM that evening. (Julian Tr. 172.)

Julian testified that she had no contact with the City until 4 hours after the allision, when Todd Olsen, a DOT supervisor, called to check in, at which point she informed him of what the *Dorothy J* had done to assist the Ferry. (Julian Tr. 173.) The City subsequently ordered the *Dorothy J* to continuously push on the *Barberi*, an activity which, according to Seckers, the tug had initiated on its own once the *Barberi* entered the slip (Seckers Tr. 57), until the following Saturday morning, when it was towed from the slip in St. George to the Brooklyn Navy Yard (Julian Tr. 174–75).

While the *Barberi* was docked at St. George, the *Barberi* was surveyed for damage and tested for mechanical problems. Before the *Barberi* could be towed from St. George to the GMD Shipyard, a ship repair facility within the Brooklyn Navy Yard to which the *Barberi* was destined, GMD required a pre-risk assessment of the damage to assure itself and its underwriters that they could move the *Barberi* without dramatically increasing repair costs. (Paulson Tr. 888–90.) GMD retained BMT Salvage to survey the *Barberi*. On the evening of October 15, 2003, BMT's Regional Manager, John Paulson, began surveying the *Barberi*, and his colleague John Vickers completed the survey in daylight on October 16. The survey was consolidated into a report with recommendations for the preparation and towage of the *Barberi* from St. George to the Brooklyn Navy Yard. (*See* Pls. Ex. 33, BMT Salvage Report.)

Called as a witness by the plaintiffs, Paulson emphasized that the *Barberi* was capable of being moved from St. George to the Brooklyn Navy Yard without any repairs and that the repairs recommended in the report and ultimately implemented were merely precautions. (Paulson Tr.

891, 901, 908, 915–18.) Paulson, whose testimony I credit, testified that the *Barberi* was in no danger of sinking. (Paulson Tr. 928.) He also confirmed that, even before the repairs were made, the deck on the starboard side was in no danger of collapsing. When asked whether the deck was at risk of collapsing, Paulson explained,

> The only area . . . of [any] deck that had really been affected was the starboard forward corner . . . there's a bulkhead, a vertical plate on the starboard forward corner that was really the brunt of the initial contact. And normally if you hit a bulkhead in a ship like that, the effect is to pull the deck down. Now I think the NTSB refer[s] to it as slightly sagging. I think it was pulled down on that corner, more than likely. If the deck was going to collapse, it would have collapsed when it hit the pier. After that, no.

(Paulson Tr. 927.) Paulson recommended additional suring to reinforce the deck to prevent "possible, possible further buckling," which was a financial rather than a safety precaution: if it buckles, "[i]t's just going to cost more to fix." (Paulson Tr. 925–26.)

In the end, the recommendations and ultimately the repairs were made in an intentionally overly cautious fashion to minimize the risk that the *Barberi* would suffer any additional damage in transit and to ensure that GMD could obtain insurance to cover any additional damage the *Barberi* could possibly experience. (Paulson Tr. 925–26.) As Paulson testified of the repairs, "[They were] precaution[s]. [They were] easily done. Why not do [them]?" (Paulson Tr. 929.)[6]

In addition to BMT Salvage's survey for structural damage, the NTSB tested the *Barberi*'s mechanical functions while the vessel was docked at St. George waiting to be towed to

---

[6]     While the plaintiffs called Paulson as their own witness, over the objection of the City, their post-trial memorandum of law alludes to the fact that he was retained as an expert witness by the City about 7 years after the allision. This fact was not elicited during Paulson's testimony, nor was it used to impeach his credibility at trial. Indeed, arguing that I should permit Paulson to testify, counsel for Henry Marine pointed to a question I had raised regarding the risk that the deck would collapse. This question, he asserted, made it "even more important to get a *neutral witness* who was not affiliated with the City or with the claimants to tell what he observed personally and what he asked be done." (Trial Tr. 817 (emphasis added).)

the Brooklyn Navy Yard. Tests of the propulsion system demonstrated that all four engines and both Voith-Schneider units were fully functional. (Gherardi Tr. 533–34; Def. Ex. 23, NTSB Engineering Group Factual Report, at 22.)

## DISCUSSION

The foregoing discussion under the heading "background" contains my principal findings of fact. These findings are supplemented as necessary in my discussion of whether the plaintiffs are entitled to a salvage award for the services they provided in the immediate aftermath of the allision, and, if they are so entitled, the appropriate amount of the salvage award and its appropriate distribution between the plaintiffs.

## I.

A successful salvage claim requires proof of three elements: "[(1)] marine peril; [(2)] service voluntarily rendered, not required by duty or contract; and [(3)] success in whole or in part, with the services rendered having contributed to such success." *Jones v. Sea Tow Servs. Freeport NY Inc.*, 30 F.3d 360, 364 (2d Cir. 1994). Reflecting on the third prong, the 1989 Salvage Convention provides that "[s]alvage operations which have had a *useful result* give rise to a reward." 1989 Salvage Convention Art. 12(1) (emphasis added). This provision "is a restatement of the traditional salvage 'no cure, no pay' principle," *United Salvage v. Louis Dreyfus Armateurs* [2006], 163 FCR 151, 160 (Fed. Ct. App.) (Austl.), and is a more precise way of stating the underlying rule that a salvage operation must confer a benefit of some kind on the owner of the salvaged property in order to qualify for an award. Indeed, Article 12(2), which provides that "no payment is due under the Convention if the salvage operations have had no useful result," 1989 Salvage Convention Art. 12(2), underscores the central idea that effort alone is not enough to justify a salvage award. *See The Sabine*, 101 U.S. 304, 384 (1879) (holding that

"[s]uccess in whole or in part, or that the service rendered contributed to such success," is a necessary element of a salvage claim); *The Clarita and the Clara*, 90 U.S. 1, 16 (1974) ("A salvor is defined to be a person who . . . proffers *useful service* . . . ." (emphasis added)); *The Blackwall*, 77 U.S. 1, 12 (1869) ("Success is essential to the claim.").[7]

In *Lincoln S. S. Line, Inc. v. United States*, 7 F.2d 886 (2d Cir. 1925), for example, a steamship, Aragon, came to the aid of a stranded vessel and attempted to haul the vessel off for several hours, but ultimately did not succeed because it broke its hawser and became debilitated. The Second Circuit found that, although Aragon "did all she could, and did it well, until she broke down," the service did not warrant a salvage award. *Id.* at 886. To recover salvage under the default "no cure, no pay" requirement, the claimants were required to prove that they "at least contributed to the cure," and the claimants had failed to do that. *Id.* at 887.

Similarly, in *The New Haven*, 159 F. 798 (D. Conn. 1908), a heavy storm struck a tow of barges, breaking the tow up, and throwing one of the barges toward the shore where it "became thoroughly embedded in the sand, and was firmly held there by oak bits." *Id.* at 799. The claimants, unaware that the barge was firmly embedded in the sand, "took what they deemed to be proper precautions to prevent the barge from drifting away upon the Sound during the night." *Id.* Because the weather that evening was calm, the claimants' actions, which included screwing ringbolts and attaching ropes, may have held the barge in place, had it been free from the sand. *Id.* Nevertheless, the court held that the claimants were not entitled to salvage. The barge was never in danger, the court explained: "[T]here was never a minute after the barge was set, by the

---

[7]     An exception to this rule, which permits "special compensation" in cases where a salvor "has carried out salvage operations in respect of a vessel which by itself or its cargo threatened damage to the environment," 1989 Salvage Convention Art. 14(1), is not applicable to this case, nor was it invoked by the plaintiffs.

unusually high tide, far up on the shore Monday afternoon, when there was the slightest danger of her being dashed upon the rocks or driven out to sea." *Id.* Thus, the claimants' efforts did not actually succeed in conferring a benefit on the barge: "though meaning well, [they] no doubt did nothing whatever which benefited the claimant owner." *Id.*; *see also The Sailor's Bride*, 21 F. Cas. 159, 160 (C.C.D. Mich. 1859) ("But as, in this case, the vessel remained aground, and the owner was in no respect benefited by the efforts of the master of the tug, no compensation can be claimed on that ground.").

## II.

In granting the plaintiffs' motion for summary judgment on the issue of their entitlement to a salvage award for the services they provided in the immediate aftermath of the allision, I assumed that the plaintiffs had satisfied the third prong required to achieve a salvage award— that the plaintiffs' salvage operation had achieved "success," or, as the Salvage Convention has rephrased the concept, a "useful result" of some kind to the owner of the salvaged property, *see* 1989 Salvage Convention Art. 12(1). This assumption was based on my belief that "the *Dorothy J* [had] successfully helped push the *Barberi* back to the passenger slip." *In re Andrew J. Barberi*, 534 F. Supp. 2d at 376. I declined to address the requirement further because I believed "the third requirement [was] not in dispute." *Id.*

After hearing all of the relevant evidence at trial, including that provided by Gansas, whose testimony was not presented on the motions for summary judgment,[8] I find that the *Dorothy J* did not "help[] push the *Barberi* back to the passenger slip." Indeed, plaintiffs no longer rely on the argument that it did so. Instead, they argue principally that the *Dorothy J*

---

[8]     Indeed, neither side was particularly anxious to call Gansas as a witness, nor was he apparently willing to testify voluntarily. Instead, at my direction he was subpoenaed to testify at trial.

provided the useful result of expediting the *Barberi*'s return to the slip by 16 to 20 minutes. This contribution, according to the plaintiffs, saved the *Barberi* from experiencing additional property damage and prevented greater injury and loss of life, thus saving the City further expense and liability. This argument rests on two stages of assistance that the plaintiffs allege the *Dorothy J* provided. Specifically, the plaintiffs allege that (1) after they arrived alongside the Staten Island end of the *Barberi*, they secured a line with which they proceeded to arrest the *Barberi*'s drift, and (2) after control of the engines and propulsion system was transferred to the New York end, the *Dorothy J* pressed up against the starboard side of the *Barberi* at a 90 degree angle as Gansas maneuvered into the slip, which prevented the *Barberi* from "go[ing] more or less out round up to get into a ferry slip," and held the *Barberi* against the wind (Seckers Tr. 50–52). The plaintiffs, however, have failed to prove by a preponderance of the evidence that either of these actions, even if supported by credible evidence, served to expedite the *Barberi*'s return to the slip.

### A. Expediting the *Barberi*'s Arrival

To begin with, the plaintiffs could not have provided more than a few minutes of assistance to the *Barberi*. Emergency records establish that the *Barberi* entered the slip 20 to 21 minutes after it allided with the maintenance pier. Emergency Message Service ("EMS") records, which document the timeline down to the second, specify that at 15:22:25 (3:22:25 PM), "boat hit slip," and at 15:42:53 (3:42:53 PM), the Ferry was "docking in slip number 5." (Def. Ex. 32, FDNY EMS Report, at 3, 6.) FDNY Fire/Response records provide a minute by minute timeline which corroborates the EMS timeline, indicating that at 3:23 PM "boat hit dock" and at 3:43 PM "boat has now docked." (Def. Ex. 33, FDNY Fire/Rescue Report, at 3, 5.) While it is possible that the allision occurred slightly earlier than the EMS and Fire/Response records convey,

depending upon how quickly the allision was reported, the evidence indicates that the allision was reported almost immediately, certainly within 1 minute of the allision (*see* Downey Tr. 324), as would be expected of a disaster of this magnitude.

The factual information section of the NTSB report, which describes "a videotape from a Coast Guard Traffic Service (VTS) camera on Governors Island (3 miles from the accident site)" (Def. Ex. 21, NTSB Marine Accident Report, at 5 (footnote omitted)), provides further guidance regarding the timeline aboard the *Barberi* in the immediate aftermath of the allision. According to the NTSB report, the VTS videotape, which began recording "about 10 minutes after the allision," captured the *Barberi* drifting for only "a few minutes" before "moving back to the terminal and turning around (so it could dock by the undamaged New York end)." (Def. Ex. 21, NTSB Marine Accident Report, at 5.)

Gansas estimated that 20 to 25 minutes elapsed between the allision until the *Barberi* arrived in the slip. (Gansas Tr. 1077.) Specifically, Gansas estimated that 15 to 20 minutes elapsed between the time he arrived in the Staten Island pilothouse until control of the engines and propulsion system was transferred to the New York pilothouse (Gansas Tr. 1022, 1045, 1078–79), and that it took him 4 to 5 minutes to maneuver the Ferry into the slip from the time control of the engines and propulsion system was transferred to the New York pilothouse (Gansas Tr. 1074). In light of the emergency records and NTSB report, together with the pace at which the Ferry proceeded toward and into the slip (Gansas Tr. 1047–49), I find that control of the engines and propulsion system was shifted to the New York pilothouse about 16 minutes

after the allision, at which point it took Gansas about 4 to 5 minutes to maneuver the *Barberi* back toward and into the slip, where it arrived 20 to 21 minutes after the allision.[9]

Against this backdrop, I move specifically to the two stages during which the plaintiffs allege the *Dorothy J* provided assistance in a way that expedited the *Barberi*'s return to the slip.

### 1. Arresting the Drift

The *Barberi* was drifting in the southeastern direction for most of the 16 minutes between the allision until control of the engines and propulsion system was transferred to the New York pilothouse, but was drifting very slowly, particularly after hitting the second pier. (*See* Gansas Tr. 1008, 1010, 1022, 1024; Flecker Tr. 267.) The *Dorothy J* arrived alongside the *Barberi* about 10 minutes after the allision, sometime after the *Barberi* moved out from the second pier. (*See* Flecker Tr. 241, 245–46, 264–65; *see also* Seckers Tr. 32–33.) It took another few minutes for the *Dorothy J* crew to secure the line (*see* Seckers Tr. 38; Flecker Tr. 248), at which point the *Dorothy J* may have slowed, but did not stop, the *Barberi*'s slow drift (*see* Gansas Tr. 1072–73; Def. Ex. 96, Covella Dep., at 73–74). This assistance lasted for a very brief period—likely no more than 2 minutes—because the tug was already on the opposite end of the *Barberi* with a wire attached when control of the engines and propulsion system was transferred to the New York pilothouse about 16 minutes after the allision (Seckers Tr. 45–50; Flecker Tr. 254–55, 264–

---

[9]    I reject the testimony of William Clifford, who testified as plaintiffs' expert. Clifford's conclusions regarding the duration of the salvage operation and the rate of the drift are based on assumptions of fact that are contrary to evidence that I credit. (*See* Clifford Tr. 380–82; Pls. Ex. 17, Nautical Chart.) Clifford's testimony regarding the duration of the salvage operation—that it took around 35 minutes—was totally inconsistent with contemporary documentary evidence obtained from the FDNY, including EMS and Fire/Rescue reports, which establish that 20 to 21 minutes elapsed between the allision and when the *Barberi* was returned to the slip. (*See* Clifford Tr. 432, 442–45; Def. Ex. 32, FDNY EMS Report, at 3, 6; Def. Ex. 33, FDNY Fire/Rescue Report, at 3, 5.) Similarly, his testimony that the *Barberi* was drifting at 3 to 5 knots is inconsistent with other evidence that the vessel was less than half a mile from the slip when it turned around 16 minutes after the allision.

65). The plaintiffs submitted no calculations to show the extent to which the tug actually arrested the Ferry's slow drift or whether and to what extent this fleeting assistance expedited the Ferry's return to the slip. Under these circumstances, the plaintiffs have failed to meet their burden of establishing that it is more likely than not that the brief slowing of an already slow drift expedited the *Barberi*'s return.

Nor did the plaintiffs establish that it is more likely than not that this assistance provided a "useful result" in the form of significantly reducing the risk that the *Barberi* would encounter a real and impending danger. Indeed, the fleeting nature of the assistance alone is sufficient to reject any such suggestion. Moreover, the plaintiffs' own witness admitted that the *Barberi* was not at risk of sinking, capsizing, or structurally collapsing after the initial allision unless it collided with another ship or pier. (*See* Cushing Tr. 674.) By the time the *Dorothy J* arrived alongside the *Barberi*, the latter had already cleared all of the piers. (*See* Gansas Tr. 1008–10.) The *Barberi* was also in no imminent danger of colliding with another ship, despite Seckers's testimony that he heard a security call over the radio from a ship that was heading toward the Verrazano Bridge to anchor in the Stapleton Anchorage[10] (Seckers Tr. 37), because it was drifting toward the middle of the channel where there were no structures or other vessels with which it could have collided (*see* Gansas Tr. 1009–10, 1024, 1028; *see also* Seckers Tr. 134). Indeed, it is unclear whether the ship to which Seckers referred had crossed into the Narrows from the Atlantic Ocean side of the Verrazano Bridge when Seckers heard its security call over

---

[10]     All ships entering the New York Harbor come through the Stapleton Anchorage. As cargo ships come into the Harbor, they often anchor around the Verrazano Bridge. (*See* Pls. Ex. 17, Nautical Chart.) There they generally remain anchored while they unload cargo and wait for the tides. Larger ships often use captains familiar with the Harbor to pilot the ship through the Narrows and into the Anchorage. (*See* Clifford Tr. 335–39.)

the radio. (*See* Clifford Tr. 390–91.)[11] This consideration aside, Gansas alerted the Coast Guard of the allision within minutes (*See* Gansas Tr. 1005–06), and the Coast Guard as a matter of course would have alerted any incoming vessels to steer clear of the *Barberi* (Clifford Tr. 401, 408, 466–67).

More significantly, because the *Barberi* never lost propulsion or steering capability, Gansas was always in a position to maneuver the vessel away from an approaching hazard.[12] Indeed, Smith and Gansas each maneuvered the Ferry from the Staten Island pilothouse when dangerous situations arose after the allision. Although Smith lost consciousness or situational awareness in the moments leading up to the allision, he regained some awareness after the Ferry hit the pier and proceeded to reverse the Ferry and steer it away from another vessel moored nearby. (Def. Ex. 21, NTSB Marine Accident Report, at 4; Def. Ex. 22, NTSB Operations Group Factual Report, at 8.)[13] Indeed, the plaintiffs' expert admits that Smith's ability to effect this

_____

[11]     Ships that are coming inbound toward or through the Stapleton Anchorage usually make security calls at a variety of locations, including when approaching the narrows on the Atlantic Ocean side of the Verrazano Bridge, once inside the Narrows, and if and when they enter the Anchorage. (Clifford Tr. 390–91.) It is unclear whether the ship to which Seckers referred in his testimony was on the Atlantic Ocean side of the Verrazano Bridge approaching the Narrows, somewhere in the Narrows, or entering the actual Anchorage.

[12]     Gansas never had any problems with the power, and to the extent that others heard him discussing issues with the power, he was referring only to the goal of locating Covella to assist him in switching control to the New York pilothouse. (Gansas Tr. 1069.)

[13]     The plaintiffs urge that portions of the NTSB reports marked as Defendant's Exhibits 21 and 22 contain hearsay. So, for example, they point to the testimony of Robert Rush, who served as the senior mate on the *Barberi* the day of the allision, a portion of which is summarized in the text above. The plaintiffs did not object to the admission of the relevant NTSB exhibits nor to any statements or testimony contained therein. (*See* Trial Tr. 941.) "This fact by itself may prohibit the evidence from being considered hearsay." *Gronowski v. Spencer*, 424 F.3d 285, 294 n.1 (2d Cir. 2005) (citing *Diaz v. United States*, 223 U.S. 442, 450 (1912) ("[I]f hearsay evidence is admitted without objection, it is considered and given its natural probative effect as if it were in law admissible.")). In this respect, I have taken into account that Rush had no apparent motive to lie and that there is no reason to believe that his words were not correctly recorded by the NTSB. Under the circumstances, it is unnecessary to reach the issue of

maneuver establishes that immediately after the allision the Ferry had power and maneuverability. (*See* Clifford Tr. 452.) Covella, who was down in the engine room at the time, testified that immediately after the allision the pitch controls were at 100 percent and the RPMs were still at full speed ahead, but that someone in the Staten Island pilothouse—presumably Smith—"purposely" reduced the RPMs and brought the pitch on the fore/aft controls to 0 percent less than 2 minutes after the allision, which placed the Ferry in neutral. (Covella Dep., at 27–29, 42.) When Gansas arrived in the Staten Island pilothouse, he observed that the pitch on the fore/aft controls had been brought to 0 percent (Gansas Tr. 987, 992–93), which he surmised Smith had done to prevent the *Barberi* from moving any further forward (Gansas Tr. 1001).

Gansas also grabbed the pitch controls in the Staten Island pilothouse in an effort to avoid an additional allision. Soon after entering the Staten Island pilothouse, Gansas noticed that the *Barberi* was approaching a second pier, and he grabbed the New York wheel in an effort to steer away from the pier. (Gansas Tr. 989–95, 1001–03.) Nevertheless, the Ferry laid up against the second pier, which Gansas attributed to the fact that he initiated the maneuver too late to actually stop the movement, rather than a problem with the pitch controls: "[i]f I was a little earlier, I would—I probably would have be[en] able to do something." (Gansas Tr. 1002.)

Although Gansas otherwise decided not to use the engines and propulsion system while control was vested in the Staten Island pilothouse (Gansas Tr. 1033–34), during which time the *Barberi* was slowly drifting southeast, he nevertheless remained in command and was capable of piloting the Ferry had another allision risk arisen. As Gansas explained, he decided to leave the Ferry in neutral during the time it was safely drifting at an insubstantial rate because, "I didn't

---

whether the statements contained in the NTSB reports may be independently admissible under Federal Rule of Evidence 803(8)(C).

want to move the boat fore or aft or in any direction [until control of the engines and propulsion system was transferred to the New York pilothouse because] I didn't know the extent of the damage[, and] I didn't want to make a bigger problem than it was." (Gansas Tr. 1020; *see also* Clifford Tr. 450–51.)

### *2. Assisting the Barberi into the Slip*

I also find that the *Dorothy J* did not provide any further assistance in hastening the *Barberi*'s return to the slip at St. George after the brief episode allaying the drift on the Staten Island end. Specifically, despite my previous summary judgment order, I find that the *Dorothy J* did not help push the *Barberi* back to the passenger slip once control of the engines and propulsion system was transferred to the New York pilothouse. Seckers testified that, at Gansas's request, he pressed the *Dorothy J* up against the damaged side of the *Barberi* at a 90 degree angle as Gansas maneuvered into the slip. (Seckers Tr. 50–52.) This assistance saved the *Barberi* valuable time, Seckers testified, because the location of the Ferry, together with the wind and sea conditions, made it impossible for the *Barberi* to propel directly into the slip on its own: "[The *Barberi*] would've had to go more or less out round up to get into a Ferry slip. And [Gansas] didn't want to do that." (Seckers Tr. 50–52.)

Seckers recollection of the matter appears to have been influenced by his belief that the *Barberi* is like a conventional ship with a rudder and separate propeller.[14] A vessel with a conventional rudder and propeller cannot make tight turns because it cannot spin, and thus in the absence of assistance would have had to go out into the harbor to turn around and then line up with the slip. (Gherardi Tr. 539–43.) In contrast, the *Barberi*'s Voith-Schneider propulsion

---

[14]     Seckers conceded that he "do[esn't] know anything about the *Barberi*," and was entirely unaware of the *Barberi*'s Voith-Schneider propulsion system. (Seckers Tr. 100.)

system allows the vessel to spin up to 360 degrees in any direction at once. Indeed, to orient the New York end of the *Barberi* toward St. George, Gansas merely "put a few degrees of pitch on and then [] turned the New York propeller steering control counterclockwise." (Gansas Tr. 1039.)

Likewise, notwithstanding Seckers's insistence to the contrary, the *Barberi*'s maneuverability was not materially affected by the wind and sea conditions. According to both Gansas, who maneuvered the *Barberi* on the date of the allision and has extensive experience with the *Barberi*, and Trevor Gherardi, who was the Assistant Engineer aboard the *Barberi* on the date of the allision and is now the Chief Engineer of the DOT, the *Barberi*'s Voith-Schneider propulsion system counteracted the wind and sea conditions experienced on October 15, 2003 (Gherardi Tr. 514; Gansas Tr. 1082; *see also* Def. Ex. 22, NTSB Operations Group Factual Report, at 15 ("On the day of the accident, . . . [i]t was windy with gusts estimated up to 30 miles per hour and there was an outgoing tidal current, but not beyond the vessel's capabilities to compensate according to other ferry Masters the Board interviewed.")).

Seckers's account is also undermined by the extensive evidence indicating that Gansas was fully capable of maneuvering the *Barberi* into the slip on its own once control of the engines and propulsion system was vested in the New York pilothouse. Specifically, Gansas had full control over each of the engines and propulsion units while he was maneuvering the Ferry into the slip, and the vessel responded to his commands perfectly. (Gansas Tr. 1032, 1042–43, 1079, 1082.) Although Gansas did not know whether the *Dorothy J* had pushed on or otherwise assisted the Ferry as it moved into the slip, he did not request or require any such assistance. (Gansas Tr. 1042.) Gherardi, who was in the *Barberi*'s engine room at the time of the crash, confirmed that the *Barberi* never lost propulsion or power before, during, or after the allision.

(Gherardi Tr. 525–28, 532–33.) Covella gave similar testimony at his deposition. (*See* Def. Ex. 96, Covella Dep., at 55–56) Significantly, as previously observed, NTSB tests conducted after the allision confirmed that both Voith-Schneider units and all four engines were functioning satisfactorily. (*See* Def. Ex. 23, NTSB Engineering Group Factual Report.)

These considerations aside, Seckers's account of the events is fraught with internal discrepancies that undermine his credibility as well as the plaintiffs' effort to establish that it is more likely than not that the *Dorothy J* assisted the *Barberi* in the manner in which he testified at trial. Thus, Seckers originally stated in an affidavit that the crew had a line up when it pushed the *Barberi* into the slip (Seckers Tr. 122–23), but testified at trial that the crew had removed the wire it had originally attached to the New York end of the *Barberi* and did not have any wire or line up during the time Gansas was maneuvering the vessel into the slip (Seckers Tr. 122). Although Flecker corroborated Seckers's testimony that the crew released the wire once the Ferry started moving toward the slip, at which point the tug went alongside midship to guide the Ferry into the slip (Flecker Tr. 256), at his deposition Flecker testified that cross wires remained on the Ferry until the Ferry was in slip and did not recall the *Dorothy J* moving midship to assist the Ferry into the slip (*see* Flecker Tr. 278, 289–91 (referring to Def. Ex. 94, Flecker Dep., at 43)). On the other hand, Druda, who did not seek a salvage award, testified that once Seckers relayed that the Ferry did not need the tow wires any longer, they "put the tow wires back onto the tug and followed the Ferry into the slip." (Druda Tr. 717.) This effort did not expedite the *Barberi*'s return to the slip.

### B. Providing Comfort and Aid to Passengers and Crew

Nevertheless, the plaintiffs' efforts were not entirely devoid of value. "The act of salvage need not be dramatic and need not consist in rendering physical assistance." *Reynolds Leasing*

*Corp. v. Tug Patrice McAllister*, 572 F. Supp. 1131, 1134 (S.D.N.Y. 1983). As the leading treatise on admiralty law explains, "Giving 'aid and comfort' to [a] vessel, at her request, can be a valid salvage service. . . . Being assured of aid at hand is of help to the salved ship as her crew is enabled to put forth redoubled efforts with their minds relieved of the thoughts of being left to their fate." Martin J. Norris, 3A *Benedict on Admiralty*, § 26; *see also The Pendragon Castle*, 5 F.2d 56, 58 (2d Cir. 1924) ("Whether that jettison did more than calm the nerves of the Sapinero's master is rather doubtful; but that it was a good thing for and a real service to this vessel to have an apparently properly commanded and able ship in attendance is not doubted."); *Reynolds Leasing Corp.*, 572 F. Supp. at 1134 (concluding that the salvage vessel "performed a successful salvage service" in part because it provided "a rescue potential" to the distressed vessel).

On this issue, it is significant that Gansas contacted the Coast Guard after the allision and requested assistance from any surrounding vessels. (Gansas Tr. 1005–06.) The *Dorothy J* was the only vessel available to render assistance in the immediate aftermath of the allision, and its presence on the scene provided comfort to Gansas and some passengers on the *Barberi* during the height of the stress from the allision. Gansas described a feeling of relief when he learned that the *Dorothy J* was alongside the Ferry: "I felt somebody else was helping me. I didn't feel like I was alone." (Gansas Tr. 1083; *see also* Gansas Tr. 1052 ("I felt a sense of relief [when I learned the *Dorothy J* had a line attached to the *Barberi*]. . . . [b]ecause I knew somebody was helping me.").) John Downey, who was a passenger on the *Barberi* when the allision occurred, described a similar reaction when he spotted the *Dorothy J* arrive alongside the *Barberi*: "I was a little relieved that there's going to be some help, you know, get us to safety." (Downey Tr. 326.) The rescue potential that the *Dorothy J* offered had particular importance because the

*Dorothy J*'s presence placed it in a position to rescue passengers who, out of sheer panic, may have jumped ship. Indeed, when the *Dorothy J* first approached the New York end of the *Barberi*, the crew was concerned that passengers would swamp the tug in an effort to escape the Ferry. At that time, the crew assured the passengers that the Ferry was not at risk of sinking and had the tug back away from the Ferry until the passengers were calm enough that the tug felt comfortable returning. (Flecker Tr. 284–85.)

Moreover, although the testimony is conflicting and difficult to sort out, there is some evidence that aid was also supplied to injured and frightened passengers. Seckers and Flecker both testified that Captain Creamer boarded the Ferry to offer a first aid kit, blankets, and sweaters to passengers while the *Dorothy J* was alongside the New York end (Seckers Tr. 47; Flecker Tr. 257, 260–61, 288), although Flecker stated during his deposition that Druda was the only crew member to board the Ferry from the time the *Dorothy J* arrived alongside it until it returned to the slip (Def. Ex. 94, Flecker Dep., at 52). According to Flecker, the crew also offered aid after the *Barberi* had moored. (Flecker Tr. 295.) While the comfort and aid that the *Dorothy J* provided may not have directly contributed to the *Barberi*'s safe return, it was nevertheless "useful" to Gansas and the passengers aboard the *Barberi*, and is deserving of a salvage award.

In sum, to the extent the plaintiffs can claim that they partially succeeded in rescuing the *Barberi* from peril or contributed to the success the *Barberi* experienced in safely returning to the slip, that success was extremely limited and had little effect on the outcome. Nevertheless, "[t]he quality and degree of contributory service need only be slight to justify a salvage award; the extent of the service may affect the amount of the award, but not its validity." *Markakis v. S/S Volendam*, 486 F. Supp. 1103, 1110 (S.D.N.Y. 1980). Thus, I proceed with an analysis of the

appropriate amount of the salvage award, an analysis which actually provides a means for calibrating any salvage award to the "measure of success obtained by the salvors." 1989 Salvage Convention Art. 13(1).

## III.

The appropriate salvage award in a particular case is highly circumstantial and generally "should not be based upon fixed percentages of the value of the salved property or upon comparisons to percentages from previous awards." *Jones*, 30 F.3d at 364. The district court has wide discretion to determine the appropriate size of a salvage award after considering the facts and circumstances of a case. *See The Connemara*, 108 U.S. 352, 359 (1883). In *The Blackwall*, 77 U.S. 1 (1869), the Supreme Court listed six factors district courts should consider in determining awards for salvage services:

> (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

*Id.* at 14.

These six *Blackwall* factors were essentially adopted, although not in identical language, by the 1989 Salvage Convention. Martin Davies, *Whatever Happened to the Salvage Convention 1989?*, 39 J. Mar. L. & Com. 463, 474–75 (2008). The Salvage Convention inserts the words "and life" at the end of the second *Blackwall* factor and adds four factors to consider: (1) "the skill and efforts of the salvors in preventing or minimizing damage to the environment," (2) "the measure of success obtained by the salvor," (3) "the availability and use of vessels or other

equipment intended for salvage operations," and (4) "the state of readiness and efficiency of the salvor's equipment and the value thereof."[15] 1989 Salvage Convention Art. 13(1).

The Salvage Convention does not include as a factor warranting consideration the concept of "liability salvage," namely that salvors should be entitled to additional remuneration for having relieved shipowners from liability to third parties. Indeed, it was explicitly considered and rejected in the context of pollution damage, which was one of the principle concerns of the drafters, because of the difficulty and raw unpredictability involved in estimating the monetary value of a reduction in liability. Michael Kerr, *The International Convention on Salvage—How it Came to Be*, 39 Int'l & Comp. L.Q. 530, 537 (1990). "[I]t would have required salvage arbitrators to determine what, if any, liability would or might have been incurred, presumably on a balance of probability, by the shipowners but for the salvors' efforts, and if so, to make some assessment of the amount of the avoided liability. This would have transformed salvage arbitrations into contests of a very different kind and created field-days for lawyers and experts." *Id.*; *see also* Davies, *supra*, at 494.

These concerns are only exacerbated in the context of liability for personal injury and wrongful death because of the inherent difficulty in determining the extent of liability averted. At the individual level, an accident resulting in a catastrophic injury does not necessarily translate into lesser liability than an accident resulting in death. So, for example, a passenger on the *Barberi* who suffered a spinal injury resulting in permanent quadriplegia received an award of $18,278,000 (reduced by the district judge from $22,945,168), an award that did not include lost

---

[15]    The plaintiffs indicate in their reply brief that the "state of readiness and efficiency of the salvor's equipment" is a consideration that is limited to professional salvors. (*See* Pls. Post-Trial Mem. at 6 n.1; Pls. Reply to Def. Post-Trial Mem. at 6.) The plaintiffs cite no authority to support that assertion.

earnings because no proof was offered. *See McMillan v. City of New York*, Nos. 03-CV-6049, 08-CV-2887, 2008 WL 4287573 (E.D.N.Y. Sept. 17, 2008). This award substantially exceeded the amount that would have been awarded in a wrongful death action had this passenger not survived. Indeed, the highest amount awarded to the family members of a deceased passenger was $8,750,000, by way of settlement. In any event, the principal case upon which the plaintiffs rely to establish the availability of liability salvage stands only for the proposition that "the factor of potential exposure to third party liability operates generally to inform the fixation of the global [salvage award] figure," without consideration of specific evidence relating to the value of liability avoided. *United Salvage*, 163 FCR at 165 (Austl.). I would decline to apply this vague factor here, even if there was evidence that the efforts of the *Dorothy J* actually resulted in reducing liability to third parties by hastening the *Barberi*'s return to the slip.

## IV.

The *Blackwall* and 1989 Salvage Convention factors are grouped together below based on their relevance to each other and this case. Many of these factors have limited relevance because of my above finding that the *Dorothy J* did not contribute to the *Barberi*'s prompt and safe return to the slip.

### A. Plaintiffs' Effect on Outcome

#### 1. The Measure of Success Obtained by the Salvor

The only assistance that the *Dorothy J* rendered that justifies a salvage award of any kind is the comfort that its presence provided the passengers and crew. While this may be sufficient to qualify for a salvage award, its success had a minimal effect on the overall outcome.

*2. The Degree of Danger from which the Property was Rescued*

This factor is of little significance to the salvage award determination because the assistance which justifies a salvage award had no direct impact on averting any danger to which the *Barberi* was exposed. Indeed, even if I accepted the plaintiffs' argument that they are entitled to a salvage award for other reasons, by the time the *Dorothy J* was alongside the *Barberi*, the *Barberi* was in no danger of further collision or grounding, and there was no danger of collapse of superstructure, damage to engines and propellers, fire or explosion, or additional death or serious injury to passengers as a consequence of such events.

*3. The Availability and Use of Vessels or Other Equipment Intended for Salvage Operations*

The *Dorothy J* happened to be docked at St. George when the *Barberi* allided with the maintenance pier. Because of its close proximity to the *Barberi* at the time of the allision, it was the only boat that came to the assistance of the *Barberi* in the 20 to 21 minutes after the allision occurred.

*4. The State of Readiness and Efficiency of the Salvor's Equipment and the Value Thereof*

The *Dorothy J* is a small tugboat that is not equipped for the purposes of salvage operations. It had difficulty assisting the *Barberi* in a useful way. Thus, while its presence may have provided the passengers and crew with some comfort, it was not capable of rendering any significant additional assistance. Indeed, Seckers analogized the *Dorothy J*'s efforts in assisting the *Barberi* to that of an "an ant on an elephant." (Seckers Tr. 54.)

*5. The Value of the Property Saved*

While the parties stipulate that the post-salvage value of the *Barberi* was $14,385,000 (*In re The Dorothy J, Robert Seckers, and Paul Flecker*, Docket No. 09-cv-3512, Doc. 62, Joint Pretrial Order, Mar. 23, 2010, at 1), the value of the *Barberi* is of little significance to the salvage award determination because the *Barberi* was not actually in danger of sinking, capsizing, crashing, collapsing, or otherwise experiencing total destruction, and because the *Dorothy J* was not actually responsible for preventing any further damage to the *Barberi*.

**B. Plaintiffs' Effort in Offering Assistance**

*1. The Promptitude, Skill, and Energy Displayed in Rendering the Service and Saving the Property (and Life)*

From the moment Seckers spotted the Ferry approaching the pier, the crew members acted promptly and energetically to render assistance to the *Barberi*. (Seckers Tr. 41–42.) Seckers immediately sounded the deck whistle and began screaming that there was an emergency, alerting Druda to the situation. (*See* Seckers Tr. 109–10; Druda Tr. 700.) Druda acted quickly to start the engine, wake sleeping crew members, and release the lines, which allowed the tug to cast off within a few minutes of the allision. (*See* Seckers Tr. 32; Flecker Tr. 241; Druda Tr. 702.)

Once alongside the *Barberi*, the crew attached a line to the port side of the Staten Island end, which required Druda to board the Ferry to secure the line and reboard the tug to complete the attachment, and then Seckers pulled north with the *Dorothy J* in a failed effort to stop the drift for a few minutes. (Seckers Tr. 38; Flecker Tr. 248–49.) The crew also tried, albeit unsuccessfully, to attach face wires to the New York end, which again required Druda to cross back and forth between the Ferry and tug. (Seckers Tr. 48–49; Flecker Tr. 254.) Henry Marine's

president, Dorothy Julian, also took measures intended to assist the Ferry by ordering her docking pilot and a second tug, the *Flossie Gellatly*, to the scene. (Julian Tr. 168–70.) Although these measures did not help the *Barberi* in any way (Julian Tr. 183–88), her actions demonstrate Henry Marine's response to the allision and general willingness to assist in any way it could.

> *2. The Skill and Efforts in Preventing or Minimizing Damage to the Environment*

Because the *Barberi* was not in danger of capsizing, sinking, exploding, collapsing, or otherwise contaminating the New York Harbor, this factor has little relevance here. Moreover, to the extent that the plaintiffs' efforts justify a salvage award, they did not directly relate to reducing the risk of any danger to the environment.

### C. The Risks Run or Liabilities Incurred by Salvors

> *1. Risks to Salvors' Equipment and Property*

>> a. Value of Slavors' Property

In February 2002, Rick Meyerrose, whom Julian described as "one of the most respected, if not the most respected, surveyor in New York Harbor" (Julian Tr. 194), surveyed the *Dorothy J* and assessed its value at $730,000 and replacement value at $1.9 million (Julian Tr. 157; Pls. Ex. 21, Condition & Valuation Survey (2002); Def. Ex. 11, Condition & Valuation Survey (2002)). The City noted that in 2003, Julian declared to her insurance company that the value of the *Dorothy J* was $530,000. (Julian Tr. 159; Def. Ex. 12, Condition & Valuation Survey (2003).) Although the insurance value may have relevance to the extent it reflects Julian's belief about the tug's value, insurance value does not necessarily represent fair market value, because a party may intentionally agree to a lower value for insurance purposes to keep premiums low. In fact, Julian claimed she did just that. (Julian Tr. 192–93.) Thus, Julian refers to

Meyerrose's valuation report as a better reflection of the *Dorothy J*'s value in October 2003. (Julian Tr. 194.)

Julian testified that the value of the *Dorothy J* would have actually increased between the February 2002 survey and the salvage operation in October 2003 because she was making regular and ongoing improvements to the tug. However, she admitted that she had been making those regular improvements every year and they generally did not affect Meyerrose's yearly valuations. (Julian Tr. 195–97; *compare* Def. Ex. 11, Condition & Valuation Survey (2002), *with* Def. Ex. 12, Condition & Valuation Survey (2003).) Accordingly, based on surveys performed in 2002 and 2003, the approximate value of the *Dorothy J* on October 15, 2003 was $730,000. (*See* Pls. Ex. 21 Condition & Valuation Survey (2002); Def. Ex. 11, Condition & Valuation Survey (2002); Def. Ex. 12, Condition & Valuation Survey (2003).)

### b. Risks to which the Property was Exposed

Although the *Dorothy J* incurred no damage, it exposed itself to certain risks in attempting to assist the *Barberi*. The plaintiffs list several risks, including damage to its engine from starting without warming up and damage to its underwater propeller from debris in the Harbor. They introduced no evidence to suggest that a single instance of starting the engines without warming up could cause damage or that lifejackets or debris floating in the water could damage its propeller. The plaintiffs also assert that the *Dorothy J* exposed itself to other general risks, such as the risk of colliding with the Ferry, many of which arose during the course of their unsuccessful efforts to assist the *Barberi*. Most of the risks that the plaintiffs cite were also risks of the type normally experienced in a towing operation. Nevertheless, I take into account the fact that the *Dorothy J* was not obligated to incur those risks on the occasion in question.

### c. The Time Used and Expenses and Losses Incurred by the Salvors

The entire salvage operation took only 20 to 21 minutes from the time the plaintiffs began reacting to the allision until the *Barberi* returned to the slip. Julian admitted that during that time the only costs Henry Marine incurred to execute the salvage operation were the fixed costs of operating the *Dorothy J* (Julain Tr. 210–11), which she conceded did not exceed the $239 per hour rate she had negotiated with the DOT (Julian Tr. 218). Indeed, as Seckers spotted the *Barberi* approaching the maintenance pier, the *Dorothy J* was being paid the contractual rate by the City to stand idle at the pier and await further instructions to tow an oil barge. (*See* Seckers Tr. 29–30.) Julian testified that she ultimately absorbed non-fixed costs for the *Flossie Gellatly* and the pilot captain she ordered to the St. George Ferry Terminal shortly after the allision. (Julian Tr. 171–72, 210–11.)

### 2. Risks to Salvors in Securing the Property from the Impending Peril

The crew members did expose themselves to risks in attempting to assist the *Barberi*. So, for example, Druda or Flecker could have been injured if either the line or the face wire had split while Druda was securing them to the *Barberi*. (Seckers Tr. 45–46.) Likewise, Druda could have lost his balance when stepping back and forth between the vessels and fallen into the water. While these risks were ones the members of the crew were not required to assume, they are of limited relevance to determining the appropriate award because they did not contribute to assisting the *Barberi* in any significant way.

This consideration aside, the risks to which the crew members exposed themselves were not unlike the risks that crew members ordinarily face on the tugboat. As Seckers testified, towing vessels in general can be dangerous and carries many of the same risks. (Seckers Tr. 127–28.) Indeed, Druda, who was the only crew member to board the *Barberi* between the time of the

allision and when it entered the slip (Def. Ex. 94, Flecker Dep., at 52), testified that the risks he incurred that day were no greater than the risks encountered any time he assisted in making the tug fast to a vessel that would be towed (Druda 785–86), and that he did not perceive any risks or dangers to himself beyond those he ordinarily experienced when he boarded vessels (Druda Tr. 723–24). Despite the plaintiffs' suggestion to the contrary, the bow of the tug was level with the deck of the Ferry each time Druda crossed, and there was no rocking, which allowed him to step between the tug and the Ferry without jumping or climbing. (Druda Tr. 710–12, 724–25; *see also* Def. Ex. 73, FDNY Photo, NYC 10823 (Druda testified that this picture, taken after the *Barberi* was in the slip, accurately reflected the level of the *Dorothy J*'s bow in relation to the *Barberi*'s deck each time he crossed over).) Nor was Druda at risk of injuring himself on debris from the allision when he boarded the *Barberi* because the *Dorothy J* was not adjacent to the damaged portion during any portion of the salvage operation. (Druda Tr. 712, 724–25.)

Moreover, the actual tasks that each crew member completed aboard the *Dorothy J* were not unlike those the crew members might undertake during normal operations. Indeed, Seckers admitted that, emergency conditions aside, all of the tasks he performed during the salvage operation—steering, operating the throttle, conducting necessary radio communication, instructing the crew—are part of his normal and routine duties on the tug. (Seckers Tr. 125.) Likewise, Flecker remained on the tug and assisted in extending, securing, and releasing lines and face wires, which he admitted is exactly what deckhands ordinarily do. (Flecker Tr. 282.)

Even Druda, who was employed as an "engineer," was accustomed to performing the type of deckhand duties he performed during the salvage operation. In addition to engineering duties, Druda frequently contributed services that would ordinarily fall to a "deckhand," particularly when the crew was short a deckhand. (*See* Druda Tr. 719, 731–32; *see also* Def. Ex.

38

9, *Dorothy J* Engine Room Log (Druda's entry for October 15, 2003 includes "Decked on Ferry Emergency").) Indeed, Julian expected Druda to serve the role of a "deckineer," which is a deckhand who has engine duties. (Druda Tr. 784–85 (discussing a letter Julian sent to Druda which read in part, "I felt it necessary to document in writing just what . . . I expect from you as a *deckineer* on one of my vessels" (emphasis added)).) Although Druda had been with Henry Marine for less than a year when the Ferry allision occurred, his deckhand duties had already required him to board vessels that were being towed (Druda Tr. 698), and he had extensive experience making up vessels for towing by putting out tow lines, push gear, and soft lines (Druda Tr. 697). Accordingly, when the *Dorothy J* was short a deckhand on October 15, 2003 (Flecker Tr. 249), it was natural for Druda to fill that void.

Moreover, though perhaps emotionally draining, the labor required during the salvage operation was not exceptionally demanding. Only 20 to 21 minutes elapsed from the time Seckers observed the *Barberi* off course and began alerting the *Dorothy J* crew until the *Barberi*'s safe return to the slip. (*See* Def. Ex. 32, FDNY EMS Report, at 3, 6; Def. Ex. 33, FDNY Fire/Rescue Report, at 3, 5; Def. Ex. 34, FDNY Synopsis of Emergency Response, at 1.) No more than 10 to 11 minutes passed from the time the *Dorothy J* arrived alongside the *Barberi* until the latter moored. During that time, with the possible exception of Druda and Creamer, who are not claimants in this case, the actual labor expended was similar to and no more arduous than that required during ordinary tugboat operations.

## V.

The parties appear to agree that my goal in this analysis is to "reconstruct the salvage contract that would have been negotiated ex ante if a competitive market transaction had been feasible." William M. Landes & Richard A. Posner, *Salvors, Finders, Good Samaritans, and*

*Other Rescuers: An Economic Study of Law and Altruism*, 7 J. Legal Stud. 83, 102 (1978). If this is the case, the contract Henry Marine negotiated with the City appears highly relevant. This contract "clearly encompasses services that have a salving effect," such as "firefighting, aid[ing] stranded ferry vessels as an emergency response vessel, and other authorized work as required." *In re Andrew J. Barberi*, 534 F. Supp. 2d at 379 (referring to Def. Ex. 2, Contract Between Henry Marine & City, § 8, at C-3). As indicated in my previous opinion, these services included the services provided in this case. *See id.* at 381 ("The services, for which salvage is sought here, fit easily within those services contemplated by the clause of the contract obligating Henry Marine to provide 'other authorized work.'"). In entering into that contract, Henry Marine agreed to perform those services at a $239 hourly rate. (Julian Tr. 197, 199–201.) Indeed, the only reason Henry Marine was not obligated to provide the salvage services in the immediate aftermath of the allision was that the City did not call upon it to do so, as required in the contract. *See In re Andrew J. Barberi*, 534 F. Supp. 2d at 381–82.

Nevertheless, it would undermine the "fundamental public policy" underlying salvage awards, which is the "encouragement of seamen to render prompt service in *future* emergencies," *Kimes v. United States*, 207 F.2d 60, 63 (2d Cir. 1953) (emphasis added), if I were to simply award the plaintiffs the raw amount due to them under the terms of a contract which they were not obligated to uphold when they rendered the salvage services. As the *Blackwall* Court explained, "Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a quantum meruit, . . . but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *See Blackwall*, 77 U.S. at 14. To adequately induce salvors to act, "the law must provide for a proper and reasonable salvage award," *Margate Shipping Co. v. M/V JV Orgeron*,

143 F.3d 976, 986 (5th Cir. 1998), and "[t]he award should not be so little as to discourage salvage aid nor so much as to encourage or exaggerate service." Norris, 3A *Benedict on Admiralty*, § 241.

While it seems clear that the crew of the *Dorothy J* acted purely out of altruistic motives and without expectation of an award of salvage, "salvage awards are not based on the altruistic principle of good samaritanism—that virtue is its own inducement and its own reward." *Margate*, 143 F.3d at 987. With the policy justification for salvage awards in mind, namely inducing salvage operations in the future, I find that Henry Marine and the crew aboard the *Dorothy J* on October 15, 2003 are entitled to $75,000, which far exceeds the normal compensation to which Henry Marine would have been entitled under its contract with the DOT and the wages the crew was due from Henry Marine. In fixing this amount, which provides a relatively minimal award, particularly when divided between Henry Marine and each of the crew members, I have also taken into account the admonition that "[i]n setting the price for the salvage service, . . . the court must consider—and consider primarily—the benefit that the service conferred on the recipient." *Margate*, 143 F.3d at 988.

## VI.

Article 15 of the 1989 Salvage Convention specifies that "[t]he apportionment of a [salvage] award between the owner, master and other persons in the service of each salvage vessel shall be determined by the law of the flag of that vessel." "There appears to be no fixed rule [under federal law] with respect to the apportionment of the salvage reward between the owners of the salving vessel and her officers and crew. The distribution in all cases of this kind is a matter resting in the discretion of the court, and is governed largely by the peculiar circumstances of each individual case." *Conekin v. Lockwood*, 231 F. 541, 544 (E.D.S.C. 1916);

*see also Jacobson v. Panama R. Co.*, 266 F. 344, 346–47 (2d Cir. 1920); *Rivers v. Lockwood*, 239 F. 380, 383 (E.D.S.C. 1917).

Although there is no "fixed rule," the owner of a salving vessel "generally receives a greater portion of the total award than its crew." *Waterman S. S. Corp. v. Dean*, 171 F.2d 408, 412 (4th Cir. 1948). Owners are generally allotted larger shares of salvage awards in recognition of the fact that a salving vessel, rather than the efforts of a crew, usually plays the central role in facilitating the success of a salvage operation. As the United States District Court for the Eastern District of South Carolina explained in an 1816 salvage award case:

> In the days of sailing vessels, as the salvage depended more upon the individual efforts of the salving crew than the efficiency of the salving vessel, the portion of the crew was much more favorably regarded, and the larger part of the salvage award was generally apportioned to the officers and crew. [Now, with the steamboat,] it is really the vessel which conduces most to the effectuation of the salvage result . . . . The proportions, therefore, have varied so as to allow a much larger portion to the owner of the vessel.

*Conekin*, 231 F. at 544–45.

Because the salving vessel is generally so important to the success of a salvage operation, salvage awards are designed to induce owners to maintain vessels with sufficient power and equipment to perform salvage services efficiently. *Id.* Vessels that are maintained in proper condition to perform salvage services are "more difficult to procure," and far more valuable to an endangered vessel, than vessels ill-equipped for the task which "would use inefficient attempts" at salvage. *Id.* As such, owners who maintain their vessels in sufficient condition to render salvage services, and whose vessels are able to successfully render salvage services as a result, are rewarded generously. *See id.*

The owner need not take part in, direct, or even know about the salvage operation, to share in the award, although such participation or direction may increase the owner's

proportionate share. *See The Camanche*, 75 U.S. 448, 461, 470, 472–73 (1869). Corporations and other entities that own salvage vessels are treated as individual owners would be for salvage award apportionment purposes. *See id.* at 474. An owner's share generally increases when the salving vessel is of large value, when the salving vessel or owner was exposed to substantial risk in rendering the services, *id.* at 473, when the principle service was performed by the vessel, *see Conekin*, 231 F. at 544–45, or when the owner directed the service, *see Cape Fear Towing & Transp. Co. v. Pearsall*, 90 F. 435, 439 (4th Cir. 1898). In contrast, the share apportioned to the crew generally increases when the risk sustained by the crew was exceptionally high, the salving vessel was not exposed to serious risk or danger, *see Markham v. Simpson*, 22 F. 743, 744 (S.D.N.Y. 1884), or where the efficiency of the salvage vessel itself played a small role in the services rendered relative to the individual efforts of the crew, *see Conekin*, 231 F. at 544–45. Moreover, in cases that do not involve professional salvors, consideration should be given to the fact that the crew took the initiative in coming to the aid of the vessel in distress. *See id.* at 545.

The portion of a salvage award allowed to the salving vessel's crew is frequently divided among them in proportion to their wages. *Id.* at 545. However, a "master upon whom the responsibility of the direction and the determination to make the effort exists is allowed frequently a larger proportionate share," as may be "such members of the crew as may show exceptional effort and merit in their service." *Id*.

In this case, the normal justification for apportioning the owner of a salving vessel the majority of the salvage award does not apply. Henry Marine did not maintain the *Dorothy J* with sufficient power and equipment to perform salvage services on the *Barberi* efficiently. No suitable vessel was available, which is why the *Dorothy J*—a vessel ill-equipped for the task— responded, and made such a small contribution to the *Barberi*'s rescue. Indeed, the policy behind

generously rewarding owners who maintain their vessels in salvage condition is to prevent just that from happening. *See Conekin*, 231 F. at 544–45.

Nor did the *Dorothy J* ultimately play a central role in facilitating the success of the salvage operation. Indeed, the salvage award in this case really acknowledges the effort of the crew to assist the Ferry despite the tug's inadequacy. The crew acted with promptness, energy, and skill during the operation, and exhausted the capacity of the tug in its effort to provide assistance. In particular, Seckers and Druda deserve credit for their service during the operation. While little evidence was presented on the role Captain Creamer played in the salvage operation other than some conflicting evidence relating to his efforts to provide aid to passengers on the *Barberi*, Seckers, as mate, apparently took the lead in directing the operation, and worked quickly to assist the *Barberi* from the moment he sounded the deck whistle to alert the crew of the emergency. Druda, who was officially hired as an engineer, took a uniquely hands-on role in the effort, crossing back and forth between the vessels several times at two different locations. Indeed, Julian acknowledged that Druda was "the biggest hero of the day." (Julian Tr. 224.)

It is unclear whether Julian actually knew about the allision prior to the time the *Barberi* arrived in the slip. Julian testified that she ordered the *Flossie Gellatly* to the allision site as soon as Captain Creamer notified her that the Staten Island Ferry had crashed (Julian Tr. 168–70, 183), but the *Flossie Gellatly* did not depart the mooring until an hour after the *Barberi* arrived safely in the slip (*see* Def. Ex. 18, *Flossie Gellatly* Vessel Log (revealing that the *Flossie Gellatly* departing the mooring at 4:40 PM); Def. Ex. 32, FDNY EMS Report, at 6 (revealing that the *Barberi* arrived in the slip at 3:43 PM)). While Julian need not have known about the operation or participated in directing it for Henry Marine to receive a share of the salvage award, *see Camanche*, 75 U.S. at 461, 470, 472–73, the assistance Julian attempted to provide once she

was informed of the allision was unrelated to the *Dorothy J*'s salvage effort and had no effect on the *Barberi*'s relatively prompt return to the Ferry slip. Consequently, those efforts do not impact the portion of the award to which Henry Marine is entitled.

Accordingly, the award of $75,000 is to be apportioned 1/3 to Henry Marine, and 2/3 amongst the crew. The $50,000 (2/3) apportioned to the crew is to be divided among the crew according to the percentage of the total daily wages each position received,[16] with adjustments for exceptional contributions to the operation. As depicted in Table 1 below, Seckers is to receive an adjustment of ×2, and Druda is to receive an adjustment of ×2.5. Once the $50,000 is divided according to each crew member's percentage of the total adjusted wages, Creamer is entitled to $9,252.44, Seckers is entitled to $16,257.06, Druda is entitled to $19,544.23, and Flecker is entitled to $4,946.26.

Table 1

| Position | *Dorothy J* Crew (10/15/03) | Daily Wage (Total = $1244.25) | Adjst. Value | Adjst. Wage (Total = $2063.78) | % of Total Adjst. Wage | Share of $50,000 | Party Status |
|---|---|---|---|---|---|---|---|
| Captain | Mark Creamer | $381.90 | × 1 | $381.90 | ≈ 18.50% | $9252.44 | Nonparty |
| Mate | Robert Seckers | $335.51 | × 2 | $671.02 | ≈ 32.51% | $16257.06 | Claimant |
| Engineer | Michael Druda | $322.68 | × 2.5 | $806.70 | ≈ 39.09% | $19544.23 | Nonparty |
| Deckhand | Paul Flecker | $204.16 | × 1 | $204.16 | ≈ 9.89% | $4946.26 | Claimant |

This action was brought by Henry Marine on its own behalf and not, as would have been permitted, in its own name on behalf of the crew. *See Castner, Curran & Bullitt v. United States*, 5 F.2d 214, 216–17 (2d Cir. 1925). Nevertheless, there is authority for the proposition that, under

---

[16]     Daily wage rates, which are displayed in Table 1, are taken from the Collective Bargaining Agreement between Henry Marine and Local 33 (*see* Def. Ex. 16, Collective Bargaining Agreement) which were in effect on October 15, 2003. Although Julian claims the Agreement does not precisely reflect the wages of the crew aboard the *Dorothy J* on October 15, 2003 (Julian Tr. 214–15), it was the only evidence supplied to the court regarding wages of the crew.

such circumstances, a court may "intervene [o]n behalf of those wards of the admiralty." *Id.* at 217. One such method of intervention is to direct that the respective shares of those who were not parties to the action be paid into the registry of the court and remain there pending final orders of distribution in proceedings initiated by the respective parties. *See, e.g.*, *Brooks v. The Adirondack*, 2 F. 872, 873–74 (S.D.N.Y. 1880); *The Leipsic*, 5 F. 108, 113–14 (S.D.N.Y. 1880). In this case, however, there is no reason for any special dispensation for Druda and Creamer. Although it is unclear whether the nineteenth and early twentieth century case law that extended salvage claims to absent members of the crew retains any force after the enactment of the statutory period of limitation, *see* 48 U.S.C. § 80107(c), the practice apparently reflected the understanding that seamen are transient and might not be in a position to press their claims, and Creamer and Druda were in no such predicament. Druda testified that he received phone calls from both sides regarding the case, evaluated his options with his counsel, and declined to join the action. (Druda Tr. 760, 762–66.) Indeed, Druda confirmed receiving one phone call in which counsel for Henry Marine informed him that Flecker had joined the action, and that if Druda was interested in asserting a salvage claim, "[this] was [his] opportunity to do so." (Druda Tr. 762.) While the record does not reveal whether Creamer received similar calls from representatives of the parties, he was at least aware that the action was pending, because he signed an affidavit in July 2005 in connection with this case. (*In re The Dorothy J, Robert Seckers, and Paul Flecker*, Docket No. 09-cv-3512, Doc. 4, Ex. 6, Affidavit of Mark Creamer, July 25, 2005.) Creamer was also listed by the plaintiffs as a potential witness on the joint pretrial order (*see In re The Dorothy J, Robert Seckers, and Paul Flecker*, Docket No. 09-cv-3512, Doc. 62, Joint Pretrial Order, Mar. 23, 2010, at 5), and may have been deposed prior to trial.

Under the circumstances, as both parties agree, non-prosecution by Druda and Creamer "inures to the benefit of the salved vessel[]." *Rauch v. Gulf Refining Co.*, 129 F. Supp. 843, 844 (E.D. La. 1955); *see also Blackwall*, 77 U.S. at 12 ("[N]on-prosecution by one set of salvors enures, not to the libellants prosecuting the claim, but to the owners of the property saved."); *Spencer v. The Charles Avery*, 22 F. Cas. 917, 919 (S.D. Ohio 1857) (reducing the total salvage award by the amount to which those salvors who waived their claims would have been entitled); 3A Norris, Benedict on Admiralty § 222.[17] Consequently, the salvage the City of New York is required to pay is reduced by $28,796.67, the amount to which Creamer and Druda would have been entitled had they not relinquished their claims as salvors.

## VII.

The plaintiffs are entitled to prejudgment interest on the salvage award. *See Steelmet, Inc. v. Caribe Towing Corp.*, 842 F.2d 1237, 1243–44 (11th Cir. 1988). Under Article 24 of the 1989 Salvage Convention, "[t]he right of the salvor to interest on any payment due under this Convention shall be determined according to the law of the [country] in which the tribunal seized of the case is situated." Under federal law, district courts have broad discretion in deciding whether to award prejudgment interest. "In federal question cases, the rate of prejudgment interest is [also] committed to the discretion of the district court." *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986); *see also Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 208 (3d Cir. 2004) (explaining that a district judge with federal question jurisdiction has "broad discretion to set a rate of prejudgment interest sufficient to compensate

---

[17]    The foregoing makes it unnecessary to consider whether Druda and Creamer are also barred from receiving their respective shares by 48 U.S.C. § 80107(c), which provides that "[a] civil action to recover remuneration for giving aid or salvage services must be brought within 2 years after the date the aid or salvage services were given."

Plaintiff for the true costs of [the money] damages incurred"); *EEOC v. Erie County*, 751 F.2d 79, 82 (2d Cir. 1984) ("The appropriate rate for prejudgment interest [in a federal question case] is 'essentially [a matter] for the discretion of the trial judge.'" (alteration in original)).

The discretion I have enables and compels me to prescribe a rate that approximates the true costs of damages incurred as a result of any delay in judgment. *See Skretvedt*, 372 F.3d at 208. I do not adopt the prejudgment interest rate designated under N.Y. CPLR § 5004, which is "nine per centum per annum," because that the application of that rate would produce a windfall for the plaintiffs in light of the historically low rates of interest and inflation that have prevailed over much of the relevant period. Indeed, with consumer prices down since late 2008, "monthly Social Security and Supplemental Security Income benefits . . . [did] not automatically increase in 2010," which made it "the first year without an automatic Cost-of-Living Adjustment (COLA) since they went into effect in 1975." *See* Press Release, U.S. Social Security Administration, Prompt Passage of Economic Recovery Act Payment for 2010 Needed: Law Does Not Provide for a Social Security Cost-of-Living Adjustment for 2010 (Oct. 15, 2009), http://www.ssa.gov/pressoffice/pr/2010cola-pr.pdf.

Under these circumstances, combined with the failure of the plaintiffs to brief the issue of the appropriate rate of prejudgment interest, I follow other federal courts in holding that the plaintiffs are entitled to prejudgment interest at the rate prescribed under 28 U.S.C. § 1961 for post-judgment interest. *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (noting that "[t]here is no federal statute that purports to control the rate of prejudgment interest," and discussing 28 U.S.C. 1961 as one source on which district courts often rely in setting the appropriate rate); *see also Norville v. Staten Island Univ. Hosp.*, 112 F. App'x. 92, 95 (2d Cir. 2004) (upholding the district court's award of prejudgment interest at the rate provided in

28 U.S.C. § 1961(a)); *Nelson v. EG & G Energy Measurements Grp., Inc.*, 37 F.3d 1384, 1391 (9th Cir. 1994) ("The interest rate prescribed . . . under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate."); *Sun Ship*, 785 F.2d at 63 ("[B]ecause the rate to be charged is a matter of district court discretion the case must be remanded for a determination of an appropriate rate of interest. In exercising that discretion, however, the court may be guided by the rate set out in 28 U.S.C. § 1961."); *EEOC v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984) ("[T]he matter of prejudgment interest remains essentially one for the discretion of the trial judge. Undoubtedly in the future, district courts may be influenced by the congressional wisdom expressed in the amendment of 28 U.S.C. § 1961(a).").

## CONCLUSION

The Clerk is directed to order a judgment in the amount of $46,203.33 in salvage and prejudgment interest at the rate prescribed under 28 U.S.C. § 1961, to be apportioned between the plaintiffs as described above.

**SO ORDERED.**

Brooklyn, New York
September 11, 2010

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge